# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

FILED

FEB 0 9 2016

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____,DEPUTY

UNITED STATES OF AMERICA,                )
                                         )
                    Plaintiff,           )
                                         )
*ex rel.*                                )
                                         )      Case No. 15-CV-370-L
[UNDER SEAL],                            )
                                         )      **PLAINTIFF-RELATORS'**
                    Plaintiff-Relators.  )      **AMENDED COMPLAINT**
                                         )
v.                                       )
                                         )
[UNDER SEAL],                            )
                                         )
                    Defendants.          )


## FILED IN CAMERA AND UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,                )
                                         )
      Plaintiff,                         )
                                         )
*ex rel.*                                )
                                         )
MARK J. O'CONNOR and SARA F.             )    Case No.  15-CV-510-L
LEIBMAN,                                 )
                                         )    **PLAINTIFF-RELATORS' MOTION**
      Plaintiff-Relators,                )    **NOTICE OF FILING AMENDED**
                                         )    **COMPLAINT**
v.                                       )
                                         )    **Filed Under Seal pursuant to the False**
UNITED STATES CELLULAR                   )    **Claims Act, 31 U.S.C. § 3730(b)(2)**
CORPORATION, USCC WIRELESS               )
INVESTMENT, INC., TELEPHONE              )    **JURY TRIAL DEMANDED**
AND                                      )
DATA SYSTEMS, INC., KING STREET          )
WIRELESS L.P., KING STREET               )
WIRELESS, INC., CARROLL                  )
WIRELESS L.P., CARROLL PCS, INC.,        )
BARAT WIRELESS L.P., BARAT               )
WIRELESS, INC., and ALLISON              )
CRYOR DINARDO,                           )
                                         )
      Defendants.                        )

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................... 3

II.  PARTIES .......................................................................................................... 8

     A.    Plaintiffs ................................................................................................. 8

     B.    Defendants .............................................................................................. 9

           1.    TDS & U.S. Cellular Defendants ................................................ 9

           2.    King Street Defendants .............................................................. 10

           3.    Carroll Defendants ..................................................................... 11

           4.    Barat Defendants ........................................................................ 13

III.  JURISDICTION AND VENUE ...................................................................... 14

IV.  STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO
     DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS ............................. 15

     A.    FCC Spectrum Auctions ...................................................................... 15

     B.    Designated Entities .............................................................................. 19

     C.    The False Claims Act ........................................................................... 27

V.  SPECIFIC ALLEGATIONS OF THE DEFENDANTS' FALSE CLAIMS
    REGARDING KING STREET ....................................................................... 28

     A.    After King Street Won DE Spectrum Licenses, It Falsely Asserted to the
         FCC Several Times That It Was A Designated Entity ......................... 28

     B.    King Street Is and Was A Sham Used by U.S. Cellular ...................... 30

           1.    U.S. Cellular Incorporated King Street's 700 MHz licenses Into Its
                Own Network and Used Those Licenses To Provide Service to Its
                Own U.S. Cellular Customers .................................................... 31

           2.    U.S. Cellular – Not King Street – Built and Owns The Network
                That Uses King Street's 700 MHz Licenses ............................. 36

           3.    U.S. Cellular – Not King Street – Controls the Nature, Terms, and
                Prices of Wireless Services Offered to Its Subscribers Using King
                Street's 700 MHz Licenses ........................................................ 43

4.    U.S. Cellular Financed and Operated the Networks Using King Street's Licensed Spectrum........................................................................ 47

    (a)    The King Street-U.S. Cellular Agreements Disclosed to the FCC Misrepresent Their Relationship and Prevent King Street From Independently Financing Its Own 4G LTE Network........................................................................ 50

        i.    The Limited Partnership Agreement................................. 51

        ii.    The Investment Agreement............................................... 51

        iii.    The Loan Agreement ....................................................... 52

        iv.    The Loan and Security Agreement .................................. 52

        v.    The Pledge Agreement From King Street Wireless.......... 53

        vi.    The Pledge Agreement From Shareholders of King Street Wireless ................................................................. 53

        vii.    The Management Agreement............................................ 53

    (b)    The King Street-U.S. Cellular Loan and Loan and Security Agreements Failed To Provide King Street With Enough Funds To Build Out Even a Single 700 MHz Market, Let Alone 152 Markets....................... 55

    (c)    U.S. Cellular Took On All The Risk Of, and Reaped All the Rewards From, Operation of the King Street Licenses and Networks ..................................................... 58

    (d)    King Street Had Neither the Necessary Employees nor Experience to Oversee the Construction and Operation of Wireless Networks in 152 Markets ............. 61

  (e)    U.S. Cellular and DiNardo Have Partnered for Sixteen Years To Obtain DE Licenses for U.S. Cellular's Use................ 63

C.    U.S. Cellular And King Street Lied to the FCC To Avoid Discovery Of Their Relationship and Having To Repay More Than $100 Million in Bidding Credits ................................................................................. 65

VI.    SPECIFIC ALLEGATIONS OF THE DEFENDANTS' FALSE CLAIMS REGARDING CARROLL AND BARAT ........................................................ 70

VII.    COUNTS ..................................................................................................... 84

VIII.    PRAYER FOR RELIEF .............................................................................. 88

# I.   INTRODUCTION

1.      This is a *qui tam* action brought by the United States of America, by and through

Plaintiff-Relators Mark O'Connor ("Relator O'Connor") and Sara Leibman ("Relator Leibman")

(collectively "Relators"), against United States Cellular Corporation, USCC Wireless

Investment, Inc., Telephone and Data Systems, Inc. ("TDS") (collectively "U.S. Cellular"), King

Street Wireless L.P., King Street Wireless, Inc. (collectively, "King Street"), Carroll Wireless

L.P., Carroll PCS, Inc., (collectively "Carroll"), Barat Wireless L.P., Barat Wireless, Inc.

(collectively "Barat"), and Allison Cryor DiNardo (collectively "Defendants") to redress

violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733.

2.      The past thirty years have seen revolutionary advances in wireless

communications, culminating in devices like the iPhone and the Surface tablet, which can send

and receive large amounts of data wirelessly through the "electromagnetic radio frequency

("RF") spectrum." Congress charged the Federal Communications Commission ("FCC") with

licensing commercial wireless carriers to use the RF spectrum and, in 1993, Congress gave the

FCC authority to assign RF licenses via auctions.  In doing so, Congress directed the FCC to

ensure that legitimate small businesses are able to bid for licenses at auction and build networks

to provide wireless services competitive with the offerings of large, established

telecommunications companies.  In furtherance of this goal, the FCC provides legitimate small

businesses (deemed "designated entities" or "DEs") with auction "bid credits" worth up to 25

percent of the spectrum license cost owed to the Federal Government.  At the same time, and

pursuant to Congress' directive, the FCC adopted a number of safeguards, including a five-year

post-licensing holding period, to prevent large companies from using DEs as "fronts" to obtain

bidding discounts.

3.     In order to wrongfully and/or fraudulently avail itself of these credits, U.S. Cellular, a company with billions of dollars in yearly revenue, created and used a sham "very small" business, King Street to purchase 152 licenses at a 2008 FCC spectrum auction. And, since the time the FCC granted those licenses in 2009 to King Street, U.S. Cellular has continued the DE charade in order to avoid paying back more than $100 million in bidding credits pursuant to the FCC's unjust enrichment rules.

4.     In 2008, U.S. Cellular was the sixth-largest wireless company in the United States and it is currently the fifth largest wireless company, serving over 4.7 million customers. During this period, however, its revenues have not risen appreciably as its number of customers failed to grow as fast as the major wireless companies - AT&T, Verizon, Sprint and T-Mobile. Despite its size, U.S. Cellular's current market value is still at least nine times less than T-Mobile's, the fourth largest wireless company in the U.S. To reduce its spectrum acquisition expenditures – a major cost of providing wireless service – and thereby raise its profit margins (or at least maintain them), U.S. Cellular and its parent TDS use sham small businesses – including Defendants King Street, Carroll, and Barat formed in partnership with Defendant DiNardo – to obtain discounted spectrum licenses from the FCC. Since 2002, U.S. Cellular has participated in FCC auctions only through entities associated with Defendant DiNardo.

5.     In 2008, King Street – as a front for U.S. Cellular – was the high bidder on 152 licenses for 700 MHz spectrum in the FCC's Auction No. 73, with cumulative gross bids of $400.6 million, for which it paid a net total of $300.5 million to the Federal Treasury. U.S. Cellular/King Street obtained "very small business" bid credits of $100.2 million, capturing substantially all of the bid credits in that auction.

6.     The FCC's rules specifically preclude entities other than legitimate small and very small businesses from obtaining auction bidding credits.  To maintain its status as a small business, FCC Rules provided for all periods relevant for this complaint that a DE cannot be "affiliated" or have an "attributable material relationship" with a larger company for a five-year period following the award of the license, nor can the larger company have a "controlling interest" in the DE for five years unless the DE first makes the appropriate unjust enrichment payment to the Federal Treasury when it becomes no longer qualified to be a small business.  A DE licensee also must seek prior FCC consent for any "reportable event" that may cause it to lose DE eligibility, including but not limited to a spectrum lease "or any other type of spectrum use agreement."  The DE is required to file annual FCC Designated Entity Reports ("DE Annual Reports") attesting that it continues to qualify as a very small business along with a summary of all agreements and arrangements, including proposed agreements and arrangements, that might impact its qualifications, and that it has entered into no other contracts or other arrangements relevant to its very small business status.  In addition, FCC Rules require licensees of certain wireless services – in this case, King Street and Carroll (but not Barat) – to build out their wireless networks using the licensed spectrum, typically within four or five years, and file detailed construction notices for each market with the FCC within that time frame.

7.     To avoid relinquishing any portion of the $100.2 million in bidding credits during the five-year "unjust enrichment" period – from December 2009 through December 2014 – U.S. Cellular and King Street perpetuated their wrongdoing by continuing to hold out King Street as a legitimate very small business in the five years after issuance of the licenses.  In furtherance of their wrongdoing and in violation of the FCA, Defendants made numerous false representations in the DE Annual Reports filed with the FCC.

8.     U.S. Cellular provided all of the funds necessary for King Street to pay the FCC for the 152 licenses, and then U.S. Cellular (not King Street) paid for and built out the networks in the 152 markets while incorporating the King Street licenses into its own network in order to provide broadband wireless services ("4G LTE") to its *own* U.S. Cellular customers.

9.     Instead of King Street providing facilities-based wireless service to the public, U.S. Cellular simply *took* the King Street spectrum, combined it with its own existing or subsequently-purchased licenses, and put up U.S. Cellular-owned towers, antennas, and other facilities supporting the combined 700 MHz frequency blocks. Then U.S. Cellular offered high-speed 4G LTE services over those frequencies to its own customers. King Street's role in the provision of wireless services was limited to capturing the $100 million bid discount for U.S. Cellular and posing as a "very small business" licensee throughout the five-year unjust enrichment period.

10.     In sum, Defendants' conduct was perpetuated deliberately over several years through numerous representations in the DE Annual Reports to the United States Government, which either failed to disclose the true extent of relationships between the Defendants and/or affirmatively misrepresented those relationships. During the post-auction period, the bond between U.S. Cellular and King Street grew even stronger. Defendants made, or caused to be made, false statements to the FCC in DE Annual Reports – which are specifically intended to alert the government to any changes in a DE's status and the need for unjust enrichment payments – when Carroll, Barat and King Street stated that it had "not entered into any agreements nor arrangements (including proposed agreements and arrangements) that relate to Filer's eligibility for bidding credits for any license covered by this annual report."

11.     King Street and U.S. Cellular also made a number of false statements in their Management Agreement, a summary of which was submitted to the FCC with each of King Street's DE Annual Reports. Those statements – including claims that King Street retains *de facto* authority and ultimate control over the determination and implementation of policy and business strategy of the networks and services using King Street's licensed spectrum, that King Street is responsible for the payment of all financial obligations and operating expenses, and that King Street enjoys the profits and bears the risk of loss from the operation of the King Street systems – falsely represent the actual relationship between U.S. Cellular and King Street. Indeed, given that each of these statements goes directly to the factors the FCC uses to determine if an entity has an affiliation or a controlling interest in a DE, the Defendants included them in the Management Agreement for the purpose of giving the FCC false comfort that Defendants understood, and were complying with, the DE rules. The actual relationship demonstrates that U.S. Cellular has a "controlling interest" in King Street under FCC rules regarding operational managers because U.S. Cellular determined the nature, types and/or prices of the wireless services offered using the King Street spectrum, and the prices and terms upon which such services are offered.

12.     As King Street was, and continues to be today, a sham entity created by U.S. Cellular solely for the purpose of obtaining, and then retaining, spectrum auction discounts meant for "very small businesses," relief under the False Claims Act is merited.

13.     As described in Part 6, below, King Street is not U.S. Cellular's only sham "very small business" FCC licensee. In 2005 and 2008, U.S. Cellular used Carroll and Barat, with DiNardo as the bogus "controlling" owner, to obtain FCC licenses at auction with very small business discounts. To obtain Personal Communications Services ("PCS") licenses in the 2005

FCC's Auction 58, U.S. Cellular devised and funded Carroll, which was the high bidder on six

licenses with a $22.1 million bid credit and the high bidder on an additional ten "closed" licenses

reserved exclusively for small entrepreneurs (not multi-billion dollar companies like U.S.

Cellular). In the FCC's Auction 66 of Advanced Wireless Services ("AWS") licenses in 2006,

Defendant DiNardo again acted as a front for U.S. Cellular, using the name Barat Wireless, L.P.,

to win 17 licenses with an auction credit of $42.4 million. Like King Street, both Carroll and

Barat made false statements to the FCC in their DE Annual Reports throughout their respective

unjust enrichment periods to avoid paying the Federal Government tens of millions of dollars

owed under federal law.

## II.   PARTIES

### A.   PLAINTIFFS

14.    Plaintiff-Relator Mark J. O'Connor is an attorney specializing in communications

law. After graduating from UCLA Law School in 1992, he practiced communications law at

Fleischman & Walsh for a year before moving to Piper & Marbury (now part of DLA Piper) to

practice communications law from 1993 through 1999. From 1999 through 2012, he was a name

partner at the communications law firm of Lampert, O'Connor & Johnston, LLC.

15.    Plaintiff-Relator Sara F. Leibman is an attorney specializing in communications

law and, through Sara Leibman Consulting, she works for telecommunications companies, law

firms, and subject matter experts (e.g., economists, technologists). In 1987, Ms. Leibman

graduated from Georgetown University Law School. Previously, she was the Chief

Counsel/Director at T-Mobile USA and a Member of the communications practice at Mintz,

Levin, Cohn, Ferris, Glovsky and Popeo, PC in Washington DC. From 1991 through 1995, she

worked as an attorney at the FCC, one year in the Common Carrier Bureau, and then the

following three years as Special Counsel in the FCC's Office of General Counsel where she, *inter alia*, worked on the DE and other FCC spectrum auction regulations and adjudications.

## B. DEFENDANTS

### 1. TDS & U.S. Cellular Defendants

16.    *Telephone and Data Systems Inc.* is a publicly-held Delaware corporation with its principal place of business in Chicago, Illinois.  TDS owns approximately 80 percent of United States Cellular Corporation, which in turn through its wholly owned subsidiary, USCC Wireless Investment, Inc. ("USCCWI"), owns 90 percent of King Street, Aquinas Wireless L.P., and Advantage Spectrum L.P.  Through its TDS Telecom subsidiaries and through United States Cellular Corporation, TDS serves roughly 7 million wireline and wireless customers in 36 states. TDS has been in the telecommunications service business since 1969 and for the last several years has had annual revenues of just over $5 billion.  TDS and U.S. Cellular are controlled by the Carlson Family Trust.

17.    *United States Cellular Corporation* is a publicly-held Delaware corporation with its principal place of business in Chicago, Illinois.  United States Cellular Corporation is currently the fifth largest commercial mobile phone operator in the United States, serving 4.7 million customers in 426 markets in 26 states.  TDS created United States Cellular Corporation in 1983 as a subsidiary of TDS.  United States Cellular Corporation, directly or through subsidiaries, holds hundreds of FCC commercial wireless licenses by which it offers mobile phone and data services.  From 2005 through 2014, United States Cellular Corporation reported annual revenues ranging from 3.0 billion to 4.1 billion.  United States Cellular Corporation wholly owns and controls Defendant USCCWI, which was incorporated on November 1, 2000 as a Delaware corporation.

## 2.    King Street Defendants

18.    *King Street Wireless L.P.* ("King Street Wireless" or "King Street") is the FCC licensee and the vehicle that U.S. Cellular used to participate in Auction No. 73 in order to obtain 152 spectrum licenses in the 700 MHz band. King Street Wireless L.P. is organized as a limited partnership under the laws of Delaware, formed on or about November 27, 2007, with its business address listed as 105 N. Washington Street, Suite 301, Alexandria, Virginia 22314. King Street has one general partner, King Street Wireless, Inc., and one limited partner, USCCWI. On or about December 21, 2007, King Street Wireless, Inc. and USCCWI executed both the King Street Wireless Limited Partnership Agreement ("Auction 73 LP Agreement") and an Investment Agreement ("Auction 73 Investment Agreement"), and King Street Wireless L.P., King Street Wireless, Inc., and USCCWI executed a Bidding Protocol Agreement ("Auction 73 Bidding Agreement"). On January 4, 2008, King Street filed its Short-Form application to participate in FCC Auction 73.

19.    *King Street Wireless, Inc.* ("King Street Inc.") is the sole general partner of King Street Wireless L.P. King Street Inc. is a Delaware corporation with its business address listed as 105 North Washington Street, Suite 301, Alexandria, Virginia 22314.

20.    King Street Inc.'s sole shareholder is Defendant Allison Cryor DiNardo ("DiNardo"), who resides in Alexandria, VA.

21.    Below is a chart that depicts the Defendants' equity relationships with King Street:



FCC Auction 73 Licenses

### 3.  Carroll Defendants

22.     Defendant *Carroll Wireless L.P.* ("Carroll" or "Carroll Wireless") was the

vehicle that U.S. Cellular and other Defendants used to participate in FCC Auction 58.  In 2012,

the FCC granted certain of the Defendants' application to transfer control of Carroll Wireless

from Carroll PCS, Inc. to U.S. Cellular.

23.     Carroll Wireless was organized as a limited partnership under the laws of

Delaware and its business address was listed as 100 N. Washington Street, Suite 301,

Alexandria, Virginia 22314.  Carroll Wireless was registered as a Limited Partnership in

11

Delaware on November 19, 2004, eleven days before the November 30, 2004, deadline to file an application to participate (referred to as the "Short-Form" or "Form 175" application) in Auction 58.

24.     Carroll Wireless had one general partner, Defendant *Carroll PCS, Inc.*, and one limited partner, Defendant USCCWI. Defendant Carroll PCS, Inc.'s sole shareholder was Defendant Allison DiNardo.  On November 30, 2004, Carroll PCS, Inc. and USCCWI executed both the Carroll PCS Limited Partnership Agreement ("Auction 58 LP Agreement") and an Investment Agreement ("Auction 58 Investment Agreement"), and Carroll Wireless L.P., Carroll PCS, Inc., and USCCWI executed a Bidding Protocol Agreement ("Auction 58 Bidding Agreement").  On the same day, Carroll Wireless L.P. filed its Short-Form application to participate in FCC Auction 58.  In the seven years from the time Carroll obtained the FCC licenses until it was acquired by U.S. Cellular in 2012 for an "immaterial amount," Carroll offered no wireless services, had no website or other marketing/advertising services; according to U.S. Cellular, Carroll was merely developing its business plan during that period. *See* United States Cellular Corporation Annual Report to Shareholders for the Year Ended December 31, 2011 ("U.S. Cellular 2011 Annual Report"), page 53 ("These VIEs are in the process of developing long-term business plans. These entities were formed to participate in FCC auctions of wireless spectrum and to fund, establish, and provide wireless service with respect to any FCC licenses won in the auctions.").

25.     Prior to the "sale" to U.S. Cellular, Defendant Carroll PCS, Inc. was the sole general partner of Defendant Carroll Wireless L.P.  Carroll PCS, Inc. was a Delaware corporation and its principal place of business address was listed as 310 West Myrtle Street, Alexandria, Virginia 22301, the same address as the personal residence of Defendant DiNardo.

12

Carroll PCS, Inc.'s sole shareholder was Defendant DiNardo. Carroll PCS, Inc. was registered with the state of Delaware on November 19, 2004, eleven days before the Short-Form application deadline for Auction 58.

### 4. Barat Defendants

26.     Defendant *Barat Wireless L.P.* ("Barat" or "Barat Wireless") was the vehicle that U.S. Cellular and other Defendants used to participate in FCC Auction 66. In 2012, the FCC granted certain of the Defendants' application to transfer control of Barat Wireless from Barat Wireless, Inc. to U.S. Cellular.

27.     Barat Wireless was organized as a limited partnership under the laws of Delaware and its business address was listed as 105 North Pitt Street, Suite 206, Alexandria, Virginia 22314. Barat Wireless was registered in Delaware on May 5, 2006, forty-five days before the Short-Form application deadline for FCC Auction 66.

28.     Barat Wireless L.P. had one general partner, Defendant *Barat Wireless, Inc.*, and one limited partner, Defendant USCCWI. Barat filed a Short-Form application for Auction 66 on June 19, 2006. Twenty days later, on July 11, 2006, Barat Wireless, Inc. and USCCWI executed the Limited Partnership Agreement of Barat Wireless L.P. ("Auction 66 LP Agreement") and a Bidding Protocol Agreement ("Auction 66 Bidding Agreement"), and Barat Wireless, Inc., USCCWI, and U.S. Cellular executed an Investment Agreement ("Auction 66 Investment Agreement"). In the five years from the time that Barat obtained the FCC licenses until it was acquired by U.S. Cellular in 2012 for an "immaterial amount," Barat offered no wireless services, had no website or other marketing/advertising services; according to U.S. Cellular, Barat was merely developing its business plan during that period. *See* U.S. Cellular 2011 Annual Report, page 53 ("These VIEs are in the process of developing long-term business plans. These entities were formed to participate in FCC auctions of wireless spectrum and to

13

fund, establish, and provide wireless service with respect to any FCC licenses won in the auctions.").

29.     Prior to the "sale" to U.S. Cellular, Defendant Barat Wireless, Inc. was the sole general partner of Defendant Barat Wireless L.P. Barat Wireless, Inc. was a Delaware corporation whose business address was listed as 310 West Myrtle Street, Alexandria, Virginia 22301, the same address as the personal residence of Defendant DiNardo. Barat Wireless, Inc.'s sole shareholder was Defendant DiNardo. Barat Wireless, Inc. was registered with the state of Delaware on May 5, 2006. Aside from its activity in Auction 66, Barat Wireless, Inc. was engaged in no other lines of business, and has no operations, assets, or revenues.

## III.    JURISDICTION AND VENUE

30.     Relators bring this action on behalf of themselves and the United States for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733. This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

31.     This Court has personal jurisdiction over Defendants, pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District, and because Defendants performed acts in furtherance of their conspiracy in this District. In addition, the acts prohibited by 31 U.S.C. § 3729 occurred in this District. 31 U.S.C. § 3732(a).

32.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

33.     Relators' claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government is already a party, or in a congressional, Government Accountability Office, or

other Federal report, hearing, audit, or investigation, or from the news media, as enumerated in 31 U.S.C. § 3730(e)(4)(A).[1]

34.    To the extent that there has been a public disclosure unknown to the Relators, the Relators are the "original source" under 31 U.S.C. § 3730(e)(4)(B).[2] The Relators have independent material knowledge of the information on which the allegations are based and have voluntarily provided the information to the Government before filing this *qui tam* action based on that information. *Id.*

## IV.    STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

### A.    FCC Spectrum Auctions

35.    The Federal Communications Act of 1934, as amended by Congress several times and as codified in Title 47 of the U.S. Code, 47 U.S.C. § 101, *et seq.*, sets out the requirements and the authority by which the Federal Communications Commission ("FCC") regulates interstate communications by radio, television, wire, satellite and cable in the United States. The Communications Act establishes that the radio spectrum (a subset of which is used for wireless communications – including use by wireless carriers to provide mobile services – which is often called "spectrum" or "the airwaves") is owned by and governed for the people of the United States. The Communications Act prohibits all private ownership of spectrum, but permits private and public organizations to obtain licenses for the exclusive use of portions of the spectrum for several years so long as that use is consistent with the "public interest, convenience and necessity." 47 U.S.C. § 307. Consistent with the Communications Act, the FCC allocates a

---

[1] To the extent that conduct alleged in this Complaint occurred prior to March 23, 2010, the prior versions of the False Claims Act are applicable (*i.e.*, 31 U.S.C. § 3730(e), as amended, October 27, 1986, and May 20, 2009).

[2] *Id.*

subset of the radio frequencies for commercial purposes. Subject to FCC regulation, several companies offer commercial wireless services to the public today, including AT&T, Verizon Wireless, T-Mobile, and Defendant U.S. Cellular.

36.     Over the last thirty years, there has been a revolution in mobile wireless communications as cellphones, smartphones, tablets and other wireless devices have grown in popularity and have become an integral part of American life for both voice and data communications. As the FCC observed in its 2014 CMRS Competition Report to Congress:

> Competition in mobile wireless services is a cornerstone of the Commission's mission and essential for driving innovation, investment, and consumer benefits. In recent years, mobile wireless services have gone from a luxury to a convenience to an absolutely central part of Americans' daily lives. Increasing numbers of users now have multiple devices connected to mobile networks. Handsets are no longer used just for voice communication, email, social networking, and web browsing, but increasingly as hubs for entertainment, mobile commerce, and to connect other personal devices such as smart watches and fitness monitors. These developments have helped make mobile wireless one of the most important sectors in the national economy.[3]

37.     Anticipating this increasing need for spectrum for wireless communications, Congress amended the Communications Act in 1993 to give the FCC the authority to award commercial spectrum licenses "through a system of competitive bidding," *i.e.*, by auction. 47 U.S.C. § 309(j)(1). In doing so, Congress directed the FCC to design the rules and procedures of the auctions to balance three national objectives. *First*, the auctions are to be a means to best serve consumers by allocating spectrum efficiently and rapidly to wireless providers – the premise being that the businesses placing the highest value on the spectrum will win licenses at auction among other competing businesses because the winners anticipate a superior commercial strategy. *Second*, because the spectrum belongs to the American people, Congress required the auctions to "recover[] for the public a portion of the value of the public spectrum resource made

---

[3] *Seventeenth CMRS Competition Report*, WT Docket No. 13-135, DA 14-1862, ¶ 1 (Dec. 18, 2014).

available for commercial use and avoid[] unjust enrichment through the methods employed to award uses of that resource." 47 U.S.C. § 309(j)(3)(C). *Finally*, Congress required the FCC to design auction rules that would enable legitimate small businesses to obtain licenses when bidding against much larger incumbent providers, both to encourage the growth of small businesses and because small businesses are likely to offer innovative and different wireless services to consumers that are not offered by the large incumbent providers. 47 U.S.C. § 309(j)(3)(B) (FCC is directed to adopt auction rules to "ensur[e] that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses ...", which are commonly referred to as "designated entities").

38.     The FCC issues licenses (typically for ten years and usually renewable for additional years) to commercial companies, including AT&T, Verizon Wireless, and U.S. Cellular, for the exclusive privilege of offering wireless services, such as mobile voice and broadband Internet access, to the American public. The American public owns the spectrum, but Congress delegated to the FCC the authority to regulate its use and to issue licenses to commercial entities.

39.     The FCC begins the licensed spectrum allocation process by identifying new frequency bands of RF spectrum that are considered suitable for future commercial use. For example, in the early 1990s, the FCC determined that certain frequency blocks at and around 1.9 gigahertz (GHz) of the electromagnetic spectrum should be allocated specifically for broadband personal communications service (or broadband PCS) commercial mobile operations. (In the wireless context, "Hertz" means "one cycle per second" of radiation – by analogy, a clock might also be said to tick at 1 Hertz.) The FCC then establishes sub-blocks within the larger spectrum

blocks that are designed for specific licenses. For example, the 700 MHz spectrum in the FCC's Auction No. 73 had five available licenses – Block A through Block E – in each geographic market, defined by the FCC and U.S. Department of Commerce as either Economic Areas ("BEAs") or Cellular Market Areas ("CMAs"). At the same time that the spectrum allocation decisions are made, the FCC adopts specific service, technical, construction, and reporting requirements by which each licensee in that service must comply. All commercial mobile radio service ("CMRS") providers, for example, are subject to the FCC's Part 24 Rules, and all 700 MHz licensees must also comply with a subsection of the FCC's Part 27 rules. Once the FCC's service and technical rules are established, the FCC then prepares for and conducts multi-round auctions for the spectrum licenses in which many CMRS providers, including "very small businesses," participate to win licenses.

40.     Prices for licenses in an FCC auction reflect the value companies participating in the auction place on the exclusive rights to use that spectrum in particular markets, including the propagation characteristics of the frequencies and the carrier's need for additional spectrum capacity to meet customer demand in a given market. For example, prices for licenses in the 700 MHz auction – Auction 73 – were relatively high compared with prior auctions partly because 700 MHz is considered "low-band" spectrum with excellent propagation characteristics that allow the operator's signal to easily penetrate walls, trees, and other obstructions. Similarly, the price for spectrum in an urban geographic region such as New York City will likely be much higher than the price for the same spectrum in less densely populated markets such as Boise, Idaho.

41.     After it is declared by the FCC to be the "provisionally winning bidder" at the close of the auction, the bidder is entitled to file a non-competing license application (sometimes

referred to as a Long Form application). This licensing process is separate from the auction

process because the FCC has a separate statutory obligation to issue licenses only if it determines

that doing so would be in the "public interest, convenience and necessity." 47 U.S.C. § 309(a).

During the Long Form application review process, other auction bidders and parties-in-interest

have the right to file a Petition to Deny the Long Form application and often raise arguments that

the FCC should not issue the license, or should condition the license grant, for various legal and

policy reasons.

### B.   DESIGNATED ENTITIES

42.     To implement its small business objectives, Congress directed the FCC to design

auction rules to encourage and enable small businesses to obtain licenses through the auction

process. 472 U.S.C. § 309(j)(4)(D) (FCC rules shall favor small businesses in spectrum auctions

through "the use of tax certificates, bidding preferences, and other procedures"). Congress,

however, required the FCC to balance this objective with the need to "prevent unjust enrichment

as a result of the methods employed to issue licenses...." 47 U.S.C. § 309(j)(4)(E). The FCC,

likewise, has emphasized repeatedly that "the integrity of the small business benefit program

depends on ensuring that only entities eligible for benefits receive them." *Updating Part 1*

*Competitive Bidding Rules*, Notice of Proposed Rulemaking, 29 FCC Rcd 12426, ¶ 42 (2014);

*Updating Part 1 Competitive Bidding Rules*, Report and Order, 30 FCC Rcd 7493, ¶ 119 (2015)

("*Part 1 Update Order*") (Section 309(j) of the Communications Act gives the FCC "the

responsibility and the discretion to provide opportunities for small businesses while preventing

the unjust enrichment of ineligible entities.").

43.     To facilitate the successful participation of DEs in its auctions, the FCC provides

auction bidding credits, which discount the payments DEs are required to make the Federal

Treasury for licenses they win in an amount measured as a percentage of their gross winning

bids. 47 C.F.R. § 1.2110(f)(2)(i)-(iii). For example, a company that meets the DE "very small business" criteria qualifies for a 25 percent bidding credit; a company that meets the DE "small business" criteria qualifies for a 20 percent bidding credit. Thus, if the "very small business" DE makes a winning auction bid of $500,000 for a license, it will be required to pay only $375,000 to obtain that license.

44.     To qualify for bidding credits, the FCC requires every DE to certify in writing that its annual gross revenues together with the annual gross revenues of all of the DE's affiliates, its controlling interests, and the affiliates of its controlling interests fall below certain annual revenue caps defined by FCC rules for each auction. 47 C.F.R. § 1.2110(b). Once the FCC issues the license, the DE licensee is then required in its DE Annual Report to disclose to the FCC all agreements, arrangements, proposed agreements, and proposed arrangements that may affect the DE's current status as a "very small business." 47 C.F.R. § 1.2110(n) ("Each designated entity licensee must file with the Commission an annual report within five business days before the anniversary date of the designated entity's license grant. The annual report shall include, at a minimum, a list and summaries of all agreements and arrangements (including proposed agreements and arrangements) that relate to eligibility for designated entity benefits. In addition to a summary of each agreement or arrangement, this list must include the parties (including affiliates, controlling interests, and affiliates of controlling interests) to each agreement or arrangement, as well as the dates on which the parties entered into each agreement or arrangement.").

45.     To further prevent unjust enrichment, FCC rules require the DE to seek prior Commission approval for all "reportable eligibility events," including "[a]ny spectrum lease … or any other type of spectrum use agreement with one entity or on a cumulative basis that might

cause a licensee to lose eligibility for ... a bidding credit" or "[a]ny other event that would lead to a change in the eligibility of a licensee for designated entity benefits." 47 C.F.R. § 1.2114(a).

46.     The FCC relies upon all licensees, especially DEs, to be truthful when dealing with the agency. *RKO General, Inc. v. FCC*, 670 F.2d 215, 232 (D.C. Cir. 1981) (the FCC "must rely heavily on the completeness and accuracy of the submissions made to it, and its applicants in turn have an affirmative duty to inform the Commission of the facts it needs in order to fulfill its statutory mandate"). The FCC is required to review tens of thousands of applications and license-related filings every year from thousands of licensees and the staff cannot independently investigate and corroborate the truthfulness, completeness, candor, and accuracy of the statements made by each of its licensees. The FCC's regulations, therefore, prohibit any person or entity from providing "material factual information that is incorrect or intentionally omit[ing] material information that is necessary to prevent any material factual statement that is made from being incorrect or misleading...." 47 C.F.R. § 1.17(a)(1). *See also* 47 C.F.R. § 1.65(a) ("[e]ach applicant is responsible for the continuing accuracy and completeness of information furnished in a pending application or in Commission proceedings involving a pending application"); *Vermont Telephone Company*, 29 FCC Rcd. 16052, ¶ 12 (2014) (holding that "[f]ull and accurate information concerning applicable gross revenues [of a DE] is necessary to meet our statutory obligation 'to prevent unjust enrichment as a result of the method employed to issue licenses' ... The Commission has a strong interest in ensuring that our auctions are fair to all participants and that only bidders that qualify for a bidding credit are able to bid with such a preference, and we rely on auction applicants to make complete, truthful and accurate disclosures in order to

properly assess the merits of an applicant's claim of entitlement to a bidding credit") (citing 47 U.S.C. § 309(j)(4)(E)).[4]

47. After conducting several auctions in the late 1990s and early 2000s, it became apparent that some putative DEs were "put[ting] themselves forward as small companies in order to qualify for auction discounts," even though they had entered into agreements to lease their prospective spectrum rights to larger firms that were not entitled to such benefits. *See Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures*, 21 FCC Rcd. 1753, 1771 (2006) ("*DE Further Notice*") (Statement of FCC Commissioner Copps). Similarly, other DEs had acquired licenses "not for the legitimate objective of developing or offering spectrum services," but rather "as investments to be later sold for profit in the after-market." *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 321-22 (S.D.N.Y. 2004) (internal quotation marks and brackets omitted).

48. Because of these concerns, the FCC proposed changes in 2006 to its DE regulations. During the rule-making process, the U.S. Department of Justice filed a statement asserting that in its "extensive experience reviewing DE's relationships with large wireless carriers in its numerous wireless merger investigations, it has often encountered DEs that are not independent of large enterprises." Ex Parte Submission of the Department of Justice,

---

[4] *Application of Fox Television Stations, Inc.*, Memorandum Opinion and Order, 10 FCC Rcd 8452, ¶ 59 (1995) ("[a] licensee's duty of candor is critical given the FCC's many duties.... There is thus no question that an applicant's candor is an issue of the utmost importance to us. Lack of candor takes two basic forms: (1) misrepresentation, which involves false statements of fact; and (2) failure to disclose, which involves concealment, evasion, or other failures to be fully informative."). A licensee's failure to be truthful with the FCC and not disclose controlling interests or affiliates is a well-settled basis for the FCC to revoke its license. 47 U.S.C. § 312(a)(2); *Marc Sobel*, Decision, 17 FCC Rcd. 1872 (2002) (revoking certain licenses based on false statements to the FCC and an unauthorized *de facto* transfer of control); *Terry Keith Hammond*, Order to Show Cause, Notice of Opportunity for Hearing, and Hearing Designation Order, 21 FCC Rcd. 10267 (2006) (ordering licensee to show cause why its license should not be revoked for, *inter alia*, misrepresentations and lack of candor violations).

*Implementation of the Commercial Spectrum Enhancement Act and the Modernization of the Commission's Competitive Bidding Rules and Procedures*, March 17, 2006 (publically available at http://www.justice.gov/atr/public/comments/215145.htm). As a result, the FCC added new requirements to its DE-related eligibility restrictions, most notably for this case, the "attributable material relationship" rule described below.

49.     Thus, under the DE rules in effect during the relevant time period for this case, the FCC calculated a DE's average gross revenues for the previous three years – which are used in determining if an entity is a DE – by aggregating:

> a) the DE's own gross revenues;
>
> b) the revenues of the DE's "affiliates";
>
> c) the revenues of the DE's "controlling interests" (those entities that have *de jure* or *de facto* control over the applicant);
>
> d) the revenues of the affiliates of DE's controlling interests; and
>
> e) the revenues of the entities with which the DE has an "attributable material relationship."

47 C.F.R. § 1.2110(b)(1). Further, the DE licensee must demonstrate that the qualifying person or entity asserted to be in *de facto* control actually "plays an integral role in management decisions" of the wireless services that are offered using the licenses. 47 C.F.R. § 1.2110(c)(2)(C).

50.     FCC regulations define an "affiliate" of a DE as a person or entity that:

> a) directly or indirectly controls or has the power to control the applicant;
>
> b) is directly or indirectly controlled by the applicant;

c) is directly or indirectly controlled by a third party or parties that also controls

or has the power to control the applicant; or

d) has an "identity of interest" with the applicant.

47 C.F.R. § 1.2110(c)(5)(i). The regulations further state that "[a]ffiliation generally arises

where one concern is dependent upon another concern for contracts and business to such a

degree that one concern has control or potential control, of the other concern." 47 C.F.R. §

1.2110(c)(5)(ix). In addition, the regulations state that two entities can be affiliates "under a

joint venture arrangement[ ]" if there:

> is an association of concerns and/or individuals, with interests in any degree
> or proportion, formed by contract, express or implied, to engage in and carry
> out a single, specific business venture for joint profit for which purpose they
> combine their efforts, property, money, skill and knowledge, but not on a
> continuing or permanent basis for conducting business generally. The
> determination whether an entity is a joint venture is based upon the facts of
> the business operation, regardless of how the business operation may be
> designated by the parties involved. An agreement to share profits/losses
> proportionate to each party's contribution to the business operation is a
> significant factor in determining whether the business operation is a joint
> venture.

47 C.F.R. § 1.2110(c)(5)(x).

51.    For all relevant periods of this case, a DE licensee has an "attributable material

relationship" with another entity if the licensee leases or resells 25 percent or more of the

licensed spectrum capacity of any of its licenses; when this happens, the annual revenues of the

entity using the DE's licensed spectrum are added to the DE's revenues (and those of its

affiliates and controlling interest holders) for purposes of its continuing status as a "very small

business." 47 C.F.R. § 1.2110(b)(3)(iv) (2014) ("[a]n applicant or licensee has an attributable

material relationship when it has one or more arrangements with any individual entity for the

lease or resale (including under a wholesale agreement) of, on a cumulative basis, more than 25

24

percent of the spectrum capacity of any one of the applicant's or licensee's licenses").[5] This "attributable material relationship" regulation is often referred to as the "AMR" rule.[6]

52.     Controlling interests are defined as "individuals or entities with either *de jure* or *de facto* control of the applicant. *De jure* control is evidenced by holdings of greater than 50 percent of the voting stock of a corporation, or in the case of a partnership, general partnership interests. *De facto* control is determined on a case-by-case basis." 47 C.F.R. § 1.2110(c)(2)(i). In determining if an entity has *de facto* control of the DE, the FCC has looked at factors such as:

   1) use of facilities and equipment;

   2) control of day-to-day operations;

   3) control of policy decisions;

   4) personnel responsibilities;

   5) control of financial obligations; and

   6) receipt of monies and profits.

*See Application of Ellis Thompson Corp.*, Memorandum Opinion and Order and Hearing Designation Order, 9 FCC Rcd. 7138, ¶¶ 9-10 (1994) ("*Ellis Thompson* Order"); *Application of*

---

[5] The FCC eliminated the AMR rule in the 2014 *Part 1 Update Order* (¶ 23). All the events alleged in this amended complaint demonstrating the attributable material relationship between the Defendants, however, occurred when the AMR rule was in full force and effect and prior to the adoption of the *Part 1 Update Order*. Moreover, while the FCC may have eliminated the AMR rule for future auctions and licenses allocated through future auctions, it adopted a replacement brightline test that demonstrates the Commission's ongoing concern about large investors' influence over DEs. Under the new 25% attribution test, the gross revenues of a "disclosable interest holder" (*i.e.*, one having more than a ten percent interest) in a DE "will become attributable, on a license-by-license basis, for any license in which the disclosable interest holder uses, in any manner, more than 25 percent of the spectrum capacity of a DE's license awarded with bidding credits." *Part 1 Update Order*, ¶ 42. U.S. Cellular holds 90% of King Street Wireless' equity, and thus is a "disclosable interest holder."

[6] Prior to 2006, FCC regulations provided that a lease of spectrum between a DE and its lessee "with a prior business relationship where substantially all of the spectrum capacity of the licensee is to be leased" would cause the spectrum lessee to become an attributable affiliate of the licensee. Such affiliation would render the licensee ineligible for designated entity or entrepreneur benefits and, therefore, would make such a spectrum lease impermissible." *Secondary Markets Second Report and Order*, 19 FCC Rcd. at 17541–42, ¶ 77.

25

*Baker Creek Communications*, L.P. 13 F.C.C.R. 18709 (1998) (citing *Intermountain Microwave*

24 Rad. Reg. 7 (P & F) 983, 984 (1963)). FCC rules also define an entity with a "controlling

interest" as follows:

> [A]ny person who manages the operations of an applicant or licensee pursuant to
> a management agreement shall be considered to have a controlling interest in such
> applicant or licensee if such person, or its affiliate, has authority to make
> decisions or otherwise engage in practices or activities that determine, or
> significantly influence: (1) The nature or types of services offered by such an
> applicant or licensee; (2) The terms upon which such services are offered; or (3)
> The prices charged for such services.

47 C.F.R. § 1.2110(c)(2)(ii)(H). The FCC adopted this rule in 2000 because "such

[management] agreements grant authority over key aspects of the applicant's or licensee's

business ... allow[ing] their holders to exercise control of the applicant or licensee."[7] Moreover,

the Commission has repeatedly stressed that the likelihood of a DE sham is "greatly increased

when a single entity provides [the DE] most of the capital and management services and is the

beneficiary of the investor protections."[8]

　　　53.　　If the DE, at any point during the five-year period following the award of the

license, is no longer eligible as a "small business" or a "very small business" – including a post-

licensing "affiliation" or attributable material relationship with a company that is too large to

qualify as a DE – then the DE must return all or some of the bidding credits the FCC awarded it.

47 C.F.R § 1.2111(b) ("Unjust Enrichment Rule"). In July 2015, the FCC reviewed and

reaffirmed the Unjust Enrichment Rule in its entirety, finding that, "[a]fter careful review of the

record, we conclude that the Commission's existing [unjust enrichment] rules provide a

---

[7] *Amendment of Part 1 of the Commission's Rules - Competitive Bidding Procedures*, Fifth Report and Order, 15 FCC Rcd 15293, ¶ 64 (2000).

[8] *Part 1 Update Order*, ¶ 32 (quoting *Implementation of Section 309(j) of the Communications Act - Competitive Bidding,* Fifth Memorandum Opinion & Order, 10 FCC Rcd. 403, ¶ 96 (1994) ("*Fifth MO&O*")).

sufficient safeguard to ensure that the designated entity benefits are provided only to *bona fide* small businesses...." *Part 1 Update Order*, ¶ 148.[9]

54.    Moreover, consistent with the 1993 Congressional statutory amendments directing the FCC to adopt licensee "performance requirements," the FCC's service-specific rules require each licensee to file a demonstration that it has constructed a network within several (usually four to five) years that delivers an adequate signal over the licenses to a portion of license area or the population in the area. *See, e.g.*, 47 C.F.R. § 27.14 (four year construction requirements for all 700 MHz licensees); 47 C.F.R. §1.946(d) (licensee must file with the FCC a written demonstration of compliance with service-specific construction requirements). If a licensee fails to meet the construction requirement, the license cancels (in whole or in part) automatically. *Id.* at §1.946(c). Further, licensees have to file interim and final construction notifications with the FCC that contain engineering analyses demonstrating that the coverage requirements have been met. Licensees' construction notices often include coverage maps and sometimes lists of the tower sites in the market.

## C.    THE FALSE CLAIMS ACT

55.    The Federal False Claims Act provides that any person who: (1) knowingly presents or causes to present a false or fraudulent claim for payment or approval; (2) knowingly

---

[9] With regard to the AMR rule, the FCC's Unjust Enrichment Rule provided that, "[i]f, within the initial term of the license, a licensee that utilizes a bidding credit seeks to ... enter into a material relationship that would result in the licensee losing eligibility for a bidding credit ..., the amount of the bidding credit ..., plus interest based on the rate for ten year U.S. Treasury obligations applicable on the date the license is granted, must be paid to the U.S. Government as a condition of Commission approval of the assignment or transfer or of a reportable eligibility event." 47 C.F.R. § 1.2111(d)(1)(2014) (available at, https://www.gpo.gov/fdsys/pkg/CFR-2014-title47-vol1/pdf/CFR-2014-title47-vol1-part1.pdf.). In its 2015 *Part 1 Update Order* (¶ 48), the FCC explicitly "disagree[d] with USCC that such a rule is unnecessary because the application of the criteria in *Intermountain Microwave* sufficiently mitigates the additional risks that unjust enrichment and undue influence may arise after the elimination of the AMR rule and relaxation of our facilities-based service requirements."

makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; and/or (3) conspires to commit a violation of either (1) or (2) is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of damages sustained by the government. 31 U.S.C. §§ 3729(a)(1)(A), (B), (C).

56.    The Federal False Claims Act also provides that any person who knowingly conceals or improperly avoids or decreases an obligation to pay or transmit money to the Government is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of damages sustained by the government. 31 U.S.C. § 3729(a)(1)(G).

## V.    SPECIFIC ALLEGATIONS OF THE DEFENDANTS' FALSE CLAIMS REGARDING KING STREET

### A.    AFTER KING STREET WON DE SPECTRUM LICENSES, IT FALSELY ASSERTED TO THE FCC SEVERAL TIMES THAT IT WAS A DESIGNATED ENTITY

57.    Between January 24, 2008 and March 18, 2008, the FCC auctioned 1,099 licenses of spectrum in the 700 MHz Band ("Auction 73"). King Street participated in FCC Auction 73 as a "very small business," claiming to the FCC that it qualified for a 25 percent bidding credit under the FCC's "Designated Entity" rules because DiNardo was in *de facto* and *de jure* control of King Street, that its 90 percent investor, U.S. Cellular, was not an affiliate of King Street, and thus King Street's average gross revenues (combined with its affiliates and controlling entities) for the past three years were under $15 million.[10]

58.    On March 18, 2008, FCC Auction 73 closed and King Street was the high bidder on 152 licenses with cumulative gross bids of $400.6 million, for which it paid a cumulative net total of $300.5 million to the Federal Treasury as a result of DE bidding credits worth $100.2

---

[10] 47 C.F.R. § 27.502. U.S. Cellular had gross operating revenues of $2.0 Billion in 2004, gross operating revenues of $ 2.4 Billion in 2005, and gross operating revenues of $ 2.9 Billion in 2006. Defendant TDS, U.S. Cellular's parent, also reported operating revenues of a similar amount.

million. All of the licenses King Street won are either overlapping with or contiguous to U.S. Cellular's existing service coverage areas. As U.S. Cellular stated in its 2009 Annual Report, King Street's "152 license areas cover portions of 27 states and are in markets which are either adjacent to or overlap current U.S. Cellular license areas." United States Cellular Corporation Annual Report to Shareholders for the Year Ended December 31, 2009 ("U.S. Cellular 2009 Annual Report"), page 5. The FCC granted King Street its licenses on December 27, 2009.

59.    On December 27, 2010, King Street filed its first DE Annual Report with the FCC ("2010 DE Annual Report"). In Exhibit II to its December 2010 DE Annual Report, King Street summarized a total of six agreements that it had allegedly disclosed to the FCC during the time of the Auction 73 licensing process as well as a previously undisclosed "Management Agreement" with U.S. Cellular (and revisions to the loan agreement),[11] and then stated that it *"has not entered into any agreements nor arrangements (including proposed agreements and arrangements) that relate to Filer's eligibility for bidding credits for any license covered by this annual report." Id.* (emphasis added). As described below, this statement is false and had King Street accurately disclosed its actual relationships with U.S. Cellular, it would have had to pay the government most or all of the $100.2 million in bidding credits it was awarded by the FCC in 2008.

60.    King Street's DE Annual Reports contain numerous false statements and do not disclose its actual relationship with U.S. Cellular. For example, Exhibit II to the 2010 DE Annual Report disclosed to the FCC for the first time a "Management Agreement" between U.S. Cellular and King Street even though the agreement had been entered into during the license application process and almost a year prior to the FCC's award of the 152 licenses to King Street

---

[11] The DE Annual report falsely stated that King Street had disclosed to the FCC, and that the FCC had previously reviewed, the management agreement during the license application and approval process.

in December 2009. It states that "control of the CMRS [Commercial Mobile Radio Services, *i.e.*, mobile wireless] systems will remain in King Street LP"; "King Street LP is also responsible for the payment of all financial obligations and operating expenses (except out-of-pocket expenses)"; and "King Street LP enjoys the profits and bears the risk of loss from the operation of the King Street LP systems ...." *Id.* These and other statements in the DE Annual Reports are false and had U.S. Cellular and King Street accurately disclosed their relationship, they would have had to pay the U.S. government up to $100.2 million (*i.e.*, the total bidding credits the FCC awarded it in 2008).

61.     King Street filed additional DE Annual Reports on December 29, 2011 ("2011 DE Annual Report"), December 26, 2012 ("2012 DE Annual Report"), and on December 26, 2013 ("2013 DE Annual Report"). The 2011, 2012 and 2013 DE Annual Reports include Exhibit II's that are word-for-word identical to Exhibit II of the 2010 DE Annual Report. The 2011, 2012 and 2013 DE Annual Reports contain the same false statements as the 2010 DE Annual Report. Under "Certificate Information," Defendant DiNardo electronically signed each of King Street's DE Annual Reports as "President of General Partner."

62.     King Street also filed the required construction notices with the FCC from 2011 to 2013 claiming that it had built out wireless networks in the 152 markets for which it held licenses. In fact, U.S. Cellular – not King Street – financed, built, owned and continues to operate the wireless networks using the King Street licenses in each of these markets.

**B.    KING STREET IS AND WAS A SHAM USED BY U.S. CELLULAR**

63.     U.S. Cellular created King Street and used it to avoid paying the full costs of FCC spectrum licenses to the Federal Treasury. Following Auction No. 73, U.S. Cellular used the savings secured through bidding discounts meant for small businesses to help finance, build and

operate the wireless networks in the 152 markets. It then used those networks and the King Street 700 MHz licenses to provide service to its own U.S. Cellular customers.

> **1.** **U.S. Cellular Incorporated King Street's 700 MHz licenses Into Its Own Network and Used Those Licenses To Provide Service to Its Own U.S. Cellular Customers**

64.     Since 2011 and continuing through the present date, U.S. Cellular has used the spectrum rights of the King Street licenses to provide service to its own customers. King Street does not offer and has never provided wireless (or any other) services to the public. Had King Street disclosed the extent of U.S. Cellular's use of its licenses, or the arrangements (oral or written) by which U.S. Cellular used and uses the King Street licensed spectrum, as well its failure to offer subscriber services, King Street would have admitted violations of its "very small business" status under the FCC's DE regulations including but not limited to the FCC's AMR rule and "controlling interest" rule regarding managers. As such, and in violation of the FCC's unjust enrichment rules, it deliberately avoided payments of up to $100.2 million to the Federal Treasury.

65.     Relators discovered evidence of U.S. Cellular's use of King Street's entire 700 MHz licensed spectrum in the Cedar Rapids, Iowa and Iowa City, Iowa markets. King Street purchased the WQLE688 license for the 700 MHz B block in the Cedar Rapids market and the WQLE717 license – the downlink frequencies of both at 734-740 MHz – for the Iowa City market in Auction 73 in 2008. U.S. Cellular previously obtained the 700 MHz A Block licenses with downlink frequencies at 728-734 MHz in those two markets, as well the C block license – 740-746 MHz – in the Iowa City market.[12]

---

[12] In particular, 282 Wireless LLC assigned the A Block in the Cedar Rapids market (license WQNB985) to U.S. Cellular on August 7, 2013; and Southern Iowa 700, LLC sold the 700 MHz C Block license in the Iowa City market (license WQDM570) to U.S. Cellular on December 5, 2009. The Iowa City C Block 700 MHz Block license was originally won by a DE, Grand River, in the FCC's 2005 Auction.

66.     Relators hired Comsearch – the preeminent provider of spectrum management

and wireless engineering products and services in the United States – to conduct drive tests for

two days in February 2015 using specialized RF equipment designed to measure activity on the

King Street and U.S. Cellular 700 MHZ A, B and C block licenses in the Cedar Rapids and Iowa

City markets in February 2015.  As demonstrated by the results and report of Comcast, Relators

discovered that substantially the entire spectrum of King Street's B block licenses had been

combined with one or the other of U.S. Cellular's 700 MHz licenses in each market and was

being operated from a single network.  Below is a sampling of the results of the Comsearch test

performed in the Cedar Rapids and Iowa City markets:

---

When Southern Iowa 700, LLC subsequently purchased the license, it paid the FCC's unjust enrichment
penalty, so no unjust enrichment penalty was due to the Federal Treasury when U.S. Cellular then bought
the license in 2009. *Assignment of Authorization Application from Southern Iowa 700, L.L.C. to USCOC
of Greater Iowa, LLC*, Description of Transaction and Public Interest Statement, filed Aug. 5, 2009,
attached as Exhibit 6.

# Iowa City – Downtown
## Typical RF Spectrum
41.650373N, 91.551905W



# Cedar Rapids – North
## Typical RF Spectrum
42.197050N, 91.667519W



"LTE Block B Downlink Spectrum (734-740 MHz)."

67.    Comsearch's testing found substantially the same results in other locations in the Cedar Rapids and Iowa City markets. *Id.* In addition to these graphs, Comsearch's real-time drive test results throughout each market, along with locations where adequate signal strength was detected, can be seen in a Google Earth file Comsearch created as part of the testing performed on behalf of Relators.

68.    This continuous signal across 700 MHz blocks of licensed spectrum could only occur if King Street had leased or otherwise agreed to cede or transfer its entire block of licensed spectrum to U.S. Cellular. By contrast, if King Street were operating a wireless network independent of the U.S. Cellular network in those two markets, then the Comsearch results would have shown a significant drop or trough in signal power between the two licensed bands as independent providers would establish minimal "guard bands" in order to avoid harmful interference between the operations of the two networks. The Comsearch testing results show no drop or trough between the U.S. Cellular and the King Street licensed spectrum.

69.    These drive tests by Comsearch's RF engineers in the Cedar Rapids, IA and Iowa City, IA markets show that virtually all of King Street's 700 MHz B block spectrum in those two markets is being used to provide U.S. Cellular 4G LTE service – far beyond the 25 percent threshold of the AMR rule. The FCC, moreover, requires that all CMRS licensees, including DE licensees, report all leases or other wholesale arrangements of spectrum – both Spectrum Manager leases and "De Facto Control" leases – to the FCC by filing license modifications. 47 C.F.R. § 1.9010 *et seq.*; *Promoting Efficient Use of Spectrum Through Elimination of Barriers to the Development of Secondary Markets*, Report and Order and Further Notice of Proposed Rulemaking, 18 FCC Rcd. 20,604, ¶ 84 and fn.181 (2003); *Secondary Markets Second Report*

34

*and Order*, 19 FCC Rcd. at ¶¶ 53-66; FCC Form 608 (form to report both types of leases). King Street has never reported any leases of its Cedar Rapids and/or Iowa City licensed spectrum to the FCC.[13]

70.    The Comsearch drive test results demonstrate that U.S. Cellular has simply incorporated King Street's 700 MHz B block licenses into its own 4G LTE network and is providing a single signal to serve its subscribers in those markets by using both the King Street and U.S. Cellular licensed 700 MHz spectrum in both markets from a single network using the same tower/antenna sites. This is to U.S. Cellular's advantage as it gives U.S. Cellular more contiguous 700 MHz spectrum in the markets and therefore enhances capacity to serve U.S. Cellular 4G LTE customers (*i.e.*, more customers can be accommodated at the same time than if U.S. Cellular operated using spectrum available with a single license).

71.    U.S. Cellular's use, whether through lease or another arrangement, of King Street's entire license in either Cedar Rapids or Iowa City alone would result in U.S. Cellular having an "attributable material relationship" with King Street, making the two companies "affiliates" under FCC regulations. 47 C.F.R. § 1.2110(b)(3)(iv) ("[a]n applicant or licensee has an attributable material relationship when it has one or more arrangements with any individual entity for the lease or resale (including under a wholesale agreement) of, on a cumulative basis, more than 25 percent of the spectrum capacity of any one of the applicant's or licensee's licenses"). As King Street and U.S. Cellular have an attributable material relationship, U.S.

---

[13] King Street was certainly aware the need to report spectrum leases or other spectrum usage arrangements and that those could cause it to lose its DE status, as shown by the fact that it has reported three leases to the FCC regarding its licensed spectrum in other markets. For example, in its March 31, 2011 report to the FCC regarding a long-term spectrum manager lease to Madison Cellular Telephone Company it claimed that the "lease arrangement will not cause Licensee to lose its eligibility as a designated entity because, consistent with Section 1.9020(d)(4) of the Commission's Rules, the arrangement will not result in Lessee acquiring a 'controlling interest' in or becoming an 'affiliate' of Licensee." *See Description of Spectrum Manager Lease Arrangement and Public Interest Statement*, March 31, 2011.

Cellular's revenues – which are almost $4 billion annually from 2010-2014 – are required by the FCC's DE rules to be added to King Street's annual gross revenues (as should the $5 billion in annual revenue of TDS, owner of 84% of United States Cellular Corporation), which disqualified King Street as a DE and legally obligated it to pay up to $100.2 million to the Federal Treasury, which it has never paid.

### 2. U.S. Cellular – Not King Street – Built and Owns The Network That Uses King Street's 700 MHz Licenses

72.     The FCC requires all 700 MHz licensees, including DE licensees, to construct a wireless network that "provide[s] signal coverage and offer[s] service over at least 40 percent of the population" of the geographic area of each license within four years after licensure and then to demonstrate the license condition has been met. 47 C.F.R. § 27.14. Each 700 MHz licensee, therefore, must file with the FCC a detailed report for each license showing the construction of an adequate wireless network using the licensed spectrum ("Construction Notices"). 47 C.F.R. § 1.946(d). From February 2011 through November 2013, King Street LP filed Construction Notices with the FCC certifying that it had constructed and was operating networks in 152 markets that delivered an adequate signal quality covering 314,400 square miles.

73.     According to King Street's Construction Notices and its DE Annual Reports, King Street began construction in its markets in 2011 and had completed construction in all 152 of its markets, including construction of 4G LTE systems in many of its markets, by the end of 2013. *See e.g.*, 2013 DE Annual Report, Exhibit III.

74.     King Street's alleged construction of these 152 new markets would have required building (and/or leasing) of networks and equipment including but not limited to base station transmitters and software, construction and rental of towers, switching facilities, backhaul facilities, and human resources and management expenses to construct and operate the networks.

75.     According to its Construction Notices, King Street initially deployed networks providing an adequate signal coverage to provide broadband fixed point-to-point broadband Internet access services using equipment from Airspan Wireless in 100 markets and to provide 4G LTE mobile services from an unidentified equipment vendor in 52 markets. As described below, based on Relators' lengthy experience in the wireless and telecommunications industry, as well information provided to Relators by network engineers familiar with constructing fixed wireless point-to-point networks, the costs of building out these 152 networks would have been hundreds of millions of dollars, if not more.

76.     King Street did not build out these networks – U.S. Cellular built them out, owns them, and maintains them. For example, for the Cedar Rapids, Iowa market, King Street told the FCC in its Cedar Rapids Construction Notice that it had antennas at 4180 Munier Road and 961 Irish Lane. (The Cedar Rapids Constriction Notification, Site Info, lists the Munier Rd. tower as "Marion" (293309), and the Irish Lane tower as "Mt. Vernon-Ced Rap" (293303)). Relators obtained the Linn County, Iowa building permits for these two sites. The building permit for 961 Irish Lane lists the owner as "U.S. Cellular Operating Co.":

| **Application for Building Permit** | | PB11-0340 |
| --- | --- | --- |
| Linn County Building Division<br>930 1st Street SW<br>Cedar Rapids, IA 52404 | Linn County, Iowa<br>Jul/07/2011 | Phone (319) 892-5130<br>Fax (319) 892-5165<br>www.linncounty.org/planning |

| Property: | 961 IRISH LANE | | | MT VERNON, IA | |
| --- | --- | --- | --- | --- | --- |
| GPN | 17-08-126-001-00000 | Subdivision | UNITED STATES CELL | | Lot  1 |
| Legal μ᷂NEЅӿ | 08-82-05 | Township | FRANKLIN TO | Zoning | Flood Zone |
| Owner: | U S CELLULAR OPERATING CO | | | | |
| | PO BOX 31369 | | CHICAGO | IL   60631 | |
| Buyer, Occupant,<br>or Lessee: | | | | | |

*See* Application for Building Permit, PB11-0340, Linn County, Iowa.

77.     During Comsearch's drive test for Relators, Comsearch drove past this site and found the signal using King Street's B block was contiguous with and flowed directly into the adjacent block directly held by U.S. Cellular; the RF engineering data show there was no "guard band" between the two licenses as there would be if the licenses were being operated by two independent wireless providers. When the location of the 961 Irish Lane tower is entered in to the Google Earth file created by Comsearch during the drive test, the following is seen:



The dotted line is the drive path of the Comsearch vehicle conducting Relators' test. The color of the dots – green – indicates that the 700 MHz signal is strong. As described above, throughout the test in Cedar Rapids, the signal went across both King Street's 700 MHz B block and into a contiguous licensed 700 MHz block held by U.S. Cellular.

78.     Similarly, the building permit for 4180 Munier Road lists the owner as "Cedar Rapids Cellular Tele LP."

38

**Application for Building Permit**   PB11-0385

Linn County Building Division
930 1st Street SW
Cedar Rapids, IA 52404

Linn County, Iowa
Jul/07/2011

Phone (319) 892-5130
Fax (319) 892-5155
www.linncounty.org/planning

Property:   4180 MUNIER ROAD                           MARION, IA
    GPN   15-05-451-001-02001  Subdivision  BLDGS ON LAND OWNE              Lot
    Legal: SESW  05-83-06   Township   MARION TOWN   Zoning  A   Flood Zone  NO

Owner:   CEDAR RAPIDS CELLULAR TELE LP
    PO BOX 31369          CHICAGO          IL   60631

Buyer, Occupant,
or Lessee:

See Application for Building Permit, PB11-0385, Linn County, Iowa.

79.    The Cedar Rapids Cellular Tele LP FCC Form 602 lists U.S. Cellular as its sole

owner. See Cedar Rapids Cellular Tele LP FCC Form 602. During Comsearch's drive test for

Relators, Comsearch drove past this site and found the signal using King Street's B block was

contiguous with and flowed directly into the adjacent 700 MHz license block held by U.S.

Cellular. When the location of the 4180 Munier Road is entered in to the Google Earth file

created during the drive by test the following is seen:



39

As with the previous map, the dotted line is the path of the Comsearch vehicle conducting Relators' drive test. The color of the dots – green – indicates that the signal is strong. As described above, throughout the test in Cedar Rapids the signal went across both King Street's B 700 MHz block license and into a contiguous 700 MHz license held by U.S. Cellular.

80.     U.S. Cellular - not King Street - obtained the local permits to put 4G LTE antennas on the two towers at 961 Irish Lane and 4180 Munier Road. U.S. Cellular - not King Street - uses those antennas to provide service over both the U.S. Cellular and King Street 700 MHz spectrum (*i.e.*, a single network signal across the two blocks). Nonetheless, King Street lists these U.S. Cellular sites as its own in its FCC Construction Notices even though King Street did not obtain construction permits for these sites. Nor is King Street providing service using these sites.

81.     Relators queried the FCC's Antenna Structure Registration ("ASR") database, which revealed that there are no registrations (anywhere in the country) for King Street. U.S. Cellular, however, has registered 43 antenna structures in the Cedar Rapids and Iowa City CMAs (Linn and Johnson Counties).[14] The owner's address provided for each tower is either United States Cellular Corp. (8410 W. Bryn Mawr Ave. #700, Chicago, IL 04449) or U.S. Cellular's law firm (Holland & Knight LLP, 2099 Pennsylvania Ave. NW, Suite 100, Washington, DC 04419). Forty of the sites listed in the King Street Cedar Rapids and Iowa City FCC Construction Notices, and plotted onto Comsearch's Google Earth file match (either exactly or very closely) U.S. Cellular's 43 registered sites.

---

[14] Not all antenna structures have to be registered with the FCC, so only those above a certain height, in a flight path, or meeting certain other criteria will appear in the FCC's ASR database. U.S. Cellular/King Street has more than 70 cell sites in the Cedar Rapids and Iowa City markets.

82.     The foregoing paragraphs establish that U.S. Cellular exercises complete control over the spectrum on which King Street bid and for which it received FCC licenses at a discount.

83.     The illegal relationship is not isolated to the two Iowa markets. Comparing the U.S. Cellular service area with the King Street license areas, it is clear that U.S. Cellular has incorporated almost all of King Street's licenses to support its own LTE service offering. Relators commissioned Mosaik Solutions – a consulting firm that provides telecommunications industry intelligence reports – to analyze all markets in which U.S. Cellular offered 4G LTE service in January 2015 and the markets in which King Street held 700 MHz licenses. The maps below show graphically all of the markets in which U.S. Cellular offered 4G LTE service in January 2015 and the markets in which King Street held 700 MHz licenses:



Coverage

**U.S. Cellular LTE Service Area as of January 2015**



Market Types

BEAs
CMAs

**King Street Wireless – Lower 700 MHz Licenses obtained in Auction 73**

84.     As seen in these charts, the markets in which U.S. Cellular offers 4G LTE service

significantly overlap with the markets in which King Street holds 700 MHz licenses. This

analysis confirms that the Defendants had an understanding and arrangement by which U.S. Cellular would use the King Street spectrum, and King Street would not operate independently.

85.     This arrangement or understanding was never disclosed to the FCC in the King Street DE Annual Reports, despite the legal obligation to do so. Such an arrangement further demonstrates that King Street lacked *de facto* control over its licenses and the networks operating with its licensed spectrum, and chose to withhold that information from the FCC.

### 3.     U.S. Cellular – Not King Street – Controls the Nature, Terms, and Prices of Wireless Services Offered to Its Subscribers Using King Street's 700 MHz Licenses

86.     Relators sent individuals to three U.S. Cellular stores in Cedar Rapids, Iowa City, and Roanoke, VA to obtain U.S. Cellular's 4G LTE service. King Street holds licenses in these markets and its FCC filings assert that it provides 4G LTE coverage in all of these markets, as well. U.S. Cellular, not King Street, however, sold the 4G LTE service and smartphones to each individual in all three markets. According to each of the three 4G LTE service contracts (one from each market), U.S. Cellular is the exclusive provider of 4G LTE service; the contracts do not contain a single reference to King Street and store employees selling the U.S. Cellular 4G LTE service had no knowledge of King Street.

87.     For example, on February 10, 2015, an individual working at Relators' direction went to the U. S. Cellular store at 4760 Valley View Mall Blvd. Roanoke, VA. Upon entering, he was greeted by an employee who explained that U.S. Cellular had 4G LTE coverage in this area. After discussing the U.S. Cellular plan and smartphone (handset) pricing, he asked about U.S. Cellular's 4G LTE service coverage and was advised that U.S. Cellular 4G LTE service was offered in twenty-six states. The U.S. Cellular store employee then gave him a booklet illustrating the coverage area for the 4G LTE service. When the customer asked the U.S. Cellular store employee if she was familiar with King Street Wireless, she responded that she

was not. Two other employees working in the store at that time also indicated that they had not heard of King Street Wireless. The U.S. Cellular Service Agreement provided in Roanoke, VA does not mention King Street.

88. On February 17, 2015, a second individual, working at the direction of Relators went to the U.S. Cellular store at 905 25th Ave., Coralville, Iowa (a suburb of Iowa City, Iowa). She spoke with a U.S. Cellular store salesperson about purchasing a new U.S. Cellular 4G LTE service plan and phone. She inquired about U.S. Cellular's 4G LTE coverage in downtown Iowa City, as well as in Des Moines, Dubuque, and Cedar Falls. After the customer stated that she had problems with roaming charges on a previous plan, the salesperson explained that U.S. Cellular sold nationwide plans and that, even if her phone were to display that it is roaming, it would not cost the customer an additional fee, as U.S. Cellular's network operated by using the towers that were best in the area of the phone, regardless of the tower ownership. When the customer asked the salesperson if he had ever heard of King Street Wireless, the salesperson stated that he had not. The U.S. Cellular Service Agreement provided in Coralville, Iowa also does not mention King Street.

89. On February 18, 2015, a third individual, working at the direction of Relators, went to the U.S. Cellular store at 2315 Edgewood Road SW, Cedar Rapids, Iowa. She spoke with a salesperson about purchasing a new phone and U.S. Cellular 4G LTE service plan for her business. She inquired about roaming and roaming charges; the salesperson explained that U.S. Cellular would not charge any roaming fees. When asked what carrier she would likely be roaming with, she was told "Sprint." When the customer asked the salesperson if she had heard of King Street, she looked puzzled and said "no." Neither the salesperson nor the U.S. Cellular Service Agreement the customer signed mentioned King Street.

90. King Street has never directly offered or provided service to the public. King Street does not own or operate any retail stores. Even though King Street has its own (limited) website at www.kingstreetwireless.com, it does not market any wireless services (despite occasional King Street/U.S. Cellular press statements claiming that the two companies are offering LTE service in partnership or in conjunction with one another). Even if a potential customer were to discover King Street's website, one cannot sign up for King Street wireless service using its website. The King Street website offers visitors two options to learn more about King Street: a phone number and an email address. Relator O'Connor has called the phone number several times and each time it went straight to a voicemail and the call was never returned. Relator O'Connor has also sent two emails inquiring about wireless service to the King Street email address but has never received a reply from King Street.

91. Further evidence discovered by Relators showing that King Street is not an operating wireless provider is King Street's failure to comply with obligations the FCC imposes upon operating telecommunications carriers. For example, Relator O'Connor sent an email on November 29, 2014 to the Universal Service Administrative Company ("USAC") asking whether King Street had ever filed an FCC Form 499A, which all telecommunications carriers must file within ten days of offering service to the public in order to meet their federal obligation to pay into the Universal Service Fund. 47 C.F.R. § 54.711. This Form 499A is also required so that USAC can bill operating telecommunications companies for their required payments into the federal Telecommunications Relay Service ("TRS") Fund, the North American Numbering Plan Administration ("NANPA"), and the Local Number Portability Administration ("LNPA"). 47 U.S.C. §§ 151, 225, 251, 254, 616. USAC responded on December 10, 2014 by email to Relator O'Connor stating that King Street had never filed an FCC Form 499A. Relators also discovered

that, as of December 27, 2015, King Street has not registered to receive an FCC Form 499 filer number (and therefore does not appear in the FCC Form 499 Filer Database) and has never filed an annual Consumer Proprietary Network Information ("CPNI") compliance report as required by law, 47 C.F.R. § 64.2001 *et seq.* Similarly, while all telecommunications carriers, including wireless service providers, need telephone numbers to assign to customers purchasing cell phones and wireless service, the Relators' evidence shows that King Street never applied for or received any numbers, or submitted to NANPA biannual Numbering Resource Utilization and Forecasting (NRUF) reports detailing how they are using telephone numbers and estimating their usage for the coming five years. *See* http://www.nanpa.com/nruf/index.html.[15] If King Street was actually providing service to the public it would have made these and similar filings.

92.    All of these facts demonstrate that U.S. Cellular has gone far beyond the limits of a permissible management arrangement with the licensee King Street in control of the services offered, contrary to the express limits stated to the FCC in each of the King Street DE Annual Reports. U.S. Cellular's control of all aspects of the LTE service offering made it an "affiliate" of King Street since commencement of service in 2011, as provided in FCC Rule § 1.2110(c)(2)(ii)(H) and as explained in paragraph 48, above.

---

[15] To get telephone numbers, telecommunications providers must participate in the North America Numbering Plan (NANP). The NANP is administered by Neustar, Inc., a contractor chosen by the FCC to serve as the NANPA, and it coordinates telephone number assignment among 20 North American countries, including the United States. *See* www.nanpa.com. Relator Leibman obtained data from the NANPA website – including all carriers with Operating Company Numbers (OCNs) and assigned telephone numbers in the United States. NANPA has no listing for King Street Wireless (or Barat or Carroll), but there are many listings for United States Cellular (OCN #6266). This is significant because even if U.S. Cellular gave one of its DEs numbers to use for their own customers, the DEs would still need their own OCNs as "intermediate" carriers. Likewise, if U.S. Cellular acted as an agent for the DEs, the agent must provide the actual service provider's (*i.e.*, Barat, Carroll or King Street Wireless) OCN to get telephone numbers. The DEs, therefore, had no telephone numbers to assign to customers and did not file NRUF reports. Nor did the DEs use any agent (including U.S. Cellular) to obtain telephone numbers.

### 4. U.S. Cellular Financed and Operated the Networks Using King Street's Licensed Spectrum

93.     Another critical factor in assessing *de facto* control is whether the largest investor or the DE has financed the network build-out and ongoing operations of the wireless networks using the DE spectrum. In this case, U.S. Cellular financed the construction and operations of the wireless facilities used to provide U.S. Cellular's wireless service over the King Street licenses. King Street did not, and had no financial or managerial ability to do so.

94.     Purchasing spectrum licenses at an FCC auction – or otherwise obtaining spectrum licenses – is merely the first step in developing a wireless network and offering commercial wireless service to the public. A wireless network, as illustrated below, requires a wide variety of equipment and knowledge, and requires substantial capital and operating expenditures.



CELLULAR DIGITAL NETWORK

95.     A wireless signal from an iPhone, for example, travels through the air to a carrier's antenna on a tower (which can be a free-standing tower or attached to a rooftop or other tall, pre-existing structure). The signal is then transmitted by the carrier's facilities (*e.g.*, a fiber connection) from the antenna to the Base Transceiver Station ("BTS"), which houses the radio transceivers that define a cell and handles the radio-link protocols. The BTS is controlled by the carrier's Base State Controller ("BSC"), which efficiently directs the data through the fiber ring (usually fiber optic cable) to the carrier's Mobile Switching Center ("MSC"). Prior to arriving at the MSC, the transmission often passes through the carrier's Transcoding Gateway. The Transcoding Gateway, sometimes called a TRAU or Transcoding Rate and Adaption Unit, first compresses traffic coming from the mobile phone through the base station controllers and then puts the traffic into a format the MSC can understand. The MSC performs a variety of functions including registration, authentication, location updating, handovers, and call routing to a roaming subscriber. It also redirects the data to either the Public Switched Telephone Network ("PSTN") for voice calls or the Internet Backbone for data.

96.     A wireless carrier's costs of constructing, operating and maintaining a wireless network in a single market involves significant costs, including paying for:

- Construction of new towers and lease of space on existing towers/rooftops (a single market requires numerous antenna sites; for example, King Street claims it has more than 40 antenna sites in the Cedar Rapids market);

- The antennas on each tower or rooftop;

- Base Station Controllers;

- Construction (or lease) of fiber connections, as well as redundant connections, from each base station to the MSC and then between MSCs;

- MSCs (which include software, routers/servers, etc.);

- Power and backup power generators and/or batteries;

- Construction (or lease) of fiber connections from the MSC to the PSTN and Internet backbone points;

- Operating and maintenance costs – repairs, equipment upgrades, etc.;

- Financing (most purchases of network equipment, such as the that contained in the MSC, involves vendor financing);

- Network operations centers;

- Service vehicles (trucks);

- Lease or construction of buildings and offices for employees and management, and for the housing of MSCs, equipment inventory and/or service vehicles;

- Labor (building, operating and maintaining a wireless network involves technicians, engineers, operations specialists, management, customer service representatives, etc.);

- Network maintenance;

- Legal, insurance, and government fees; and

- Taxes

97.     In 2010, the FCC calculated that the cost for adding 700 MHz antennas and other equipment to a single existing tower site – *i.e.*, mostly the first four bullet points above – would be at least $95,000, and at rural sites, the cost would be, on average, upwards of $216,000 per site. *A Broadband Network Cost Model*, OBI Technical Paper No. 2, May 2010, available at

http://transition.fcc.gov/pshs/docs/ps-bb-cost-model.pdf. In 2013, King Street claimed that it had deployed 45 antenna sites in the Cedar Rapids market alone and, at $95,000 per site, FCC data shows that it would have spent at least $3.8 million just to develop the antenna sites in that single market. In addition to the 45 antenna sites in Cedar Rapids, King Street claims it has constructed thousands more antenna sites in its 151 other markets. Applying the FCC's cost data and assuming the same costs for the 151 markets as with the Cedar Rapids market, it would have cost King Street just under $600 million for just antenna sites alone.

98.     In addition to the costs associated with obtaining tower space and antennas for the initial network, a wireless carrier faces substantial costs associated with adding network capacity – including building or leasing new towers, deploying base stations, adding MSCs and backhaul facilities, and leasing spectrum – in order to develop a broader network that meets growing customer demands. Further, once services are established in the core market, carriers typically expand their networks into the surrounding communities to provide additional coverage and attract more customers. Finally, carriers incur significant additional costs associated with marketing and advertising, customer services, legal and government fees, and general overhead and administration.

> (a)     **The King Street-U.S. Cellular Agreements Disclosed to the FCC Misrepresent Their Relationship and Prevent King Street From Independently Financing Its Own 4G LTE Network**

99.     As set forth in the agreements between King Street and U.S. Cellular (as summarized in King Street's DE Annual Reports), U.S. Cellular did not provide King Street with enough funds for King Street to build out the network itself. The agreements between U.S. Cellular and King Street also foreclose King Street's ability to obtain the needed third party equity or debt financing to build out and operate networks in 152 markets.

100.    King Street's DE Annual Reports disclose, in identical language, a total of seven agreements between King Street and U.S. Cellular.[16]

### i.    The Limited Partnership Agreement

101.    The Limited Partnership Agreement between King Street, Inc. and USCCWI was entered into on December 21, 2007, amended on January 1, 2009 and amended again on August 11, 2010 ("LP Agreement"). According to the DE Annual Reports, under the LP Agreement:

(a) "the purpose of King Street LP is to construct and operate a 700 MHz wireless

services system with respect to any 700 MHz licenses acquired in Auction No. 73";

(b) King Street Inc. (which is solely owned by DiNardo) "controls" King Street LP;

(c) King Street Inc. "manages the day-to-day operations of King Street LP, which"

includes "the borrowing of money from banks, or other lending institutions"; "the

acquisition, use and sale of real and personal property on behalf of the Partnership;" "the

making of all payments required of the Partnership"; and "the arranging for all federal,

state and local regulatory and tax filings."

### ii.    The Investment Agreement

102.    The Investment Agreement between King Street, Inc., USCCWI and United States Cellular Corporation was entered into on December 27, 2007. It provides that:

(a) King Street LP was to "be capitalized on a 20 percent equity, 80 percent debt basis";

(b) King Street LP "is responsible for obtaining financing"; and

---

[16] On April 30, 2008, King Street amended Exhibit D of its then-pending FCC license application to disclose an eighth agreement. It disclosed a "Promissory Note, dated December 21, 2007, is entered into between King Street Inc. and USCC whereby King Street Inc., as the Borrower, agrees to pay [U.S. Cellular], as the Lender, the principal amount of $5,000,000 or, if less, the aggregate principal amount of all advances made by King Street Inc. pursuant to the Loan Agreement dated December 21, 2007." King Street Wireless L.P., Exhibit D (Amended): Agreement and Other Instruments, April 30, 2008, page 6. King Street's DE Annual Reports do not report this Promissory Note.

51

(c) King Street Inc. would contribute $125,000 of its own funds, while the remainder of the capital contribution would be in the form of a loan from U.S. Cellular (which is set forth in the Loan Agreement).

### iii.    The Loan Agreement

103.    The Loan Agreement between King Street, Inc. and United States Cellular Corporation was entered into on December 21, 2007 for the "purpose" of making the "required capital contribution to King Street L.P." Under this agreement, U.S. Cellular advanced "up to" $5,895,570 to King Street LP. The interest rate on the advance is eight percent with interest and principal due on "the earlier of (1) December 21, 2017; (2) the sale of the capital stock in King Street Inc.; (3) the sale of all or substantially all of the Assets of King Street LP; (4) the sale of any or all of King Street Inc.'s interest in King Street LP; or (5) the date of return by the FCC of the Auction 73 deposit." In other words, King Street would not have to pay any interest or principal on the loan for 10 years after the licenses were issued (barring the sale of the company).

### iv.    The Loan and Security Agreement

104.    The Loan and Security Agreement between King Street Inc. and United States Cellular Corporation was entered into on December 21, 2007 for the "sole purpose of making the 700 MHz band Auction deposit," which King Street was obligated to make following its purchase of 152 licenses during Auction 73, and "to also provide additional working capital." U.S. Cellular provided $240,822,800 to King Street at eight percent interest. But, as with the Loan Agreement, King Street has no obligation to make any principal or interest payments for ten years as no payments are due until "the earlier of (1) December 21, 2017; (2) the sale of the capital stock in King Street Inc.; (3) the sale of all or substantially all of the Assets of King Street LP; (4) the sale of any or all of King Street Inc.'s interest in King Street LP; or (5) the date of return by the FCC of the Auction 73 deposit." In return for the $240,822,800 loan, King Street

granted U.S. Cellular, as collateral, a security interest in "all FCC license and permits held by" King Street.

### v. The Pledge Agreement From King Street Wireless

105. The Pledge Agreement between King Street, Inc. and United States Cellular Corporation was entered into on December 21, 2007 ("King Street Pledge"). Under the King Street Pledge, as condition of the Loan Agreement, King Street Inc. granted U.S. Cellular "a first priority security interest in its Partnership Interests in King Street LP (defined as 100% of the General Partnership Interests in King Street LP) and all proceeds of any and all of the collateral." King Street Inc. was also "restricted from selling, transferring, pledging, or otherwise encumbering or disposing of any of its Partnership Interests in King Street LP or any of the collateral."

### vi. The Pledge Agreement From Shareholders of King Street Wireless

106. The Pledge Agreement between DiNardo and United States Cellular Corporation was entered into on December 21, 2007 ("DiNardo Pledge"). Under the DiNardo Pledge, as condition of the Loan Agreement, DiNardo granted U.S. Cellular "a first priority security interest in her interest in King Street LP (defined as 100% of all the issued and outstanding shares of stock in King Street Inc.) and all proceeds of any and all of the collateral." DiNardo was also "restricted from selling, transferring, pledging, or otherwise encumbering or disposing of any of its her interest in King Street Inc. or any of the collateral."

### vii. The Management Agreement

107. The Management Agreement (signed almost 12 months before the FCC granted King Street's license applications, but not reported to the FCC until King Street submitted its 2010 DE Annual Report one year after the licenses were issued) provides that U.S. Cellular has

certain responsibilities to manage the "CMRS systems licensed to, constructed, and operated by or on behalf of King Street LP utilizing licenses acquired in Auction No. 73." Among other things, the Management Agreement also provides that:

(a)     King Street LP is responsible for the payment of all financial obligations and operating expenses (except out-of-pocket expenses);

(b)     King Street LP enjoys the profits and bears the risk of loss from the operation of the King Street LP systems;

(c)     King Street LP must approve key U.S. Cellular employees responsible for the operation of the King Street LP systems;

(d)     U.S. Cellular will provide or arrange for the following services for the King Street LP systems:

> 1.     Administrative, accounting, billing, credit, collection, insurance, purchasing, clerical and such other general services as may be necessary to administer the King Street LP Systems;
>
> 2.     Operational, engineering, maintenance, repair and such other technical services as may be necessary to operate the King Street LP Systems; and
>
> 3.     Marketing, sales, advertising and such other promotional services as may be necessary to market the products and services of the King Street LP Systems, provided that King Street LP shall determine the terms upon which the King Street LP Systems' services are offered and prices charged for its services;
>
> 4.     Negotiating, as agent for King Street LP, such agreements as may be necessary for the provision of services, supplies, office or other types of space, utilities, insurance, concessions and the like;
>
> 5.     Developing and implementing plans for the construction of the King Street LP Systems in accordance with the Technical Services Plan to be developed with King Street LP;
>
> 6.     Developing and implementing mechanisms and systems for billing for the products and services provided by the King Street LP Systems or entering into arrangements to procure on behalf of King Street LP such billing mechanisms and systems;

7.     Developing and implementing plans for the maintenance of the King Street LP Systems and for monitoring the performance of the King Street LP Systems;

8.     Developing and implementing sales and marketing plans for the services to be provided by the King Street LP Systems, including, but not limited to, arrangements for roaming agreements, arranging for necessary sales personnel and technical support for sales operations, and arranging for appropriate marketing vehicles for the sales of King Street LP's services and associated equipment; and

9.     Assisting King Street LP in the preparation of filings, applications, reports and other matters with Governmental Entities.

(e)     U.S. Cellular is entitled to be reimbursed for out-of-pocket expenses incurred in its performance under the Management Agreement and to be paid a management fee.

**(b)     The King Street-U.S. Cellular Loan and Loan and Security Agreements Failed To Provide King Street With Enough Funds To Build Out Even a Single 700 MHz Market, Let Alone 152 Markets**

108.     King Street's DE Annual Reports list four possible sources of funding for King Street: the $240.8 million Loan and Security Agreement; the U.S. Cellular capital contributions through the Investment Agreement; and the Loan Agreement for $5.9 million; and DiNardo's capital contribution of $125,000. Totaled, however, this reported financing is insufficient for King Street even to have paid the Federal Treasury the $300 million auction payment for the 152 licenses King Street won in Auction 73.

109.     While never reported to the FCC, Relators discovered that U.S. Cellular actually provided King Street with slightly more than $300 million – little more than the amount necessary to meet the auction payment obligation. Because King Street is a Variable Interest Entity ("VIE") and consolidated under GAAP for accounting and SEC reporting purposes, U.S. Cellular disclosed in its 2008 Annual Reports that it provided $300.5 million to King Street as of 2008 – the year King Street had to pay the FCC the same amount – for the 152 licenses won in

Auction 73. United States Cellular Corporation Annual Report to Shareholders for the Year Ended December 31, 2008, page 53. Then, U.S. Cellular provided King Street with loan and capital contribution amounts of just $100,000 in 2009, and an additional $300,000 in 2010. U.S. Cellular 2009 Annual Report, page 55; United States Cellular Corporation Annual Report to Shareholders for the Year Ended December 31, 2010, page 52. In 2011, U.S. Cellular provided a total of $15.8 million to King Street, Aquinas Wireless (another VIE affiliated with DiNardo), Barat Wireless (another VIE affiliated with DiNardo) and Carroll Wireless (yet another VIE affiliated with DiNardo), but it did not disclose how the $15.8 million was divided among these four VIE entities. U.S. Cellular 2011 Annual Report, page 52. In 2012, U.S. Cellular provided a total of $10 million to King Street and Aquinas Wireless, but did not disclose how the $10 million was divided among the two VIEs. United States Cellular Corporation Annual Report to Shareholders for the Year Ended December 31, 2012 ("U.S. Cellular 2012 Annual Report"), page 53. U.S. Cellular provided no additional funding to King Street in 2013. United States Cellular Corporation Annual Report to Shareholders for the Year Ended December 31, 2013 ("U.S. Cellular 2013 Annual Report"), page 63. Thus, according to its Annual Reports to shareholders and filed with the SEC, by the end of 2013, U.S. Cellular had provided, at most (if one assumes that 100 percent of the 2011 and 2012 VIE funds went to King Street), a total of $326.4 million to King Street. After paying the $300.5 million auction obligation in 2008, King Street had (at most) $26.4 million of U.S. Cellular's funds remaining.

110. As described above, building out 4G LTE or even fixed wireless networks in the 152 markets in which King Street has 700 MHz licenses – as it says it has done in its Construction Notices and DE Annual Reports[17] filed with the FCC – would have cost King

---

[17] *See, e.g.*, King Street's 2013 DE Annual Report, Exhibit III (claiming that King Street had "has constructed and filed the required build-out notifications demonstrating satisfaction of the interim

Street hundreds of millions of dollars by the end of 2013. After paying the FCC for the 152

licenses it had won at auction, however, King Street would have had no more than $26.4 million

left in funds from U.S. Cellular. King Street has not disclosed any other sources of third-party

funding in its DE Annual Reports or in any other reports filed with the FCC. Further, U.S.

Cellular's Annual Reports have never disclosed that King Street has obtained third-party

financing, which it would have reported given that King Street is a VIE and is consolidated on

U.S. Cellular's financial statements.

111. King Street, moreover, is not able to obtain additional funds via third-party debt

or equity financing due to the restrictive terms of the loans and pledge agreements with U.S.

Cellular. With regard to debt financing, King Street has no collateral to offer a third-party lender.

The Loan Agreement for $5.9 million prevents King Street from raising any funds through

equity financing because it provides that all payments become due immediately upon any sale of

the capital stock of the general partner, King Street Inc., and that all payments become due

immediately upon the sale of any or all of King Street Inc.'s interest in King Street LP.

Similarly, the King Street Pledge Agreement provides that King Street Inc., as a condition to any

advances made pursuant to the Loan Agreement, grants U.S. Cellular a first priority security

interest in its Partnership Interests in King Street LP (defined as 100% of the General Partnership

Interests in King Street LP) and all proceeds of any and all of the collateral.

112. U.S. Cellular's security interests under the $240.8 million Loan and Security

Agreement also prevent King Street from obtaining a third-party loan because King Street can

offer no loan collateral. Specifically, "King Street LP granted to U.S. Cellular a continuing

security interest in … all FCC licenses and permits held by the King Street LP." DE Annual

---

construction requirement for all its one-hundred and fifty two (152) markets, including constructing LTE
systems in several of the markets").

Reports at Exhibit II, ¶ 4. Similarly, the DiNardo Pledge Agreement provides that DiNardo, as a condition to any advances made pursuant to the Loan Agreement, grants U.S. Cellular a first priority security interest in her interest in King Street Inc. and all proceeds of any and all of the collateral. *Id.* at Exhibit II, ¶ 6.

(c)     **U.S. Cellular Took On All The Risk Of, and Reaped All the Rewards From, Operation of the King Street Licenses and Networks**

113.    Since 2005, U.S. Cellular has been either the 6th or the 5th largest wireless carrier in the country. As the market has concentrated, it has been left been with fairly stagnant revenues.

**Service Revenues for Facilities–Based Mobile Wireless Service Providers (In millions of dollars)**
**2005-1st Half 2014**

| National | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 1H2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| Verizon | 28,131 | 32,796 | 38,016 | 49,717 | 52,046 | 55,629 | 59,157 | 63,733 | 69,033 | 36,065 |
| AT&T | 30,665 | 33,788 | 38,678 | 44,249 | 48,563 | 53,510 | 56,726 | 59,186 | 61,552 | 30,535 |
| Sprint | 28,631 | 31,918 | 32,106 | 28,435 | 25,832 | 25,894 | 27,390 | 29,086 | 29,263 | 14,337 |
| T-Mobile | 12,308 | 14,511 | 16,891 | 19,242 | 18,926 | 18,689 | 18,481 | 17,213 | 20,535 | 10,821 |
| Nextel | 1,695 | 468 | | | | | | | | |
| **Regional** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **1H2014** |
| U.S. Cellular | 2,832 | 2,445 | 3,679 | 3,940 | 3,926 | 3,913 | 4,054 | 4,099 | 3,595 | 1,697 |
| Metro PCS | 872 | 1,291 | 1,919 | 2,437 | 3,130 | 3,690 | 4,428 | 4,540 | | |
| Leap (Cricket) | 769 | 956 | 1,396 | 1,709 | 2,171 | 2,413 | 2,829 | 2,947 | 2,631 | |
| NTELOS | 264 | 302 | 357 | 392 | 400 | 383 | 395 | 424 | 467 | 226 |
| Cincinnati Bell | 215 | 236 | 267 | 291 | 284 | 269 | 252 | 225 | 185 80 | |
| Alltel | 6,485 | 7,030 | 7,984 | | | | | | | |
| Centennial | 395 | 433 | 484 | 524 | 408 | | | | | |
| CentennialPCS | 363 | 339 | 294 | 320 | 236 | | | | | |
| Dobson | 1,117 | 1,202 | 1,030 | | | | | | | |

*Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, 29 FCC Rcd. 15311, ¶ 29, Table II.C.1 (2014).

114.    U.S. Cellular service revenues have been declining to flat in recent years, at the same time as the four larger wireless carriers' revenues have steadily risen. U.S. Cellular's

national market share is currently less than 1.3 percent and has been declining.[18] The financial markets are aware of this and U.S. Cellular's stock price has, as of the end of year 2015, declined more than 16 percent over five years, and its public market capitalization has declined to $3.5 billion at the same time as all major stock indexes have risen.

115.   U.S. Cellular, however, had more than enough funds to build out its networks using the licenses it obtained via King Street for a discounted price. U.S. Cellular reported capital expenditure, primarily for its 4G LTE network build out, of $737.5 million in 2013, $836.7 million in 2012 and $782.5 million in 2011. U.S. Cellular 2013 Annual Report, page 15 (stating that "[t]hese expenditures were made to construct new cell sites, build out 4G LTE networks in certain markets, increase capacity in existing cell sites and switches, develop new and enhance existing office systems such as the new Billing and Operational Support System ('B/OSS') and customer relationship management platforms, and construct new and remodel existing retail stores. The decrease in capital expenditures on a year-over-year basis is due primarily to the timing of spending for network operations equipment"). The licenses obtained by King Street in Auction 73 and the subsequent build out of the 4G LTE network covers "approximately 94% of [U.S. Cellular's] postpaid customers as of December 31, 2014...." United States Cellular Corp Form 10-K, February 25, 2015, page 5.

116.   King Street lacked the funds to build out its 4G LTE network but, as described above, U.S. Cellular had such funds and told its shareholders that it paid for the construction of the networks. *E.g.*, U.S. Cellular 2013 Annual Report at 13. Indeed, U.S. Cellular's Annual

---

[18] *Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, Eighteenth Report, WT Docket 15-125, Table II.C.1 (rel. December 23, 2015).

Reports show that it had more than enough funds, and access to additional funds, to have paid for the King Street licenses without capturing the 25 percent discount.

117. Although King Street told the FCC that it enjoys the profits and bears the risk of loss from the operation of the King Street LP systems, U.S. Cellular told the SEC and its investors the opposite:

> Given the significance of these contributions and/or advances in relation to the equity investment at risk, U.S. Cellular was deemed to be the primary beneficiary of these VIEs. Without financial support from U.S. Cellular, these VIEs are unable to finance their operations (i.e., participate in FCC auctions and construct wireless networks). Accordingly, these VIEs are consolidated pursuant to FIN 46(R) because U.S. Cellular anticipates benefiting from or absorbing a majority of these VIEs' expected gains or losses.

United States Cellular Corporation Quarterly Report to Shareholders for the Quarter Ended March 31, 2009, page 13

> U.S. Cellular consolidates variable interest entities in which it has a controlling financial interest and is the primary beneficiary. A controlling financial interest will have both of the following characteristics: (a) the power to direct the VIE activities that most significantly impact economic performance and (b) the obligation to absorb the VIE losses and right to receive benefits that are significant to the VIE.

U.S. Cellular 2013 Annual Report, page 61.

118. U.S. Cellular, moreover, did not simply deem King Street Wireless to be a consolidated VIE, it also determined that federal accounting rules required it to consolidate the partnership's sole general partner, King Street Wireless, Inc. (in which it ostensibly had no equity at risk and no affiliation through officers and directors) on its financial statements. *See* U.S. Cellular 2013 Annual Report, page 61. Thus, even though Allison DiNardo owned 100 percent of the stock of King Street Wireless, Inc., 100 percent *de jure* voting control of King Street Wireless, Inc., and was the sole officer (president) of King Street Wireless, Inc., U.S. Cellular has been telling the SEC and public shareholders that U.S. Cellular "has a controlling

financial interest [in] and is the primary beneficiary [of]" the supposedly *independent general partner* of its DE. U.S. Cellular 2013 Annual Report at 61. To the FCC, by contrast, U.S. Cellular has characterized its equity in its DE as merely that of a limited (*i.e.*, non-controlling) partner, and its status as a limited partner has been critical to its false depiction of its investment in King Street as passive.

119. The consolidated balance sheets of U.S. Cellular's VIEs, including King Street, from 2009-2014 show that the VIEs have virtually no liabilities in any of the years, and almost all their assets are in the "Licenses" category. As U.S. Cellular makes clear through those balance sheets and the other statements in its Annual Reports, and as shown in the Comsearch analysis and other evidence of the Relators, King Street (and the other U.S. Cellular DEs) were created by U.S. Cellular merely to obtain and keep hundreds of millions of dollars in "very small business" bidding credits during the unjust enrichment period and not to provide wireless service to the public. As U.S. Cellular has demonstrated previously with two other DiNardo-affiliated DEs (Defendants Carroll and Barat) and as discussed in detail below, once the unjust enrichment period expires and Defendants no longer have to maintain their charade with the FCC, U.S. Cellular will have no remaining need for King Street. U.S. Cellular 2012 Annual Report, page 53 (stating that it purchased Carroll Wireless and Barat Wireless, two other VIEs in which it owned 90% and DiNardo owned 10%, for an "immaterial" amount).

### (d) King Street Had Neither the Necessary Employees nor Experience to Oversee the Construction and Operation of Wireless Networks in 152 Markets

120. King Street's four-person staff is run by a single person in Alexandria, Virginia and its staff cannot possibly manage and supervise in any meaningful way the construction of thousands of antenna construction sites, complex legal and business terms of service applying to millions of customers, thousands of personnel, and maintenance (as well as dozens of other

responsibilities) of networks in 152 markets throughout the country. Although King Street told the FCC that under the U.S. Cellular-King Street Management Agreement, King Street (and DiNardo) would "determine the terms upon which the King Street LP Systems' services are offered and prices charged for its services," the service contract - with all terms of service and pricing - is between the customer and U.S. Cellular, not King Street. King Street's website states its actual function: "The company holds 152 licenses of 700 MHz spectrum in 27 states…. King Street is partnering with Chicago-based U.S. Cellular to deliver high–speed 4G LTE service to U.S. Cellular's customers in several of that carrier's markets."

http://www.kingstreetwireless.com/index.html (last visited March 13, 2015).

121.   King Street's four person operation with one office that is not even located in a King Street market totally lacks the ability to control the daily operation of the wireless networks in the 152 markets for which is has licenses. As TDS and U.S. Cellular well know, "'[c]ontrol of daily operations' must mean more than approval of major expenses and a loosely defined practice of maintaining 'contact.'" *Telephone and Data Systems, Inc., United States Cellular Corporation v. FCC*, 19 F.3d 42, 49 (DC Cir. 1994). Instead of controlling the daily operations of the 152 wireless networks, King Street "allows" U.S. Cellular to control the networks entirely. Moreover, none of the four King Street employees, including DiNardo, have any experience operating even a small wireless network, let alone a national network, and none have any educational background – engineering or legal – to address the many substantial day-to-day issues that arise with operating a national network. Finally, King Street has only one officer, DiNardo, and she cannot possibly be making the myriad management decisions to supervise the operation of the 152 networks. Between 2009 and 2012, moreover, DiNardo told the FCC she

was also managing Defendants Carroll and Barat and their networks while making the same assertion regarding King Street Wireless and its 152 wireless systems.

### (e) U.S. Cellular and DiNardo Have Partnered for Sixteen Years To Obtain DE Licenses for U.S. Cellular's Use

122.    U.S. Cellular and DiNardo have a sixteen-year relationship in which U.S. Cellular has funneled money to various "very small businesses" bidding entities allegedly controlled by, or involving, DiNardo in order to obtain much-needed spectrum at a 20-25% auction discount from what U.S. Cellular should have paid the Federal Treasury. Typically, these DiNardo-U.S. Cellular bidding entities won licenses as DEs; however, in all that time not a single one of these DEs has ever provided wireless service to the public. With at least two of them (Defendants Carroll and Barat), after the unjust enrichment period expired, the licenses were transferred to U.S. Cellular for an immaterial amount. U.S. Cellular relies heavily on its relationship with DiNardo to obtain spectrum at a discount compared with the spectrum costs of its competitors AT&T, Verizon, T-Mobile and Sprint. U.S. Cellular has not participated in an FCC auction except through a DE associated with DiNardo since 2002.

123.    In 1996, DiNardo began working for the Kington Foundation and, shortly thereafter, for Kington Management Corp. (collectively "Kington") as a key employee and then later as an officer. Prior to joining Kington, DiNardo had no telecommunications education or experience. She had several jobs, including serving as a spokesperson for a travel agency industry interest group, a White House Deputy Associate Director of Presidential Personnel, and a fundraiser for the University of Virginia athletics department.

124.    Kington Management, and its owner Mark Kington, participated in numerous FCC auctions through various DE bidding entities since at least 2000 with U.S. Cellular as a limited partner and 85 percent owner, including such DEs as X-10 PCS, Y-12 Wireless, K-25

Wireless, and Black Crow PCS. Almost all of the licenses obtained by those DEs were later acquired by and assigned to U.S. Cellular. Allison DiNardo served as a key employee and Vice President of Kington Management during this period and, in some cases, was Vice President of the DE.

125. In 2003, DiNardo unsuccessfully ran for Alexandria, VA city council. In response to an election questionnaire from Alexandrians for Sensible Growth, Inc., she stated that "she manages several wireless companies, partnering with US. Cellular, the nation's eighth largest wireless telecommunications provider to purchase and manage several U.S. markets."

126. By 2005, DiNardo had left Kington and began working even more closely and directly with U.S. Cellular. As described below, she partnered with U.S. Cellular to form the bidding entity Carroll Wireless PCS, LP in 2005, a limited partnership 90% owned by U.S. Cellular, which won sixteen DE licenses in FCC Auction No. 58. Carroll Wireless was later sold to U.S. Cellular in 2012 for an "immaterial amount," but it had provided no wireless services to the public prior to the acquisition. In 2006, DiNardo and U.S. Cellular formed Barat Wireless L.P., a limited partnership 90% owned by U.S. Cellular, which won seventeen DE licenses in FCC Auction No. 66. Barat was later sold to U.S. Cellular in 2012 for an "immaterial amount," but it had provided no wireless services to the public prior to the acquisition. As described above, DiNardo partnered with U.S. Cellular in 2008 to form King Street and won 152 DE licenses in FCC Auction No. 73. That same year, she partnered with U.S. Cellular to form Aquinas Wireless L.P., a limited partnership 90% owned by U.S. Cellular, which won 5 DE licenses in FCC Auction No. 78. In 2014-15, DiNardo partnered with William Vail and U.S. Cellular to form the bidder Advantage Spectrum L.P., which won 124 licenses as a DE in FCC

Auction No. 97. Thus, the ongoing relationship between DiNardo and U.S. Cellular has involved multiple DEs over the course of more than 16 years.

### C. U.S. CELLULAR AND KING STREET LIED TO THE FCC TO AVOID DISCOVERY OF THEIR RELATIONSHIP AND HAVING TO REPAY MORE THAN $100 MILLION IN BIDDING CREDITS

127.    King Street's DE Reports falsely stated that it had not entered into any agreements or arrangements (including proposed agreements or arrangements) that jeopardize its continued "very small business" status and would have subjected it unjust enrichment payments. King Street's DE Annual Reports contained statements and omissions that concealed the true nature of its relationship U.S. Cellular. For example, the Management Agreement, as described by King Street to the FCC, expressly limits U.S. Cellular to the role of manager "of the King Street systems licensed to, constructed, and operated by or on behalf of King Street LP," while King Street is a "responsible for the payment of all financial obligations and operating expenses (except out-of-pocket expenses)...." DE Annual Reports at ¶ 7. Under the Management Agreement, King Street – not U.S. Cellular – owns the networks. And, according to King Street, King Street "enjoys the profits and bears the risk of loss from the operation of the King Street LP systems." *Id.* The DE Annual Reports also state that under the LP Agreement, the purpose of King Street is "to construct and operate a 700 MHz wireless services system with respect to any 700 MHz licenses acquired in Auction No. 73" and that King Street Wireless, Inc. "shall execute all contracts, agreements and instruments as the General Partner reasonably may deem necessary or desirable to carry on the purpose of the Partnership." *Id.* at ¶ 1. These statements are false.[19]

---

[19] King Street's Construction Notices also conceal the true nature of U.S. Cellular's role as King Street asserts that it has met the four-year construction requirement and has built out the network in the each relevant market. These statements are also false.

The facts discovered by Relators demonstrate that U.S. Cellular is both an "affiliate" of - and holds a "controlling interest" in - King Street in several ways.

128.    First, the gross revenues of U.S. Cellular became attributable to King Street for purposes of DE eligibility under the FCC's AMR rule, which remained in full force and effect during King Street's entire five-year unjust enrichment period from December 2009 until December 2014.  Under this rule, a DE licensee had an "attributable material relationship" with another entity if the licensee leases or resells 25 percent or more of the licensed spectrum capacity of any of its licenses; when this happens, the gross revenues of the third party become attributable to the DE for purposes of maintaining DE eligibility from the time of the beginning of the arrangement.  47 C.F.R. § 1.2110(b)(3)(iv) ("[a]n applicant or licensee has an attributable material relationship when it has one or more arrangements with any individual entity for the lease or resale (including under a wholesale agreement) of, on a cumulative basis, more than 25 percent of the spectrum capacity of any one of the applicant's or licensee's licenses").  Prior to consummating any such "reportable event," the DE must seek prior consent from the FCC and must pay an unjust enrichment penalty, as well as report such an arrangement on its next DE Annual Report.  *Id.*, at §§ 1.2110(n) & 1.2114(a).  As described above, the Comsearch analysis commissioned by Relators shows that U.S. Cellular is using substantially all of King Street's licenses in both the Cedar Rapids and Iowa City markets.  U.S. Cellular's use of the King Street license in either of these two markets alone results in U.S. Cellular (and its 84 percent owner, TDS) becoming an affiliate of King Street.  Once U.S. Cellular's billions of dollars in revenues were added to King Street's revenues as affiliates, King Street was no longer a "very small business."  Had King Street or U.S. Cellular disclosed the true nature of their relationship, including U.S. Cellular's use of more than 25 percent of one or more of King Street's 700 MHz

licenses, they would have owed the U.S. Treasury up to $100.2 million in bidding credits King Street obtained in Auction 73.

129. Second, King Street has disclosed in each of its DE Annual Reports (Exhibit I, section 7) that it has a comprehensive management agreement with U.S. Cellular. As discussed above, however, FCC rules provide that any manager will be deemed a "controlling interest" holder, and so an "affiliate," of the DE if the manager:

> has authority to make decisions or otherwise engage in practices or activities that determine, or significantly influence: (1) The nature or types of services offered by such an applicant or licensee; (2) The terms upon which such services are offered; or (3) The prices charged for such services.

47 C.F.R. § 1.2110(c)(2)(ii)(H). Relators' evidence demonstrates that U.S. Cellular has done far more than "significantly influence" the nature, terms, and prices of the services offered using King Street's licenses. In fact, U.S. Cellular controlled all of these critical functions, making it an "affiliate" of King Street.

130. Third, U.S. Cellular is a controlling interest of King Street as it has *de facto* control of King Street under the FCC's controlling interest regulations. The false statements in King Street's DE Annual Reports (and in its Construction Notices) disguised U.S. Cellular's *de facto* control of King Street under each of the six factors the FCC uses to determine who has *de facto* control of a licensee. 47 C.F.R. § 1.2110(c)(2)(i); *Ellis Thompson Order*; *Ronald Brasher*, 19 FCC Rcd. 18462 (2004); *Marc Sobel*, 17 FCC Rcd.1872 (2002), *aff'd*, *Kay v. FCC*, 396 F.3d 1184 (D.C. Cir. 2005).

131. The first factor under the FCC's *de facto* control test is "*Use of Facilities and Equipment*." In this case, U.S. Cellular constructed, owns and operates the 4G LTE network in the markets in which King Street holds 700 MHz licenses. U.S. Cellular, moreover, uses the network and the King Street spectrum to provide 4G LTE service to U.S. Cellular customers.

132.    The second factor under the FCC's *de facto* control test is *"Control of Day-to-Day Operations."* Relators' evidence shows that U.S. Cellular management and its employees run the day-to-day operations, not the four employees of King Street who have no experience in operating a wireless network.

133.    The third factor is *"Control of Policy Decisions."* Again, Relators' evidence shows that U.S. Cellular, not King Street, offers wireless services to the public using King Street's licenses, and the service contracts are between U.S. Cellular and the individual customer. King Street has no relationship with the wireless customers. Moreover, as U.S. Cellular explicitly acknowledges in its reports to shareholders, U.S. Cellular has "the power to direct [King Street's] activities that most significantly impact economic performance." U.S. Cellular 2013 Annual Report, page 61.

134.    With regard to the fourth factor under the FCC's *de facto* control test – *"Personnel Responsibilities"* – King Street has four employees, none of whom have any experience in building, operating, or maintaining a wireless network or marketing or selling a wireless service. They could not have possibly supervised the thousands of employees and contractors necessary to build the networks in 152 markets, maintain and operate them, and then supervise all the employees at the U.S. Cellular stores in any meaningful way.

135.    The fifth factor – *"control of financial obligations"* – also points entirely in the direction of a finding of *de facto* control by U.S. Cellular. U.S. Cellular controls every aspect of King Street's finances. U.S. Cellular supplied all the money to pay the FCC for the King Street licenses won at auction; the restrictions imposed on King Street in the loan and pledge agreements with U.S. Cellular ensured that King Street had no ability to obtain any third party debt or equity financing; and U.S. Cellular paid for all of the construction, operations and

maintenance costs of running the wireless networks. Notwithstanding King Street's pretense to the FCC in its DE Annual Reports, U.S. Cellular explicitly acknowledges in its reports to shareholders that U.S. Cellular had and retains "a controlling financial interest" in King Street. U.S. Cellular 2013 Annual Report, page 61.

136. As the FCC has found in the past, financing provisions of large company investors in DEs that "have the effect of deterring potential outside lenders in the first instance and giving the Limited Partner control of whether [the DE] receives funds from outside sources should an outside source of capital be located" give the limited partner – here U.S. Cellular –"the power to dominate [the DE's] business affairs." *Baker Creek Communications, L.P.*, 13 FCC Rcd. 18709, ¶ 24 (1998). Further, as the Commission observed in *Applications of Shawn Phalen,* Memorandum Opinion and Order, 7 FCC Rcd. 623, ¶ 14 (1992), "a financier can use that leverage as a bludgeon with which bend a licensee to its will." *See also Heitmeyer v. FCC,* 95 F.2d 91, 99 (D.C. Cir. 1937) ("It is well known that one of the most powerful and effective methods of control of any business, organization, or institution ... is the control of its finances ... [T]he burden is and should be upon the applicant to satisfy the Commission, not only that he has financial ability to construct and operate a station, but financial ability to construct and operate it free of control, direct or indirect ....").

137. With regard to the sixth factor under the FCC's *de facto* control test, *Receipt of Monies and Profits*, U.S. Cellular expects to reap the financial rewards from its 90% ownership of King Street. As it has repeatedly stated in its annual reports to its shareholders, U.S. Cellular "anticipates benefiting from or absorbing a majority of [King Street's] expected gains or losses" and "it has a controlling financial interest and is the primary beneficiary" in King Street. *See, e.g.,* U.S. Cellular 2009 Annual Report, page 55. U.S. Cellular further states that it has a

"controlling financial interest" in King Street in part because it has "the obligation to absorb [King Street's] losses and right to receive benefits that are significant to [King Street]." *Id.*

138.    Relators' evidence relevant to each factor the FCC uses to determine *de facto* control shows that U.S. Cellular (and its 84 percent owner, TDS) has a controlling interest in King Street and that King Street made multiple material misrepresentations to the government in its DE Annual Reports. Once U.S. Cellular's and TDS's billions of dollars in revenues are added to King Street's revenues as controlling interests in King Street, King Street would no longer be a "very small business." Had King Street or U.S. Cellular disclosed the true nature of their relationship, they would have owed the Federal Treasury up to $100.2 million in unjust enrichment obligations.

139.    Defendants have submitted claims for payment, and conspired to submit (and/or cause to be submitted) false claims or statements to the government in order to obtain and/or retain money or property – in the form of auction bidding credits from the FCC – of up to $100.2 million. Defendants submitted such claims despite Defendants' knowledge that U.S. Cellular (and its 84 percent owner, TDS) is an affiliate of, and has a controlling interest in, King Street. In reliance upon the above-described false claims and false statements, the United States has disbursed funds to the Defendants and/or Defendants have knowingly concealed or improperly avoided or decreased their obligations to pay or transmit money to the Federal Treasury.

## VI.    SPECIFIC ALLEGATIONS OF THE DEFENDANTS' FALSE CLAIMS REGARDING CARROLL AND BARAT

140.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

141.    U.S. Cellular's misuse of King Street to avoid unjust enrichment obligations from FCC bidding auction credits to which it was not entitled was not the first time the Defendants

had abused the FCC's designated entity rules. In fact, it has misused the FCC's DE program through at least two other DE licensees – Carroll and Barat – to control illegally dozens of valuable FCC licenses that were obtained in FCC Auctions 58 and 66. Further, with respect to Carroll, U.S. Cellular illegally controlled several "closed" licenses reserved only for much smaller companies, called "entrepreneurs" under FCC rules.

142. Through the fraudulent and illegal control of Carroll and Barat, the Defendants U.S. Cellular and TDS have defrauded the Federal Government of over $120 Million. The Defendants did so by falsely reporting to the Commission in the DE Annual Reports of Carroll and Barat that U.S. Cellular and TDS were not in control or affiliates of the respective licensees.

143. The facts disclosed by the Relators show exactly the opposite. U.S. Cellular had complete control of Carroll and Barat throughout the auction bidding and application processes and for the entire unjust enrichment periods. Except on certain papers filed with the FCC and the SEC, Carroll and Barat were, at most, U.S. Cellular's wholly-owned subsidiaries. They made no independent personnel and strategic decisions, and served as shell "spectrum holders" created for the sole purpose of allowing U.S. Cellular to obtain bidding discounts during the auction and retain them for the entire unjust enrichment period.

144. *First*, as discussed above, U.S. Cellular has controlled, and has had an attributable material relationship with, King Street since 2010, which means that Defendant DiNardo has been affiliated with U.S. Cellular since that time. As the owner of the general partner of Carroll and Barat, however, she falsely told the FCC in the Carroll and Barat DE Annual Reports that they were not affiliated with or controlled by U.S. Cellular and TDS.

145. *Second*, in 2012, U.S. Cellular acquired Defendant DiNardo's "controlling" interest in the Carroll and Barat licensees for an "immaterial amount." Defendant DiNardo's 10

percent equity holdings in the licenses and the associated wireless networks as well as her purported control of those licenses and networks, was worth far more than an "immaterial amount" (in light of the materiality, on U.S. Cellular's public accounting reports, of far smaller amounts). The fact that Defendant DiNardo accepted a grossly below-fair-market-value payment for her purported equity and controlling interest in Carroll and Barat demonstrates that each of the companies' statements to the FCC in their DE Annual Reports that they remained small businesses were lies.

146. *Third*, Defendant DiNardo had an undisclosed and preexisting business relationship with, and ties of loyalty to, U.S. Cellular and TDS amounting to a long-standing joint venture that included Carroll and Barat, a form of affiliation under FCC DE rules.

## A. Defendants' Participation in FCC Auctions 58 and 66

147. For Auctions 58 and 66 (as with Auction 73), entities qualified as "very small businesses" were entitled to receive bid credits of 25 percent of the gross high bid of the license. Thus, for example, if a "very small business" applicant was declared the high bidder on a license based on a bid of $1 million, that bidder would be obligated to pay the federal government only the "net" high bid of $750,000.00. In Auctions 58 and 66, a "very small business" applicant was eligible for a 25 percent bid credit *only* if the average annual gross revenues of the applicant, its affiliates, its controlling interests and their affiliates did not exceed $15 million for the preceding three years. Given that both U.S. Cellular and TDS were each earning billions of dollars in the years preceding Auctions 58 and 66, Defendants U.S. Cellular, USCCWI, and TDS (and any entity that was openly controlled by them) would not have qualified as an applicant eligible to receive "very small business" credits in either auction or to control DE licenses after the auction for five years.

148. In Auction 58, Carroll was the high bidder on 16 licenses[20] with cumulative gross bids of $151,815,000.00, for which it paid a cumulative net total of $129,669,750.00, amounting to a "very small business" bidding credit of $22,119,250.00. Ten of those 16 licenses were in a "closed" block, meaning there were no bidding credits available, but only DEs were eligible to bid.[21] Carroll's high bids on the closed licenses totaled $63,338,000.00. The FCC granted the Carroll license applications on January 6, 2006.

149. In Auction 66, Barat was the high bidder on 17 licenses with cumulative gross bids of $169,520,000.00, for which it paid a cumulative net total of $127,140,000.00, amounting to a "very small business" bidding credit of $42,380,000.00. The FCC granted the Barat license applications on April 30, 2007.

150. U.S. Cellular's affiliation with and control of King Street since at least 2010, as discussed above, also means that U.S. Cellular was an affiliate of and controlled Carroll and Barat beginning at that time. In particular, the FCC's rules provide that the annual gross revenues of a DE licensee's "affiliates, its controlling interests, and the affiliates of its controlling interests" are to be included in measuring the DE's eligibility. 47 C.F.R. § 1.2110(b)(1)(i). Even if we were to assume *arguendo* that U.S. Cellular did not directly control Carroll and Barat, then DiNardo would have been the "controlling interest" of the two DEs, as she purported to be on numerous FCC applications and annual DE reports. Since U.S. Cellular

---

[20] Carroll won 17 licenses in Auction 58, but for reasons not related to this Complaint, the FCC did not grant one of the licenses.

[21] The largest DEs that were eligible to bid on "closed" licenses in Auction 58 were "entrepreneurs," which were defined by FCC rules as bidders with less than $125 million in annual revenues in each of the last two years and total assets of less than $500 million. 47 C.F.R. § 24.709(a). High bidders on the "closed" licenses received no bidding credits and the licenses could not be assigned or transferred to an entity that was not an "entrepreneur" (or smaller) for five years after the license was issued. 47 C.F.R. § 24.839(a). By contrast, the "open" licenses could be bid on by any applicant regardless of its revenues and assets, but "small businesses" and "very small businesses" were eligible for bidding credits.

had *de facto* control of King Street Wireless, King Street Wireless, Inc., and DiNardo, however, under the FCC's rules, U.S. Cellular would have been deemed an "affiliate[] of [Carroll's and Barat's] controlling interest[]" (*i.e.,* DiNardo). Thus, even without the benefit of the Relators' evidence concerning U.S. Cellular's direct control of Carroll and Barat, FCC rules would require U.S. Cellular's gross revenues to be attributed to Carroll and Barat beginning in 2010.

**B.     U.S. Cellular's Post-Licensing Control of Carroll and Barat**

151.    Although Carroll and Barat presented themselves to the FCC during the post-licensing five-year unjust enrichment period as distinct and independent business operations, in fact they were simply the license-holding instruments for U.S. Cellular and TDS. The sham "very small businesses" were specifically designed to deceive the FCC and to evade federal affiliation and control requirements. To the U.S. Securities and Exchange Commission and to investors, U.S. Cellular and TDS have made plain the true nature of these relationships:

- "Carroll Wireless . . . [is] an entity in which U.S. Cellular owns a controlling interest for financial reporting purposes."

- "Barat Wireless and Carroll Wireless are in the process of developing long-term business and financing plans. For financial statement purposes, U.S. Cellular consolidates Barat Wireless and Barat Wireless, Inc., the general partner of Barat Wireless and Carroll Wireless and Carroll PCS, Inc., the general partner of Carroll Wireless, pursuant to the guidelines of FIN 46(R), as U.S. Cellular anticipates benefiting from or absorbing a majority of Barat Wireless' and Carroll Wireless' expected gains or losses."[22]

- "As of December 31, 2006, U.S. Cellular has made capital contributions and advances to Carroll Wireless and/or its general partner of $129.9 million; of this amount, $129.7 million is included in Licenses on the Consolidated Balance Sheet as of December 31, 2006.

---

[22] "Under GAAP, a reporting entity must consolidate any entity in which it has a *controlling financial interest.* Under the voting interest model, generally the investor that has voting control (usually more than 50 percent of an entity's voting interests) consolidates the entity. Under the VIE model, the party that has the power to direct the entity's most significant economic activities and the ability to participate in the entity's economics consolidates the entity. This party could be an equity investor, some other capital provider, or a party with contractual arrangements." PWC, Guide to Accounting for Variable Interest Entities, page 2 (2013) (emphasis in original), available at http://www.pwc.com/us/en/cfodirect/assets/pdf/accounting-guides/pwc_variable_interest_2013.pdf.

- "As of December 31, 2006, U.S. Cellular has made capital contributions and advances to Barat Wireless and/or its general partner of $127.2 million to provide funding of Barat Wireless' participation in Auction 66; this amount is included in Licenses on the Consolidated Balance Sheet as of December 31, 2006.

- "The consolidated financial statements include the accounts of U.S. Cellular, its majority-owned subsidiaries, general partnerships in which U.S. Cellular has a majority partnership interest and variable interest entities ("VIEs") in which U.S. Cellular is the primary beneficiary."

- "On September 7, 2012, U.S. Cellular acquired 100% of the ownership interest in Barat Wireless, Inc., the general partner of Barat Wireless, for an immaterial amount. On December 5, 2012, U.S. Cellular acquired 100% of the ownership interest in Carroll PCS, Inc., the general partner of Carroll Wireless, for an immaterial amount. Prior to these acquisitions, U.S. Cellular consolidated Barat Wireless, Barat Wireless, Inc., Carroll Wireless, and Carroll PCS, Inc. as VIEs. Subsequent to the acquisition dates these entities ceased to be VIEs but continue to be consolidated based on U.S. Cellular's controlling financial interest in the entities."

152.    TDS specifically confirmed to investors that Carroll's "17 licensed areas cover portions of 12 states and are in markets which are either adjacent to or overlap current U.S. Cellular licensed areas." The licenses that Barat obtained in Auction 66 follow the same pattern, and cover markets that either overlap with or are contiguous to U.S. Cellular's operating wireless service areas. The unique license holdings of Barat and Carroll were complementary *only* to the U.S. Cellular operating markets, and were not complementary to the markets of any other wireless service provider in the country. Controlling the Carroll and Barat licenses had tremendous value for U.S. Cellular and TDS by allowing them to reduce spectrum costs and increase profit margins with easy, but illegal, access to valuable spectrum at below-market prices, and allowing them to "hedge" against market risks associated with acquiring and owning wireless spectrum at full price.

153.    U.S. Cellular's strategy of controlling Carroll and Barat is further confirmed by their failure to engage in independent or ongoing business operations during the five-year periods subsequent to Auctions 58 and 66. They had no websites or public presence and, at the

end of 2011, U.S. Cellular reported to the SEC that the two VIEs were still "in the process of developing long-term business plans." U.S. Cellular 2011 Annual Report at 53. In addition, the Relators have discovered that the two DEs complied only minimally with the obligations the FCC imposes upon operating telecommunications carriers. For example, neither Barat nor Carroll has ever filed an annual Consumer Proprietary Network Information ("CPNI") compliance report as required by law, 47 C.F.R. § 64.2001, *et seq.*[23] Similarly, while all telecommunications carriers, including wireless service providers, need telephone numbers to assign to customers purchasing cell phones and wireless service, the Relators' evidence shows that Carroll and Barat never applied for or received any numbers, or submitted NANPA biannual NRUF reports detailing how they are using telephone numbers and estimating their usage for the coming five years. *See* http://www.nanpa.com/nruf/index.html. If Carroll or Barat had actually provided service to the public prior to being acquired by U.S. Cellular in 2012, they would have made these and similar required filings. At the same time, U.S. Cellular established a "controlling interest" over Barat under FCC regulations through its management agreement allowing U.S. Cellular to set the prices, terms and nature of the services offered using the Barat licenses.

154. Rather, the Defendants' plan was to cache the Carroll and Barat licenses for future use by U.S. Cellular, with the DEs as vehicles to amass millions of dollars of discounted licenses. Defendant DiNardo's role in this plan was to manage the license-holding entities as "subsidiaries" of U.S. Cellular to meet prescribed FCC licensee obligations, but she had no

---

[23] While Carroll did file a statement with the FCC (EB Docket 06-36) in February 2006 that it was not offering service but that it would comply with the CPNI rules if it ever did offer service, Carroll never filed an annual CPNI report subsequently. Barat never filed a statement regarding CPNI with the FCC.

experience, financial resources, training, management team, or employees capable of operating an independent wireless services business.

    **C.**    **U.S. Cellular and TDS Provided All of the Funding for the Carroll and Barat Licenses and Wireless Networks, and They Enjoyed Virtually All the Benefits and Assumed Virtually All the Risks of Ownership of Carroll and Barat.**

    155.    U.S. Cellular provided all of the funds necessary for the operation and activities of Carroll and Barat, except for a small token investment from DiNardo. Beginning with the formation of the limited partnerships, U.S. Cellular provided initial capital for both its 90 percent share of the Carroll and Barat limited partnerships and even loaned the monies to the general partners purportedly controlled by DiNardo to allow those entities to make their respective initial 10 percent equity capital contributions. U.S. Cellular then provided all of the hundreds of millions of dollars necessary for Carroll and Barat's upfront payments and net winning bid payments to obtain the FCC licenses. None of the other Defendants – DiNardo, Carroll Wireless, Carroll PCS, Inc., Barat Wireless, Barat Wireless, Inc., King Street Wireless, and King Street Wireless, Inc. – have contributed their own financial assets or raised third-party financing for the auction payments for the FCC licenses.

    156.    Further, through restrictions placed on Carroll and Barat in various agreements among the Defendants, U.S. Cellular effectively prevented Carroll and Barat (as well as their general partners and DiNardo) from obtaining any debt or equity financing from any entity not affiliated with U.S. Cellular.

    157.    U.S. Cellular also prevented Defendant DiNardo from raising funds through the sale of Carroll or Barat licenses to any third-party buyer. In the case of Carroll, for example, under an amendment to the Limited Partnership Agreement – the terms of which were not disclosed to the FCC before the licenses were issued – the limited partner (USWWI) had veto

power over any decision by the general partner (Carroll PCS, Inc.) involving "the sale, transfer, exchange, lease, mortgage, pledge, or assignment of any license [with the exception of four specific licenses]." In light of this amendment, and the fact that the sole activity of the limited partnership was to bid on and then hold spectrum licenses, there was little room left for Carroll PCS, Inc., or Defendant DiNardo to exercise any actual control over the activities of Carroll Wireless.

158. The terms of the Carroll and Barat Limited Partnership Agreements and Investment Agreements favored the limited partner, USWWI, and ensured that U.S. Cellular and TDS would reap the vast majority of any profits derived from the revenue-generating activities of the DEs. These agreements also guaranteed that U.S. Cellular and TDS had the ability to manipulate and control the return on investment and the profits earned by the sham "general partners" and Defendant DiNardo. Indeed, the financial arrangements allowed the sham "general partners" and Defendant DiNardo to receive little more than compensation for services performed as agents of U.S. Cellular.

159. U.S. Cellular and TDS also bear the hallmark of a controlling ownership over Carroll and Barat because they, not the general partners or DiNardo, would suffer almost all of the losses if the activities of Carroll or Barat were to prove to be unprofitable. For example, if the value of the Carroll or Barat licenses were to fall to zero, it was U.S. Cellular and TDS – having proffered hundreds of millions of dollars for those licenses – that would have borne the entire loss, not Carroll, Barat or DiNardo. Neither of the general partners nor DiNardo had contributed capital into the ventures and none had the ability to pay back U.S. Cellular under the massive loan arrangements. U.S. Cellular's control over Carroll and Barat is also evidenced by the fact that each was severely undercapitalized during the entire period prior to the transfer of

78

their licenses to U.S. Cellular in 2012, rendering them wholly dependent on U.S. Cellular to pay all of their costs and expenses.[24]

160.    U.S. Cellular's, USCCWI's, and TDS's *de facto* control over Carroll's and Barat's finances, financial decisions and obligations, ability to sell the FCC licenses, and enjoyment of the profits and risks of ownership was not fully disclosed to the FCC by the Defendants, notwithstanding that such disclosure was mandated by FCC rules.

161.    Carroll also filed the required construction notices with the FCC from September 2007 through February 2010, claiming that it had built out wireless networks in the 16 markets for which it held licenses. In fact, U.S. Cellular – not Carroll – financed, built, owned and continues to operate the wireless networks using the Carroll licenses in each of these markets.

162.    As the D.C. Circuit Court of Appeals noted when finding an investor had *de facto* control of an FCC license applicant: "In our view it is wholly unrealistic to say that a stockholder who is to furnish all the money to his corporation for the construction of a television station and to take part in determining the necessity for advancing it as the work progresses, and is to furnish all the money for the first year's operation, receiving weekly financial statements and giving financial advice, is not in practical effect one of the 'principals' of the corporation." *WLOX Broadcasting Co. v. FCC*, 260 F.2d 712, 715 (D.C. Cir. 1958). The same is true in this case: U.S. Cellular's total financial control over Carroll and Barat rendered them entirely incapable of operating as independent entities.

---

[24] *Application of Inter-Urban Broadcasting of Cincinnati, Inc.*, Memorandum Opinion and Order, 10 FCC Rcd. 8777, ¶ 14 (1995) (finding *de facto* control of investors that had entirely capitalized licensee).

D.     **U.S. Cellular's Acquisition of Carroll and Barat for an "Immaterial Amount" Demonstrates that DiNardo Never Had a Controlling Ten Percent Interest in the Licensees.**

163.    From the time Barat and Carroll were formed, U.S. Cellular reported to the SEC and shareholders that it had financial control over the DEs. U.S. Cellular, however, did not simply deem its DEs to be consolidated VIEs, it also determined that federal accounting rules required it to consolidate the partnerships' sole general partners, Barat Wireless, Inc. and Carroll PCS, Inc. (in which it ostensibly had no equity at risk and no affiliation through officers and directors) on its financial statements. *See* U.S. Cellular 2011 Annual Report, page 51. Thus, even though Allison DiNardo owned 100 percent of the stock of Barat Wireless, Inc. and Carroll PCS, Inc., 100 percent *de jure* voting control of Barat Wireless, Inc. and Carroll PCS, Inc., and was the sole officer (president) of Barat Wireless, Inc. and Carroll PCS, Inc., U.S. Cellular told the SEC and public shareholders that U.S. Cellular controlled the *general* partners' financial activities. To the FCC, by contrast, U.S. Cellular characterized its equity in its DEs as merely that of a limited (*i.e.*, non-controlling) partner, and its status as a limited partner was critical to its false depiction of its investment in the DEs as passive.

164.    Ultimately, U.S. Cellular formalized its *de facto* control over Carroll and Barat by acquiring them. In 2012, just after the unjust enrichment period for Barat had expired, U.S. Cellular purchased the remaining equity in the two companies for what it described in its 2012 Annual Report as an "immaterial amount." U.S. Cellular 2012 Annual Report, page 53. While the Defendants have not disclosed the exact sale price, it is telling that the same page of the report discloses specific dollar amounts concerning the VIEs that are relatively small, such as $47,000.00 for "other cash assets" of the VIEs and $153,000.00 for "other assets and deferred

charges." It is reasonable to conclude, therefore, that the sale price was, in fact, an amount so "immaterial" that it did not warrant reporting to the public.

165. If DiNardo and U.S. Cellular had been independent parties engaged in reasonable and commercially negotiated sale transactions, DiNardo's 10 percent ownership and controlling general partnership interests in Carroll and Barat would have been worth tens of millions of dollars in 2012. Indeed, using a very conservative analysis that takes into account solely the value of the spectrum licenses in late 2012,[25] and a reasonable "control premium."[26] DiNardo's 10 percent interests in Carroll and Barat would have been worth approximately $44.4 million and $49.6 million respectively. When DiNardo's debt to U.S. Cellular, plus compounded interest, is subtracted, U.S. Cellular should have paid DiNardo approximately $21 million and $26 million respectively for her ten percent interests in, and control of, Carroll and Barat.[27]

---

[25] Without taking into account the bidding discounts, Carroll paid $151,815,000 for its licenses in Auction 58 and Barat paid $169,520,000 for its licenses in Auction 66. Through reviewing the available literature on the subject, the Relators have conservatively estimated that both the PCS and AWS licenses had increased 125% in value by the third quarter of 2012. See, e.g., Wallsten, Is There Really a Spectrum Crisis? Quantifying the Factors Affecting Spectrum License Value, Technology Policy Institute, Feb. 26, 2013, at n.56 ("Estimating the all-license regression above as a log-linear model suggests a price change of about 150 percent between 2007 and 2011 (approximately 25 percent annual growth rate), which seems plausible but still high, as secondary trades discussed below highlight."); id. at 35 ("I also find evidence that, all else equal, license prices increased steadily since about 2007, suggesting that demand for wireless services has been outpacing improvements in technological efficiency. However, the range of estimated change is large—between 4 and 30 percent annually for 2011 and 2012 and the rate of price increase has probably been slowing.").

[26] National Association of Certified Valuators and Analysts (NACVA), Fundamentals, Techniques & Theory, Chapter Seven (Valuation Discounts and Premiums) at 5, available at http://edu.nacva.com/preread/2012BVTC/2012v1_FTT_Chapter_Seven.pdf. ("Of all the intrinsic characteristics related to an equity interest, arguably none may be more important than the element of control."). In Relators' analysis, they have assumed a conservative control premium of 30 percent. See id. at 14 ("Upon analysis of the Mergerstat Review data, it can be observed [that] … [t]he annual median control premium observations conducted over this historical period [1980-2002] range from 27.3 to 44.6 percent."). Given the regulatory benefits to U.S. Cellular of assuming de jure control over companies that it had to pretend were independently run for more than five years, and the enormous business value to U.S. Cellular of the spectrum assets held by the partnerships, the control premium likely should be higher.

[27] Although U.S. Cellular's Consolidated Balance Sheets reflect virtually no liabilities attributable to the VIEs, Relators' valuations of DiNardo's controlling 10% interest in Carroll and Barat at the time of the sales to U.S. Cellular in the third quarter of 2012 are reduced to take into account her portion of the debt

166.     The fact that DiNardo agreed to sell her interests in Carroll and Barat for a small

fraction of what they were worth demonstrates that DiNardo and U.S. Cellular were never

independent parties.  It also demonstrates that Carroll and Barat materially lied to the FCC in

their DE Annual Reports when they claimed that DiNardo had maintained 10 percent ownership

and control over the DEs.  As the FCC has warned, a DE that lacks of a meaningful economic

stake is a telltale mark of a sham: "We will scrutinize … any mechanisms that deprive the [DE]

control group of the ability to realize a financial benefit proportional to its ownership of the

applicant;"[28] and the DEs' "equity interest [should] entitle[] them to a substantial stake in the

profits and liquidation value of the venture relative to the non-controlling principals."[29]

### E.   Through Fraudulent Representations and Deceptive Omissions, U.S. Cellular and TDS Illegally Appropriated and Retained "Very Small Business" Credits and "Closed" DE Licenses

167.     To deceive the FCC regarding U.S. Cellular's *de facto* control, the Carroll and

Barat DE Annual Reports were designed to create the erroneous appearance that the putative 10

percent general partner, and ultimately Defendant DiNardo, controlled the enterprises.  In fact,

however, none of the Defendants expected Carroll and Barat would conduct actual business

operations.  The Defendants understood that DiNardo's formal paper badges of control were

meaningless in practical terms.  Indeed, through the Carroll and Barat DE Annual Reports, the

---

obligations (principal plus interest accrued) associated with each DE and its General Partner. Specifically, in December 2004, U.S. Cellular loaned Carroll PCS, Inc. $2,501,900.00 and loaned Carroll Wireless L.P. $104,076,000.00, with an interest rate for both loans of 8% compounded annually.  By the time of the Q3 2012 sale, DiNardo's liability under both of these Carroll notes (including accrued interest) was approximately $23.5 million (reflecting her 100% ownership of Carroll PCS, Inc. and her 10% ownership of Carroll Wireless L.P.).  Similarly, in July 2006, U.S. Cellular loaned Barat Wireless, Inc. $4,500,000.00 and loaned Barat Wireless L.P. $101,952,000.00, with an interest rate for both loans of 8% compounded annually.  By the time of the Q3 2012 sale, DiNardo's liability under both of these Barat notes including accrued interest was approximately $22.4 million.

[28] *Fifth MO&O*, ¶ 82.

[29] *Implementation of Section 309(j) of the Communications Act - Competitive Bidding*, Second Report and Order, 9 FCC Rcd 2348, ¶ 278 (1994).

Defendants knowingly made false representations to the FCC concerning the *de facto* control of U.S. Cellular and TDS over Carroll and Barat. *Fox Television Stations, Inc.*, Second Memorandum Opinion and Order, 11 FCC Rcd 5714, ¶ 14 (1995) ("[W]e must examine the economic realities of the transactions under review and not simply the labels attached by the parties to their corporate incidents.").

168.     The Defendants made these omissions and false certifications with the intention to induce, and did fraudulently induce, the FCC to believe that Carroll and Barat remained qualified "very small businesses," and not affiliates of U.S. Cellular and TDS, during the entire five-year term of their respective unjust enrichment periods.  Further, the omissions and false certifications made by Carroll in its DE Annual Reports were intended to induce, and did fraudulently induce, the FCC to believe that it remained qualified as an "entrepreneur" entitled to hold the ten "closed" bid licenses, for five years after issuance of the licenses.

**F.     The Defendants Have Failed To Return the Value of the Ill-Gotten Credits Or the Closed Licenses to the U.S. Treasury**

169.     Federal law requires the licensee to pay the federal government an unjust enrichment penalty when control over a license obtained through bidding credits is transferred to an ineligible entity within five years after the FCC issues the license, plus interest from the time that the license was granted.  47 C.F.R. § 1.2111(b).  Federal unjust enrichment laws mandate that the bidding credits received by Defendants — valued at the time the licenses were awarded — be returned to the U.S. Treasury, plus interest from the date of issuance.  No Defendant, however, has returned any portion of the bidding credits the FCC Applicants received for licenses obtained through Auctions 58 and 66.

170.     Further, federal law provides that the FCC shall not consent to the transfer of a "closed" bidding license within five years of its issuance to an entity that does not meet the

"entrepreneur" revenue and assets caps. 47 C.F.R. § 24.839. If the licensee fails to meet a license condition, the license shall be deemed void automatically and returned to the FCC for re-allocation in a subsequent FCC auction. No Defendant, however, has returned any portion of the value that the Federal Government would have been able to obtain if the ten Carroll "closed" bidding licenses had been returned and re-auctioned. Even assuming *arguendo* that the Carroll "closed" bidding licenses were not declared null and void at the time of the illegal *de facto* transfer of control, the Defendants have not paid the Federal Government the difference between the high bid they paid for the "closed" licenses and what they would have had to pay as non-DEs if those licenses had been auctioned as "open" to all competing bidders.

## VII. COUNTS

### COUNT ONE
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)[30]
### (Against All Defendants)

171. Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

172. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

173. By virtue of the misrepresentations and concealment described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for improper payment or approval from the FCC.

---

[30] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(1) (1986).

174.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants presented, or caused to be presented, paid for claims that otherwise would not have been allowed.

175.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWO
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)[31]
### (Against All Defendants)

176.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

177.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

178.    By virtue of the misrepresentations and concealment described above, Defendants knowingly made, used, or caused to be made or used, a false record(s) or statement(s) material to a false or fraudulent claim with regard to payments from the FCC.

179.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants submitted or caused to be submitted, paid for claims that otherwise would not have been allowed.

180.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

---

[31] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(2).

## COUNT THREE
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(D)[32]
### (Against All Defendants)

181.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

182.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(D).

183.   Defendants have possession, custody, or control of property in the form of FCC "closed" licenses that, absent Defendants' illegal acts, would have been re-auctioned by the Government in a subsequent FCC auction for tens of millions of dollars, except for the fact that the Defendants knowingly delivered, or caused to be delivered, none of that property.

184.   As a result of Defendants' retention of the improperly obtained funds and property, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT FOUR
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)[33]
### (Against All Defendants)

185.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

186.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(D)&(G).

187.   Defendants knowingly made, used or caused to made or used a false record or statement material to an obligation to pay or transmit money or property to the Government and

---

[32] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730 (a)(4).

[33] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730 (a)(7).

Defendants knowingly concealed and improperly avoided or decreased their obligation to pay

such monies or relinquish such property to the Government by concealing their relationship from

the FCC in order to avoid paying the Federal Treasury the unjust enrichment payments and in

order to avoid return and relinquishment of "closed" bidding FCC licenses.

188.    As a result of Defendants' retention of the improperly obtained funds and

property, the United States has been damaged, and continues to be damaged, in a substantial

amount.

## COUNT FIVE
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C) [34]
### (Against All Defendants)

189.    Relators re-allege and incorporate by reference the allegations contained in the

preceding paragraphs of this Complaint.

190.    This is a claim for treble damages and civil penalties under the False Claims Act,

31 U.S.C. § 3729(a)(1)(C).

191.    By virtue of the conduct described above, Defendants knowingly conspired to

commit violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), (D), and (G) in violation of 31 U.S.C. §

3729(a)(1)(C).

192.    The United States -- unaware of the conspiracy among Defendants to submit false

claims, make false statements or records, and/or to conceal and improperly avoid or decrease

their obligation to pay funds to the Federal Treasury and to retain FCC licenses illegally -- paid

for claims that otherwise would not have been allowed and/or failed to receive funds otherwise

---

[34] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730 (a)(3).

due and did not recover property in the form of FCC "closed" licenses otherwise due to it under federal law.

193.    By reason of the Defendants' failures to pay the Government and to relinquish property owing and due under federal law, the United States has been damaged, and continues to be damaged, in a substantial amount.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Relators request that judgment be entered against Defendants, ordering that:

a.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*;

b.    Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions;

c.    The Relators be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

e.    The Relators be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

f.    Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

g.    Defendants disgorge all sums by which it has been enriched unjustly by its wrongful conduct; and

h.    The United States and the Relators recover such other relief as the Court deems just and proper.

**REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relator hereby demands a trial by jury.

Dated: February 9, 2016

Respectfully submitted,

s/Vicki Zemp Behenna
Vicki Zemp Behenna, OBA #10734
CROWE & DUNLEVY, P.C.
Braniff Building
324 North Robinson Avenue, Suite 100
Oklahoma City, OK 73102-8273
(405) 235-7700
(405) 239-6651 (Facsimile)
vicki.behenna@crowedunlevy.com

THE VERNIA LAW FIRM
1455 Pennsylvania Avenue, N.W., Suite 400
Washington, D.C. 20004
Telephone: (202) 349-4053
Facsimile: (866) 572-6728
bvernia@vernialaw.com

*Attorneys for Relators Mark J. O'Connor and Sara F. Leibman*

## CERTIFICATE OF SERVICE

On February 9, 2016, I hereby certify that a copy of this Notice of Filing Amended Complaint was served upon the following persons via first class mail, certified, return receipt requested:

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

| | |
|---|---|
| United States Attorney General<br>Loretta E. Lynch<br>United States Department of Justice<br>950 Pennsylvania Ave., N.W.<br>Washington, D.C. 20530 | United States Attorney General Loretta E.<br>Lynch<br>c/o Ms. Joyce R. Branda<br>Deputy Director, Commercial Litigation<br>Branch - Fraud Section<br>U.S. Department of Justice<br>Ben Franklin Station<br>950 Pennsylvania Avenue<br>P.O. BOX 261<br>Washington, D.C. 20530<br>(202) 307-0231<br>(202) 616-3085 |
| United States Attorney for the Western<br>District<br>of Oklahoma<br>Assistant U.S. Attorney Ronald Gallegos<br>Assistant U.S. Attorney Scott Maule<br>United States Attorney's Office<br>210 West Park Avenue, Suite 400<br>Oklahoma City, OK 73102<br>(405) 553-8700<br>(405) 553-8888 (fax) | Elspeth A. England<br>Trial Attorney<br>Fraud Section, Commercial Litigation<br>Branch<br>Civil Division<br>United States Department of Justice<br>601 D Street, N.W.<br>Washington, D.C. 20530 |

s/Vicki Zemp Behenna
Vicki Zemp Behenna

2926241.1