**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| *ex rel.*, ) | |
| ) | |
| MARK J. O'CONNOR AND SARA F. ) | |
| LEIBMAN, ) | |
| ) | |
| Plaintiffs- Relators, ) | |
| ) | |
| v. ) | |
| ) | Case No.  15-CV-370-G |
| UNITED STATES CELLULAR ) | |
| CORPORATION, USCC WIRELESS ) | |
| INVESTMENT, INC., TELEPHONE AND ) | |
| DATA SYSTEMS, INC., KING STREET ) | |
| WIRELESS, L.P., KING STREET ) | |
| WIRELESS, INC., CARROLL WIRELESS ) | |
| L.P., CARROLL PCS, INC., BARAT ) | |
| WIRELESS, L.P., BARAT WIRELESS, ) | |
| INC., AND ALLISON CRYOR DINARDO, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

**<u>SECOND AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ........................................................................................................... 1

THE PARTIES ................................................................................................................. 5

    A.    Plaintiffs ......................................................................................................... 5

    B.    Defendants ...................................................................................................... 6

JURISDICTION AND VENUE ..................................................................................... 9

RELEVANT STATUTES AND REGULATIONS .................................................... 10

    A.    The False Claims Act ................................................................................. 10

    B.    The Federal Communications Act ........................................................... 12

    C.    FCC Spectrum Auctions and Licensing Regulations ........................... 13

        1.    Short-Form and Long-Form Applications ................................ 13

        2.    Designated Entity and Closed Bidding Eligibility
            Requirements ................................................................................ 15

        3.    "Attributable Interest Holder" Requirements ........................... 16

            a.    "Attributable Material Relationship" ("AMR") Rule .................. 17

            b.    "Controlling Interests" Rule ........................................................ 17

            c.    "Management Agreement Controlling Interest"
                ("MACI") Rule ............................................................................ 17

            d.    "Affiliation Rule" ........................................................................ 18

            e.    "Joint Venture" Rule ................................................................... 18

        4.    Post-Licensing Requirements ..................................................... 18

            a.    Reporting and Disclosure Requirements .................................... 18

            b.    "Unjust Enrichment Rule" .......................................................... 19

            c.    Construction and Service Performance
                Requirements ............................................................................... 20

I.    KING STREET ALLEGATIONS – FCC AUCTION 73 ................................. 21

A.    U.S. Cellular Used King Street as a Front to Acquire Licenses with DE Bid Credits ........................................................................................ 21

    1.    As a Front for U.S. Cellular, King Street Falsely and Fraudulently Applied for Very Small Business DE Bid Credits in Auction 73 ........................................................ 22

    2.    King Street Falsely and Fraudulently Obtained and Used Bid Credits Far in Excess of Any Other DEs in Auction 73 .......................... 22

    3.    As a Front for U.S. Cellular, King Street Falsely and Fraudulently Applied for Licenses as a Very Small Business DE ......................................................................................... 23

B.    Throughout the Unjust Enrichment Period, U.S. Cellular Controlled and Managed King Street and Its Spectrum ........................................ 28

    1.    Through the Transfer of Virtually All Its Spectrum to U.S. Cellular, King Street Had an Attributable Material Relationship with U.S. Cellular ............................................... 28

    2.    U.S. Cellular Incorporated Virtually All of King Street's Spectrum into Its Own 4G LTE Network .................................. 30

    3.    U.S. Cellular Owns and Controls the Networks Using the King Street Spectrum, as Well as the Profits and Revenues from the Spectrum ...................................................................... 31

    4.    U.S. Cellular and King Street Were Affiliates and Engaged in a Joint Venture ................................................................ 33

    5.    King Street Does Not Control Its Spectrum, or Even Function as a Telecommunications Provider ............................ 33

C.    Defendants Made and Caused to Be Made Numerous False Statements and Omissions of Material Facts to Conceal that, as a Front for U.S. Cellular, King Street Was Ineligible for DE Bid Credits, and to Avoid Having to Return $100.2 Million to the Government ....................................................................................... 35

    1.    False Statements and Omissions of Material Facts Regarding the Network Build-Out in DE Annual Reports and Construction Notices ............................................................ 36

    2.    False Statements and Omissions of Material Fact Regarding U.S. Cellular's Controlling Interest in King Street and Its Spectrum in DE Annual Reports ............................................. 40

3.  Further False Statements and Omissions of Material Fact in FCC Auction 901 ........................................................................ 42

4.  U.S. Cellular's Admission of Its Controlling Interest in King Street – to the SEC .................................................................... 44

II.  CARROLL ALLEGATIONS – FCC AUCTION 58 ...................................... 45

A.  U.S. Cellular Used Carroll as a Front to Acquire Licenses with DE Bid Credits and Small Business Entrepreneur Benefits ........................ 45

1.  As a Front for U.S. Cellular, Carroll Falsely and Fraudulently Applied for Very Small Business DE Bid Credits and Entrepreneur Benefits in Auction 58 ........................ 46

2.  As a Front for U.S. Cellular, Carroll Falsely and Fraudulently Applied for Licenses as a Very Small Business and Entrepreneur ............................................................. 48

B.  Throughout the Unjust Enrichment Period, U.S. Cellular Controlled Carroll and Its Spectrum ................................................................ 50

1.  U.S. Cellular Controlled Carroll and Its Spectrum ................. 50

2.  Carroll Did Not Control Its Spectrum, or Even Function as a Telecommunications Provider ................................................ 51

C.  Defendants Made and Caused to Be Made Numerous False Statements and Omissions of Material Facts to Conceal that, as a Front for U.S. Cellular, Carroll Was Ineligible for DE and Entrepreneur Benefits, and to Avoid Having to Return $22 Million and Its Closed Licenses to the Government ...................................... 53

III.  BARAT ALLEGATIONS – FCC AUCTION 66 ........................................ 56

A.  U.S. Cellular Used Barat as a Front to Acquire Licenses with DE Bid Credits ...................................................................................... 56

1.  As a Front for U.S. Cellular, Barat Falsely and Fraudulently Applied for Very Small Business DE Bid Credits in Auction 66 ................................................................................................ 56

2.  As a Front for U.S. Cellular, Barat Falsely and Fraudulently Applied for Licenses as a Very Small Business ....................... 58

B.  Throughout the Unjust Enrichment Period, U.S. Cellular Controlled Barat and Its Spectrum .......................................................... 59

     C.      Defendants Made and Caused to Be Made Numerous False Statements and Omissions of Material Facts to Conceal that, as a Front for U.S. Cellular, Barat Was Ineligible for DE Bid Credits, and to Avoid Having to Return $42 Million to the Government ......................... 60

COUNTS .................................................................................................................. 63

COUNT ONE – CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT False Claims Act, 31 U.S.C. § 3729(a)(1)(C)   (Against All Defendants) ................................ 63

Overt Acts ............................................................................................................... 65

COUNT TWO – FALSE AND FRAUDULENT CLAIMS FOR PAYMENT False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (Against All Defendants) .................................. 69

COUNT THREE – FALSE RECORDS AND STATEMENTS False Claims Act, 31 U.S.C. § 3729(a)(1)(B)  (Against All Defendants) ........................................................ 70

COUNT FOUR – POSSESSION OF PROPERTY USED BY THE GOVERNMENT False Claims Act, 31 U.S.C. § 3729(a)(1)(D) (Against All Defendants) .................................................................................................................. 71

COUNT FIVE – FAILURE TO RETURN PAYMENTS TO THE GOVERNMENT False Claims Act, 31 U.S.C. § 3729(a)(1)(G)   (Against All Defendants) ................................................................................................................. 71

PRAYER FOR RELIEF ......................................................................................... 72

REQUEST FOR TRIAL BY JURY ...................................................................... 73

On behalf of the United States of America, Plaintiff-Relators Mark O'Connor ("Relator O'Connor") and Sara Leibman ("Relator Leibman") (collectively "Relators") bring this action for violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, against United States Cellular Corporation ("U.S. Cellular"), USCC Wireless Investment, Inc. ("USCC"), Telephone and Data Systems, Inc. ("TDS") (collectively, "U.S. Cellular"), King Street Wireless, L.P., King Street Wireless, Inc. (collectively, "King Street"), Carroll Wireless, L.P., Carroll PCS, Inc., (collectively "Carroll"), Barat Wireless, L.P., Barat Wireless, Inc. (collectively "Barat"), and Allison Cryor DiNardo, and, based upon personal knowledge, relevant documents, unique quantitative and qualitative analyses, unique field tests, information and belief, allege as follows:

## **INTRODUCTION**

1.      In 2008, Defendant U.S. Cellular was the sixth largest wireless company in the United States with billions of dollars in revenues. Between 2005 and 2008, U.S. Cellular used Defendants King Street, Carroll, and Barat, all of which were formed as sham "very small businesses" in partnership with Defendant DiNardo, to acquire wireless communications spectrum licenses using over $150 million in Government-provided bid credits, and licenses that were reserved exclusively for legitimate small business entrepreneurs.

2.      None of the three purported small businesses, King Street, Barat, or Carroll, ever provided wireless services to the public, and U.S. Cellular, not DiNardo and the purported licensees, financed and met the requirements attached to the licenses.

3.      As dependent entities controlled by U.S. Cellular, King Street, Barat, and Carroll's claims for the payment of more than $150 million in small business bid credits, and for reserved licenses were false and fraudulent, in violation of the False Claims Act.

4.      To retain the fraudulently claimed bid credits, as well as the fraudulently claimed reserved licenses, Defendants, through DiNardo, filed and caused to be filed numerous

false records and statements with the FCC to conceal that the alleged small businesses were merely fronts for U.S. Cellular in violation of FCC rules, and to avoid being required to return the funds to the Government, in further violation of the False Claims Act.

5.      The FCC is charged with managing and licensing the radio frequency portion of the electromagnetic spectrum (hereinafter "spectrum") through which wireless communications are transmitted for commercial users. In 1993, Congress authorized the FCC to assign spectrum licenses to commercial wireless carriers through competitive auctions.

6.      Congress directed the FCC to ensure that legitimate small businesses would be able to bid competitively for spectrum licenses with the large established telecommunications companies. *See* 47 U.S.C. § 309(j)(4)(D). To accomplish this, the FCC provides "small" and "very small" businesses, known as "Designated Entities" ("DEs"), with auction "bid credits," effectively reducing their spectrum license costs, 47 C.F.R. § 1.2110, and, in certain cases, offers licenses exclusively to small business "entrepreneurs" in "closed bidding."

7.      To prevent large companies from using small businesses as fronts to acquire these benefits fraudulently, the FCC has adopted controlling interest standards to determine whether applicants qualify as small or very small businesses.

8.      The FCC has also established a five-year post-licensing "unjust enrichment" period, during which DE and closed bidding licensees may not lease or otherwise transfer their spectrum rights without seeking approval from the FCC, and returning some or all of the bid credits, and/or the licenses, to the Government. *See, e.g.,* 47 C.F.R. §§ 1.2110; 1.2111 ("Unjust Enrichment Rule").

9.     As a further safeguard, the FCC requires DE and closed bidding licensees to report any event or transaction during the unjust enrichment period that affects their eligibility for the benefits. 47 C.F.R. § 1.2114(a) ("Reportable Eligibility Event Rule").

10.     The FCC further requires that these licensees certify and file annual reports ("DE Annual Reports") for each license acquired with small business benefits, including, at a minimum, a list and summary of all agreements and arrangements that relate to their eligibility for benefits.  47 C.F.R. § 1.2110(n).

11.     In 2008, King Street – as a front for U.S. Cellular – was the high bidder on 152 licenses for 700 MHz spectrum in FCC Auction No. 73 with cumulative bids of $400.6 million. U.S. Cellular, through King Street, paid $300.4 million, and the U.S. Government provided $100.2 million in bid credits, for the licenses.

12.     The FCC required the Auction 73 licensees, including King Street (i) to construct and operate wireless networks that provided a wireless signal sufficient to offer service covering specific percentages of the geographic license areas within specified time periods, (ii) to file detailed "Construction Notices," reporting the installation and operation of wireless transceiver equipment for each market, and (iii) to offer wireless service in each market using the licensed spectrum and wireless networks. Failure to meet these requirements would have required the FCC to cancel the licenses. *See* 47 C.F.R. §27.14(g).

13.     King Street failed to meet either requirement. Instead, throughout the five-year post-licensing period, King Street/DiNardo ceded its spectrum licenses to U.S. Cellular, which built the networks, owned the facilities, and took King Street's spectrum into its own network to provide and expand voice and broadband mobile wireless services to its own U.S. Cellular customers.

14.     Under the FCC's controlling interest standards, the arrangements, oral and written, through which King Street/DiNardo ceded control of the spectrum licenses to U.S. Cellular established that King Street was ineligible for, and ineligible to retain, the DE bid credits it used to acquire the licenses, and, under the Unjust Enrichment Rule, was required to return the funds to the Government.

15.     To conceal and avoid their obligation to return the funds to the Government, the Defendants conspired to file, caused to be filed, and filed numerous false and fraudulent statements and documents with the FCC, including but not limited to, false and misleading DE Annual Reports and Construction Notices.

16.     On February 9, 2018, after the unjust enrichment period had expired, U.S. Cellular filed an application for consent to formally transfer the King Street licenses from King Street/DiNardo to U.S. Cellular. That application remains pending at the FCC.

17.     Prior to using King Street/DiNardo to acquire the DE licenses in FCC Auction 73, U.S. Cellular also used Carroll/DiNardo and Barat/DiNardo to acquire and hold licenses during the unjust enrichment period. In 2005, in FCC Auction 58, U.S. Cellular acquired 16 Personal Communications Services ("PCS") licenses through its DE front, Carroll, which falsely and fraudulently claimed $22.1 million in bid credits for 6 licenses, and falsely and fraudulently secured 10 closed licenses reserved for small business entrepreneurs. In 2006, in FCC Auction 66, U.S. Cellular acquired 17 Advanced Wireless Services ("AWS") licenses through its DE front, Barat, which falsely and fraudulently claimed $42.4 million in bid credits. Both purchases were funded by U.S. Cellular.

18.     Neither Carroll nor Barat took even the most preliminary steps to become functioning wireless providers during their respective five-year unjust enrichment periods.

19.     As with King Street, the Defendants conspired to file, caused to be filed, and filed numerous false and fraudulent statements and documents with the FCC, including but not limited to, false and fraudulent DE Annual Reports and Construction Notices to conceal that Carroll and Barat merely held the licenses for, and were controlled by, U.S. Cellular, in violation of FCC regulations and the Unjust Enrichment Rule.

20.     Shortly after the unjust periods expired in each instance, U.S. Cellular formally "acquired" Carroll and Barat and their licenses from DiNardo for "an immaterial amount."

## THE PARTIES

**A.     Plaintiffs**

21.     Plaintiff-Relator Mark J. O'Connor is an attorney specializing in communications law. After graduating from UCLA Law School in 1992, he practiced communications law at Fleischman & Walsh for a year before moving to Piper & Marbury (now part of DLA Piper), where he continued to practice communications law from 1993 through 1999. From 1999 through 2012, he was a name partner at the communications law firm of Lampert, O'Connor & Johnston, P.C. Since that time, he has been on the senior management team of a small wireless equipment manufacturer, and is a board member of a small broadband wireless Internet service provider. Mr. O'Connor is currently a co-founding member of a DC-based communications law firm.

22.     Plaintiff-Relator Sara F. Leibman is an attorney specializing in communications law. In 1987, Ms. Leibman graduated from Georgetown University Law School. From 1991 through 1995, she worked as an attorney at the FCC; one year in the Common Carrier Bureau, and then the following three years as Special Counsel in the FCC's Office of General Counsel where she, *inter alia*, worked on the DE and other FCC spectrum

auction regulations and adjudications. Subsequently, she was a Member of the communications practice at Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC in Washington, DC and Direct and Chief Counsel for Regulatory Affairs at T-Mobile USA. Through Sara Leibman Consulting, Ms. Leibman works with telecommunications companies, law firms, and related-field subject matter experts (e.g., economists, technologists).

### B.    Defendants

23.    **United States Cellular Corporation** ("U.S. Cellular") is a publicly held Delaware corporation with its principal place of business in Chicago, Illinois, which is approximately 80 percent owned by TDS. In 2015, U.S. Cellular Corporation was the fifth largest commercial mobile phone operator in the United States, serving 4.7 million customers in 426 markets in 26 states. Currently, U.S. Cellular is the fourth largest commercial mobile phone operator in the United States, serving 5.1 million customers in 23 states, including in the Western District of Oklahoma. Directly or through its subsidiaries, U.S. Cellular holds hundreds of FCC commercial wireless licenses by which it offers mobile phone and data services. From 2005 through 2018, U.S. Cellular has reported annual revenues ranging from $3.0 billion to $4.1 billion.

24.    **Telephone and Data Systems Inc.** ("TDS") is a publicly held Delaware corporation with its principal place of business in Chicago, Illinois. TDS owns approximately 80 percent of United States Cellular Corporation ("U.S. Cellular"), which, through its wholly owned subsidiary, USCC Wireless Investment, Inc. ("USCC Wireless"), owns 90 percent of King Street, Aquinas Wireless L.P., and Advantage Spectrum L.P. Through its TDS Telecom subsidiaries and through U. S. Cellular, TDS serves roughly 7 million wireline and wireless customers in 36 states. TDS has been in the telecommunications service business since 1969 and

for the last several years has had annual revenues of just over $5 billion. TDS and U.S. Cellular are controlled by the Carlson Family Trust.

25.     **USCC Wireless Investment, Inc.** ("USCC") was incorporated in Delaware on November 1, 2000 and is a wholly owned subsidiary of U.S. Cellular. USCC owns 90 percent of King Street Wireless, LP, and owned 90 percent of Carroll Wireless, L.P. and Barat Wireless, L.P, prior to their formal acquisition by U.S. Cellular in 2012.

26.     **King Street Wireless, L.P.** is a limited partnership, registered in Delaware on or about November 27, 2007, with its business address listed as 105 N. Washington Street, Suite 301, Alexandria, Virginia 22314. King Street Wireless, L.P. has one general partner, King Street Wireless, Inc., and one limited partner, USCC. King Street Wireless, L.P. is the nominal FCC licensee of 152 700 MHz licenses in 27 states, including seven markets in the Western District of Oklahoma.

27.     **King Street Wireless, Inc.** is a Delaware corporation, formed on November 27, 2007, with its business address listed as 105 North Washington Street, Suite 301, Alexandria, Virginia 22314, and is the sole general partner and 10 percent owner of King Street Wireless, L.P.  Defendant **Allison Cryor DiNardo** is the sole shareholder and owner of King Street, Inc.

28.     During the period relevant to this Complaint, **Carroll Wireless, L.P.** was a limited partnership, registered in Delaware on November 19, 2004, with its business address listed as 100 N. Washington Street, Suite 301, Alexandria, Virginia 22314. Carroll Wireless, L.P. had one general partner, Carroll PCS, Inc., and one limited partner, USCC. In September 2012, the Defendants filed an application with the FCC seeking consent to transfer control of Carroll Wireless, L.P. from Carroll PCS, Inc. to U.S. Cellular. That transaction was completed on December 5, 2012.

29.     During the period relevant to this Complaint, **Carroll PCS, Inc.** was a Delaware corporation, formed on November 19, 2004, with its principal place of business listed as 310 West Myrtle Street, Alexandria, Virginia 22301, and was the sole general partner and 10 percent owner of Carroll Wireless, L.P. Defendant **Allison Cryor DiNardo** was the sole shareholder and owner of Carroll PCS, Inc.

30.     During the period relevant to this Complaint, **Barat Wireless, L.P.** was a limited partnership registered in Delaware on May 5, 2006, with its business address listed as 105 North Pitt Street, Suite 206, Alexandria, Virginia 22314. Barat Wireless, L.P. had one general partner, Barat Wireless, Inc., and one limited partner, USCC. In May 2012, the Defendants filed an application with the FCC seeking consent to transfer control of Barat Wireless, L.P. from Barat Wireless, Inc. to U.S. Cellular. That transaction was completed on September 7, 2012.

31.     During the period relevant to this Complaint, **Barat Wireless, Inc.** was a Delaware corporation, formed on May 5, 2006, with its business address listed as 310 West Myrtle Street, Alexandria, Virginia 22301, and was the sole general partner and 10 percent owner of Barat Wireless, L.P. Defendant **Allison Cryor DiNardo** was the sole shareholder and owner of Barat Wireless, Inc.

32.     **Allison Cryor DiNardo** is, and was, the sole shareholder and owner of King Street Wireless, Inc., Carroll Wireless, Inc., and Barat Wireless, Inc., each of which is, and was, the general partner and 10% owner of the limited partnerships of the same name. In 2012, DiNardo sold Carroll and Barat to U.S. Cellular for an "immaterial amount." Previously, as an employee and Vice President of Kington Management, Defendant DiNardo participated in numerous FCC auctions through various DEs in which Defendant U.S. Cellular was also a

limited partner and 85 percent owner. Between 2002 and 2016, the only licenses Defendant U.S. Cellular acquired in FCC spectrum auctions were through purported small businesses associated or formed in partnership with DiNardo. Since leaving Kington Management, in addition to Defendants King Street, Carroll, and Barat, DiNardo has partnered with U.S. Cellular to form at least two other DE licensees. In 2008, in FCC Auction No. 78, the Defendants obtained four licenses with $557,500 in DE bid credits through Aquinas Wireless, L.P., which was 90 percent owned by U.S. Cellular and 10 percent owned by DiNardo. In 2015, in FCC Auction No. 97, the Defendants obtained 124 licenses with $112.8 million in DE bid credits through Advantage Spectrum, LP ("Advantage"), a limited partnership that currently is 90 percent owned by U.S. Cellular and 10 percent owned by William Vail. During the bidding in Auction 97, however, Vail and DiNardo each had a 5 percent interest in Advantage. DiNardo relinquished her interest to Vail just before the FCC granted the licenses.

## JURISDICTION AND VENUE

33.     Relators bring this action on behalf of themselves and the United States for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733. This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

34.     This Court has personal jurisdiction over Defendants, pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District, and because Defendants performed acts in furtherance of their conspiracy in this District. In addition, acts prohibited by 31 U.S.C. § 3729 occurred in this District. 31 U.S.C. § 3732(a). Defendant King Street holds seven DE licenses covering areas in this District, and Defendant Carroll held a DE license in Oklahoma City, portions of which were leased to a subsidiary of Defendant U.S. Cellular. Defendant U.S. Cellular has constructed wireless networks and provides wireless service to customers residing in this District, and offers wireless services to the public, including

over the King Street and Carroll spectrum, from retail stores and other outlets located in this District.

35.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District, the geographic bounds of some FCC spectrum licenses at issue in this action include this District, and Defendants performed numerous acts proscribed by 31 U.S.C. § 3729 in this District.

36.     Relators' claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government is already a party, or in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, or from the news media. 31 U.S.C. § 3730(e)(4)(A).

37.     To the extent there has been a public disclosure unknown to the Relators, the Relators are the "original source" under 31 U.S.C. § 3730(e)(4)(B). The Relators have independent material knowledge of the information on which the allegations are based and have voluntarily provided the information to the Government before filing this *qui tam* action based on that information. *Id*.

## RELEVANT STATUTES AND REGULATIONS

**A.     The False Claims Act**

38.     The False Claims Act ("FCA") provides that any person who:

(A)     knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; (31 U.S.C. §§ 3729(a)(1)(A)),

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (31 U.S.C. §§ 3729(a)(1)(B)) [and/or. . .]

(D)      has possession, custody, or control of property or money used, or to be

used, by the Government and knowingly delivers, or causes to be delivered, less

than all of that money or property; (31 U.S.C. §§ 3729(a)(1)(D)) [and/or … ]

(G)      knowingly makes, uses, or causes to be made or used, a false record or

statement material to an obligation to pay or transmit money or property to the

Government, or knowingly conceals or knowingly and improperly avoids or

decreases an obligation to pay or transmit money or property to the Government,

(31 U.S.C. §§ 3729(a)(1)(G)),

is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of

damages sustained by the Government. 31 U.S.C. §§ 3729(a)(1)(A), (B), (G).[1]

39.      The FCA further provides that any person who *conspires* to commit a

violation of any of the subsections, 31 U.S.C. § 3729(a)(1)(A, B, D, E, F, G), is liable for a civil

penalty of up to $11,000 for each such violation, plus three times the amount of damages

sustained by the Government. 31 U.S.C. § 3729(a)(1)(C).

40.      A conspiracy to violate the FCA arises when two or more individuals or

entities form an agreement to commit a violation of the FCA, and engage in some overt action in

furtherance of that violation.

41.      Pursuant to the Civil Monetary Penalties Inflation Adjustment Act, Pub. L.

104-134, the False Claims Act penalty range for violations on or before November 2, 2015 is

$5,500 to $11,000 for each violation. *See id.*, 28 C.F.R. § 85.3. Pursuant to the Bipartisan Budget

Act of 2015, Public Law 114-74, section 701 (Nov. 2, 2015) the civil penalties for violations

---

[1]To the extent that conduct alleged in this Complaint occurred prior to March 23, 2010, the prior versions of the False Claims Act are applicable (*i.e.*, 31 U.S.C. § 3729, as amended, October 27, 1986, and May 20, 2009).

have been linked to inflation, and the range is currently from $11,181 to $22,363 for each violation. *See* 28 C.F.R. § 85.5.

**B.     The Federal Communications Act**

42.     Pursuant to the Federal Communications Act of 1934 ("Communications Act"), the FCC regulates all non-federal uses of radio frequency spectrum in the United States, 47 U.S. Code, §§ 101, *et seq.* The Communications Act establishes that the radio frequency spectrum (a portion of which is used for commercial wireless communications) is owned by and governed for the people of the United States. Private and public organizations may obtain licenses for the exclusive use of portions of the spectrum for a period of time – as long as that use is consistent with the "public interest, convenience and necessity." 47 U.S.C. § 307.

43.     In 1993, Congress amended the Communications Act to give the FCC the authority to assign commercial spectrum licenses through auctions. 47 U.S.C. § 309(j)(1). To promote economic opportunity and competition for small businesses, Congress expressly directed the FCC to develop regulations to:

> [P]rescribe area designations and bandwidth assignments that promote (i) an equitable distribution of licenses and services among geographic areas, (ii) economic opportunity for a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women, and (iii) investment in and rapid deployment of new technologies and services; [and]

> [E]nsure that small businesses, rural telephone companies, and businesses owned by members of minority groups and women are given the opportunity to participate in the provision of spectrum-based services, and, for such purposes, consider the use of tax certificates, bidding preferences, and other procedures.

47 U.S.C. § 309(j)(4)(C)-(D).

44.     To avoid unjust enrichment through exploitation of the system of competitive bidding, Congress further directed the FCC to "require such transfer disclosures and anti-trafficking restrictions and payment schedules as may be necessary to prevent unjust enrichment

as a result of the methods employed to issue licenses and permits." 47 U.S.C. § 309(j)(4)(E).  *See also* § 309(j)(3) (The FCC's auction rules "shall include safeguards to protect the public interest in the use of the spectrum," including the "avoidance of unjust enrichment…").

45.     The FCC has implemented regulations to comply with these directives.

## C.     FCC Spectrum Auctions and Licensing Regulations

### 1.     Short-Form and Long-Form Applications

46.     Approximately 45-60 days before a spectrum auction, individuals or companies seeking to participate in the auction must submit a short-form application (FCC Form 175) to the FCC.

47.     All information, statements, certifications and declarations submitted in the Form 175 application are made under penalty of perjury, including, *e.g.*: (1) the applicant's ownership and other information set forth in 47 C.F.R. § 1.2112; (2) that the applicant is a qualified DE under 47 C.F.R. § 1.2110; (3) that the applicant has identified each party to any partnerships, joint ventures, consortia or other agreements, arrangements, or understandings relating to the licenses being auctioned, regarding bidding strategies, or post-auction market structure, to which the applicant, or any party that controls or is controlled by the applicant, is a party; and (4) that the applicant or any party that controls or is controlled by the applicant has not entered and will not enter into any partnerships, *etc.,* relating to the licenses being auctioned, regarding bidding strategies, or post-auction market structure with a nationwide provider that is not an applicant. *See, e.g.,* 47 C.F.R. §§ 1.2105(a)(2)(ii)(B); (iv); (viii); (ix).

48.     Once the auction is completed, the winning bidders must submit a long-form application (FCC Form 601) to be issued the licenses. 47 C.F.R. § 1.2107(c).

49.     Long-form applicants must certify that all statements made in the application and in the exhibits, attachments, or documents incorporated by reference are "material, are part of

this application, and are true, complete, correct, and made in good faith." The material certifications include, *e.g,* that: (1) the grant of the application would not cause the applicant to be in violation of any pertinent or cross-attribution rules; (2) the applicant has reviewed the appropriate Commission rules defining eligibility to hold the requested licenses, and is eligible to hold the requested licenses; (3) the applicant is eligible to obtain the licenses for which it applies; and (4) the applicant has provided separate gross revenue and total asset information for itself, its officers and directors, its other controlling interests, its affiliates, and each affiliate of its officers, directors, and other controlling interests.

50.     DE applicants must also describe and certify how they satisfy the DE requirements, and list and summarize "all agreements that affect designated entity status, such as partnership agreements, shareholder agreements, management agreements, spectrum leasing arrangements, spectrum resale (including wholesale) arrangements, spectrum use agreements, and all other agreements, including oral agreements*, establishing as applicable, *de facto* or *de jure* control of the entity." 47 C.F.R. § 1.2110(j).  Applicants must further provide the date(s) on which they entered into each of the agreements listed, as well as a copy of each agreement. *Id*.[2]

51.     Entrepreneur applicants are required to summarize and certify all agreements and other instruments "that support the applicant's eligibility for a license(s) … including the establishment of *de facto* and *de jure* control; such agreements and instruments include articles of incorporation and bylaws, shareholder agreements, voting or other trust agreements, partnership agreements, management agreements, joint marketing agreements, franchise agreements, and any

---

[2] As an exhibit to its long-form application, the applicant must provide a detailed explanation of the terms and conditions and parties involved in any bidding consortia, joint venture, partnership or other agreement or arrangement it had entered into relating to the competitive bidding process prior to the time bidding was completed. 47 C.F.R. § 1.2107(d). The applicant must also submit FCC Form 602, providing all ownership information required under 47 C.F.R. § 1.2112, with the long-form application. 47 C.F.R. §§ 1.2107; 1.1919.

other relevant agreements (including letters of intent), oral or written." 47 C.F.R. §

24.799(c)(2)(ii).

52.     Each applicant is responsible for the *continuing* accuracy and completeness of

information furnished in a pending application or in Commission proceedings involving a pending

application. 47 C.F.R. § 1.65(a). If the information is no longer substantially accurate and

complete in all significant respects, the applicant must amend or seek to amend the application to

reflect the additional or corrected information. *Id.* Similarly, if there has been a substantial change

which may affect the Commission's decision, the applicant must submit a statement furnishing

the additional or corrected information. *Id.*

### 2.     Designated Entity and Closed Bidding Eligibility Requirements

53.     The FCC provides auction bidding credits to "very small business" and "small

business" DEs, which are expressed as percentage discounts in the prices they are required to pay

for the licenses they win at auction.

54.     To ensure that bid credits flow to small and very small businesses, and not to

large companies seeking to game the system by using these businesses to obtain auction

discounts, the FCC requires DEs (1) to meet the small or very small business size standard,

which is measured by their attributable revenues, *and* (2) to retain control over the spectrum

associated with the licenses for which it received small business benefits. *See* 47 C.F.R. §§

1.2110(b)(1)-(3), 1.2111(b)(1). These requirements are designed to ensure that the applicant is

not actually controlled by a large company seeking to use the program to lower its license

acquisition costs.

55.     To meet the FCC's DE size requirements, an applicant's average gross

revenues, *including those of its attributable interest holders*, for the previous three years must be

within the ranges specified by the FCC. *See* 47 C.F.R. § 1.2110(b). A very small business is

eligible for 25 percent bid credits if its average gross revenues, aggregated with those of its attributable interest holders, do not exceed $15 million, while a small business is eligible for 15 percent bidding credits if its average gross revenues, aggregated with those of its attributable interest holders, are greater than $15 million and less than $40 million. 47 C.F.R. §§ 1.2110(f)(2)(i)-(iii); 24.321(a). Thus, with a "very small business" credit of 25 percent, a DE with a winning bid of $500,000 would pay $375,000 for that license; with a "small business" credit of 15 percent, the DE would pay $425,000. King Street, Carroll, and Barat all applied for bid credits as a "very small business."

56.     To meet the FCC's "entrepreneur" requirements to participate in "closed bidding," an applicant's gross revenues, *including those of its attributable interest holders*, must have been less than $125 million in each of the last two years, and its total assets less than $500 million at the time it filed the short-form application. 47 C.F.R. § 24.709(a)(1); 47 C.F.R. § 1.2110(b)(1)(ii).

### 3.     "Attributable Interest Holder" Requirements

57.     An applicant's "attributable interest holders" are its "affiliates;" its "controlling interests;" the affiliates of its controlling interests; and the entities with which it has an "attributable material relationship." 47 C.F.R § 1.2110(b)(i). If the aggregated revenues of the applicant or licensee and its attributable interest holders exceed the relevant revenue thresholds, the applicant or licensee is ineligible for the auction benefits, or to retain them.

58.     The FCC has adopted various controlling interest standards to identify or determine whether an entity qualifies as an attributable interest holder in an applicant or licensee. 47 C.F.R. § 1.2110.

### a. "Attributable Material Relationship" ("AMR") Rule

59.     At all times relevant to this Complaint, an "attributable material relationship" existed when an applicant or licensee had one or more agreements with any individual or entity for the lease or resale of, on a cumulative basis, more than 25 percent of the spectrum capacity of any individual license held by the applicant or licensee. 47 C.F.R § 1.2110(b)(iv)(A) (2015).

### b. "Controlling Interests" Rule

60.     A "controlling interest" exists when an individual or entity has either *de jure* or *de facto* control of the applicant or licensee. 47 C.F.R. § 1.2110(c)(2)(i). *De jure* control is evidenced by holdings of greater than 50 percent of the voting stock of a corporation or, in the case of a limited partnership, general partnership interests. *De facto* control is determined on a case-by-case basis. *Id.* In determining whether an entity has *de facto* control of an applicant or licensee, the FCC looks at the following factors: (1) use of facilities and equipment; (2) control of day-to-day operations; (3) control of policy decisions; (4) personnel responsibilities; (5) control of financial obligations; and (6) receipt of monies and profits.[3]

### c. "Management Agreement Controlling Interest" ("MACI") Rule

61.     Any person or entity that manages the operations of an applicant or licensee pursuant to a management agreement has a "controlling interest" in the applicant or licensee if it has authority to make decisions or otherwise engage in practices or activities that determine or significantly influence: (1) the nature or types of services offered by the applicant or licensee; (2) the terms upon which the services are offered; or (3) the prices charged for such services ("MACI Rule"). 47 C.F.R. § 1.2110(c)(2)(ii)(H).

---

[3] *See Application of Ellis Thompson Corp.*, Memorandum Opinion and Order and Hearing Designation Order, 9 FCC Rcd. 7138, ¶¶ 9-10 (1994); *Application of Baker Creek Communications*, L.P. 13 FCC Rcd. 18709 (1998) (citing *Intermountain Microwave* 24 Rad. Reg. 7 (P & F) 983, 984 (1963)).

### d.    "Affiliation Rule"

62.    A person or entity that: a) directly or indirectly controls or has the power to control the applicant; b) is directly or indirectly controlled by the applicant; c) is directly or indirectly controlled by a third party or parties that also controls or has the power to control the applicant; or d) has an "identity of interest" with the applicant, is an "affiliate" of the applicant or licensee. 47 C.F.R. § 1.2110(c)(5)(i).

### e.    "Joint Venture" Rule

63.    A "joint venture" exists where there is "an association of concerns and/or individuals, with interests in any degree or proportion, formed by contract, express or implied, to engage in and carry out a single, specific business venture for joint profit for which purpose they combine their efforts, property, money, skill and knowledge, but not on a continuing or permanent basis for conducting business generally." 47 C.F.R. § 1.2110(c)(5)(x). The determination whether an entity is a joint venture rests on the facts of the business operation, "regardless of how the business operation may be designated by the parties involved." *Id.*

### 4.    Post-Licensing Requirements

### a.    Reporting and Disclosure Requirements

64.    Once a company has been issued a license as a DE or entrepreneur, the FCC requires regular reports and certifications that it *continues* to meet the eligibility requirements during the five-year post-licensing unjust enrichment period. Each licensee must certify and file a DE Annual Report, which includes "at a minimum, a list and summaries of all agreements and arrangements (including proposed agreements and arrangements) that relate to eligibility for designated entity benefits." 47 C.F.R. § 1.2110(n). "This list must include the parties (including affiliates, controlling interests, and affiliates of controlling interests) to each agreement or

arrangement, as well as the dates on which the parties entered into each agreement or arrangement." *Id.*

65.     DE licensees also must report any event during the five-year unjust enrichment period that would affect their eligibility to *retain* their DE bid credits for the remainder of the period. (FCC Form 608). A "reportable eligibility event" includes (1) Any spectrum lease … or resale arrangement (including wholesale agreements) with one entity or on a cumulative basis that might cause a licensee to lose eligibility for … a bidding credit (or for a particular level of bidding credit) … ; or (2) any other event that would lead to a change in the eligibility of a licensee for designated entity benefits." 47 C.F.R. § 1.2114(a)(1)-(2).

(a)     A spectrum lease is an "arrangement between a licensed entity and a third-party entity in which the licensee leases certain of its spectrum usage rights in the licensed spectrum to the third-party entity…." 47 C.F.R. § 1.9003. A *de facto* transfer leasing arrangement exists when a licensee retains *de jure* control of its license while transferring *de facto* control of the leased spectrum to a third party. *Id.*

(b)     Events that could lead to a change in a DE licensee's eligibility to retain its DE benefits during the unjust enrichment period include, in addition to a spectrum lease:  (1) granting a *de facto* and/or MACI Rule controlling interest to another entity or individual; and (2) entering into an affiliation and/or joint venture with another entity or individual. *See* 47 C.F.R. 1.2114(a).

**b.     "Unjust Enrichment Rule"**

66.     Licenses, or control of a licensee, may be transferred only upon application to and approval by the FCC. 47 C.F.R. § 1.948(a).

67.     If, during the five-year post-licensing unjust enrichment period, a DE licensee "seeks to assign or transfer control of a license to an entity that does not meet the eligibility criteria for a bidding credit, [it] will be required to reimburse the U.S. Government for the amount of the bidding credit, plus interest based on the rate for ten year U.S. Treasury obligations applicable on the date the license was granted, as a condition of Commission approval of the assignment or transfer."  47 C.F.R § 1.2111(b)(1).

68.     During the relevant period of this Complaint, the Unjust Enrichment Rule also specified that, if a licensee "seeks to make any ownership change or to enter into a material relationship … that would result in the licensee losing eligibility for a bidding credit … the amount of the bidding credit … plus interest based on the rate for ten year U.S. treasury obligations applicable on the date the license is granted, must be paid to the U.S. Government as a condition of Commission approval of the assignment or transfer or of a reportable eligibility event." 47 C.F.R. § 1.2111(d)(1)(2014).

69.     A closed bidding licensee that loses its eligibility as an entrepreneur must return the licenses to the Commission.

### c.     Construction and Service Performance Requirements

70.     In granting spectrum licenses to telecommunications providers, Congress intended that FCC regulations "include performance requirements, such as appropriate deadlines and penalties for performance failures." 47 U.S.C. §§ 307, 309(j)(4)(B). To this end, the FCC has enacted interim and end-of-term network signal coverage and service offering requirements, and Construction Notice requirements for certain licenses.

71.     Licensees with authorizations in the lower 700 MHz band (such as King Street) are required to "provide signal coverage and offer service over at least 35 percent of the

geographic area of each of their license authorizations [within four years of issuance] … and … over at least 70 percent of the geographic area … by the end of the license term."  47 CFR § 27.14(g).[4]

72.     "A licensee who commences service or operations within the construction period or meets its coverage or substantial services obligations within the coverage period must notify the Commission by filing FCC Form 601." 47 C.F.R. § 1.946(d).

73.     "If a licensee fails to commence service or operations by the expiration of its construction period or to meet its coverage or substantial service obligations by the expiration of its coverage period, its authorization terminates automatically (in whole or in part as set forth in the service rules), without specific Commission action, on the date the construction or coverage period expires." 47 C.F.R. § 1.946(c).

## I.     KING STREET ALLEGATIONS – FCC AUCTION 73

### A.     U.S. Cellular Used King Street as a Front to Acquire Licenses with DE Bid Credits

74.     Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

75.     On August 17, 2007, the FCC announced an auction of 1,099 licenses in the A, B, C, D, and E Frequency Blocks of the 700 MHz Band. Each license was for a term of 10 years, and licensees were required to provide signal coverage and offer service to at least 35

---

[4]"In adopting these stringent performance requirements," which replaced the previous "substantial service" requirements, "we accomplish several important policy objectives. We ensure that these 700 MHz Commercial Services licensees put this spectrum to use throughout the course of their license terms and serve the majority of users in their license areas. With the inclusion of an interim benchmark and the potential for enforcement action for failure to meet the construction requirements, we require licensees to provide service to consumers in a timely manner."  *In the Matter of Service Rules for the 698-746, 747-762 and 777-792 MHz Bands,* Second Report and Order, 22 FCC Rcd. 15289, ¶154 (2007).  The earlier "substantial service" requirements applied to the Carroll licenses, *infra*.

percent of the geographic areas of their licenses within four years, and at least 70 percent of the geographic areas at the end of the license term.

### 1. As a Front for U.S. Cellular, King Street Falsely and Fraudulently Applied for Very Small Business DE Bid Credits in Auction 73

76.     On November 27, 2007, Defendant Allison Cryor DiNardo registered King Street Wireless, L.P. as a limited partnership, and King Street Wireless, Inc. as a corporation, in Delaware.

77.     On the following day, through DiNardo, King Street Wireless, L.P. submitted its FCC Form 175 short-form application to participate in Auction 73 as a "very small business." (*King Street Wireless, L.P., Auction 73 Form 175 and Exhibits,* attached herein as Exhibit 1).

78.     In the application, DiNardo falsely certified that King Street Wireless, Inc. and DiNardo held the controlling interests in King Street Wireless, L.P.; that DiNardo had both *de jure* and *de facto* control of King Street Wireless, Inc.; and that, as the 100 percent owner of King Street Wireless, Inc., DiNardo had a controlling interest in King Street Wireless, L.P. DiNardo further certified falsely that, "No other individual or entity has a controlling interest in the Applicant," and that King Street had no affiliates except for entities that were affiliates of DiNardo. *Id.*

79.     These statements were false and material because U.S. Cellular, which held a controlling interest in King Street, had formed King Street in partnership with DiNardo to participate in Auction 73 as a DE front for U.S. Cellular, and the Defendants knew that the FCC would not have awarded DE credits to King Street on that basis.

### 2. King Street Falsely and Fraudulently Obtained and Used Bid Credits Far in Excess of Any Other DEs in Auction 73

80.     Auction 73 began on January 24, 2008 and closed on March 18, 2008. King Street was the high bidder on 152 A and B Block licenses, with a total auction price of $400.6

million. Through King Street, U.S. Cellular paid $300.4 million for the licenses, while the Government paid the remaining $100.2 million in the form of very small business bid credits.

81.     Of the 176 Block A licenses auctioned in Auction 73, 68 were won by 13 DE bidders, including King Street. Of the total $85.5 million in DE bid credits that the Government paid toward these Block A licenses, King Street received $42.3 million, or 49.5 percent of the total, for 25 licenses. The next largest credits-recipients received $22 million (25.7 percent of the total) for 10 licenses, and $14.7 million (17 percent of the total) for 23 licenses, respectively. The remaining $6.4 million (7.5 percent) of the bid credits went to 10 DE bidders toward the purchases of 13 licenses.

82.     Of the 734 Block B licenses in Auction 73, 292 were won by 49 DE bidders, including King Street. Of the total $75.6 million paid by the Government in DE bid credits, King Street received $57.8 million (76.5 percent of the total) for 127 licenses. The next largest credits-recipients received $3 million (4.1 percent) for 30 licenses, and $1.9 million (2.6 percent) for 4 licenses, respectively. The remaining $12.6 million (16.7 percent) of the bid credits went to 46 bidders toward the purchase of 131 licenses.

83.     With $100.2 million in bid credits, King Street accounted for 61 percent of the total bid credits paid by the Government, and was the high bidder on 152 (16.7 percent) of the 910 Block A and B licenses available in Auction 73. King Street obtained seven licenses with service areas covering the Western District of Oklahoma, with an aggregate bid credit for these licenses of approximately $2.3 million.

### 3.   As a Front for U.S. Cellular, King Street Falsely and Fraudulently Applied for Licenses as a Very Small Business DE

84.     On March 28, 2008, King Street submitted its long-form application for the 152 licenses it had won in Auction 73, falsely certifying that it had not entered into any

agreements that would impact its status as a very small business DE. (*King Street Wireless, L.P., Form 601 and Exhibits,* attached herein as Exhibit 2). In fact, King Street, through DiNardo, entered into numerous agreements, only some of which were disclosed in the application, some of which were disclosed after the licenses were granted, and some of which were never disclosed, that, together and separately, established that U.S. Cellular held a controlling interest in King Street.

      (a)    In "Exhibit C: Designated Entities," DiNardo falsely certified that King Street's "Controlling Interests" were King Street Wireless, Inc. and Allison Cryor DiNardo; that DiNardo had "both *de jure* and *de facto* control in King Street Wireless, Inc;" and that "[n]o other individual or entity has a controlling interest in the Applicant." DiNardo further certified falsely that King Street did not have any affiliates, except the Barat and Carroll entities, which it described as affiliates of DiNardo.  *Id.*

      (b)    In "Exhibit D: Agreement [sic] and Other Instruments," DiNardo falsely certified that, "except as set forth below, [King Street] has entered into no partnerships, joint venture, consortia or other agreements, arrangements or understandings of any kind with third parties relating to the licenses being auction, including any such arrangements relating to the post-auction market structure." *Id.*

      (c)    King Street identified seven agreements "that supports *[sic]* its qualifications as an Designated Entity entitled to a bidding credit of twenty-five (25) percent on its winning bids in Auction No. 73": (a) *The King Street Wireless LP Agreement,* naming King Street Wireless, Inc. as the General Partner and USCC Wireless Investment, Inc. as the Limited Partner, and specifying that "King Street Inc. controls the Applicant;" (b) *The December 21, 2007 Investment Agreement* stating that King Street

Wireless, L.P. was responsible for obtaining financing; (c) *The December 21, 2007 Bidding Protocol* declaring that DiNardo had sole authority to determine the bidding for King Street; (d) *The December 21, 2007 Loan Agreement* for King Street Wireless, Inc. to make the "required capital contribution to King Street L.P." with funds from U.S. Cellular through USCC; (e) *The December 21, 2007 Loan and Security Agreement* for making the auction deposit, and providing additional working capital for King Street Wireless, L.P., and granting U.S. Cellular a security interest in King Street Wireless, L.P.'s assets, including all FCC licenses; (f) *The December 21, 2007 Pledge Agreement from King Street Wireless, Inc.* granting U.S. Cellular a first priority security interest in 100% of the General Partnership Interests in King Street Wireless, L.P.; and (g) *The December 21, 2007 Pledge Agreement from Shareholders of King Street Wireless, Inc.* granting U.S. Cellular a first priority security interest in DiNardo's ownership interest in King Street Wireless, Inc. *Id.*

85.     On April 17, 2008, through DiNardo, King Street amended Exhibit C, modifying the description of its gross revenues with the following false certification:

> Finally, no revenues are being disclosed for the following entities:  United States Cellular Corporation, Telephone and Data Systems, Inc., and USCC Wireless Investment, Inc.  None of these entities have control in the Applicant.  Hence, in accordance with the Commission's rules, these entities are not considered affiliates and Applicant is not required to disclose their gross revenues. *Id.*

86.     On April 25, 2008, King Street again amended Exhibit C, adding four new footnotes, falsely stating respectively that DiNardo controlled Barat Wireless, Inc., Barat Wireless, L.P., Carroll Wireless, Inc., and Carroll Wireless, L.P. *Id.*

87.     In January 2009, while King Street's long-form application was still pending, U.S. Cellular and King Street entered into a "Management Services Agreement," ("Management

Agreement"). The Management Agreement delegated certain responsibilities in the management of the "CMRS systems licensed to, constructed, and operated by or on behalf of King Street, LP utilizing licenses acquired in Auction No. 73," to U.S. Cellular, while falsely and repeatedly stating in varying terms that King Street Wireless, Inc. held the controlling interest in King Street Wireless, L.P.

88. On May 8, 2009, in response to specific inquiries from the FCC, King Street submitted a lengthy memorandum with exhibits, falsely denying that King Street was controlled by U.S. Cellular or TDS, and falsely insisting throughout that DiNardo had controlled all auction activities, had at all times controlled King Street, and handled all daily and long-term partnership decisions.  King Street did not include the Management Agreement with U.S. Cellular in this submission.

89. The FCC issued King Street its licenses on December 27, 2009. All of the licenses that King Street won in Auction 73 were in markets that were either adjacent to or overlapped with U.S. Cellular wireless service areas.

90.     The map below shows the markets in which King Street held 700 MHz licenses in 2015:



91.     The map below shows the markets in which U.S. Cellular offered 4G LTE service as of January 2015:



**B.    Throughout the Unjust Enrichment Period, U.S. Cellular Controlled and Managed King Street and Its Spectrum**

1.    **Through the Transfer of Virtually All Its Spectrum to U.S. Cellular, King Street Had an Attributable Material Relationship with U.S. Cellular**

92.     On October 25, 2011, U.S. Cellular and King Street entered into a so-called network sharing agreement (the "2011 NSA"), which formalized the arrangements under which U.S. Cellular financed and built the purported King Street network, incorporated the King Street spectrum into its own 4G LTE network, and provided service to its own customers using King Street's spectrum, while King Street performed the clerical and reporting functions necessary to preserve the fraudulent pretense that it functioned as a legitimate DE-licensee.

93.     The 2011 NSA explicitly transferred King Street's spectrum rights for 90 of its licenses to U.S. Cellular to "complete construction and installation of an LTE system," stating that, "King Street has determined that constructing wireless and data systems so that they are

28

technically and operationally compatible with [U.S. Cellular] systems … in each market area covered by King Street licenses is in the public interest," and that U.S. Cellular has "certain legacy assets from its existing wireless data and communications systems which can be used in support of new systems which will initially be deployed using the frequencies subject to the King Street Licenses and the [U.S. Cellular] Licenses, and at later dates, using any and all frequencies held by King Street, [U.S. Cellular] or their respective affiliates."

94.     Under the agreement, in addition to constructing and installing the networks, U.S. Cellular agreed "to provide operational, engineering, maintenance, repair, and such other technical services as may be necessary to keep each King Street System in operation throughout the Term," while King Street was to "interface with the FCC on matters related to the King Street Licenses;" "maintain the King Street Licenses in full force and effect;" and, generally, ensure compliance with the Communications Laws and FCC Regulations.

95.     The 2011 NSA also provided that the revenues and profits from the King Street network flow largely to U.S. Cellular. Thus, while U.S. Cellular ostensibly pays King Street for its use of the King Street spectrum, these payments are offset by the management fees that King Street is required to pay under the Management Agreement, and the purported "loan repayments" King Street is required to make under the various loan agreements with U.S. Cellular.[5]

96.     King Street did not disclose the 2011 NSA to the FCC, either as a reportable eligibility event under 47 C.F.R. § 1.2114(a)(1)-(2), or, in its DE Annual Reports under 47 C.F.R. § 1.2110(n), as an agreement or arrangement related to its eligibility for DE benefits.

---

[5] The Defendants amended the NSA twice – on May 9, 2012 and June 10, 2015 – both times to revise the payments for the use of the King Street Systems and the Revenue Calculation.

97.     The transfer of more than 25 percent of the spectrum rights on even one license established an attributable material relationship between King Street and U.S. Cellular. 47 C.F.R. § 1.2110(b)(iv)(A) (2015). King Street's attributable material relationship with U.S. Cellular, *which was eventually marked by the ceding of virtually all of its spectrum*, confirmed that King Street was ineligible for the DE bid credits.

## 2. U.S. Cellular Incorporated Virtually All of King Street's Spectrum into Its Own 4G LTE Network

98.     Field tests commissioned by the Relators, and conducted in February 2015, verified U.S. Cellular's undisclosed incorporation of the King Street licensed spectrum blocks in the Cedar Rapids, Iowa and Iowa City, Iowa markets. U.S. Cellular controlled the 700 MHz A Block licenses with downlink frequencies at 728-734 MHz in those two markets, as well the C block license – 740-746 MHz – in the Iowa City market. In Auction 73, King Street purchased the WQLE688 license for the 700 MHz B block in the Cedar Rapids market and the WQLE717 license for the B block in the Iowa City market. Both licenses were immediately adjacent to those already owned by U.S. Cellular.

99.     The tests found a continuous signal across the 700 MHz spectrum of the King Street and U.S. Cellular adjacent licenses. If King Street had actually been operating an independent wireless network, the tests would have shown a significant drop in signal power between the two licensed bands. Instead, there was no signal power drop between the U.S. Cellular and the King Street licensed spectrum. U.S. Cellular simply incorporated King Street's 700 MHz licenses in these markets into its own 4G LTE network, and was serving its own subscribers using both sets of channels and a single signal.

### 3. U.S. Cellular Owns and Controls the Networks Using the King Street Spectrum, as Well as the Profits and Revenues from the Spectrum

100.    The undisclosed 2011 NSA provided that "[s]olely at its own expense," U.S. Cellular would purchase or otherwise provide, install, and maintain all equipment (including but not limited to, towers, transmission lines, antennas, microwave facilities, transmitters and related equipment necessary for the operation of the King Street System). King Street has never disclosed, in any of its Construction Notices, that U.S. Cellular, not King Street, fulfilled the performance requirements for the licenses.

101.    U.S. Cellular paid for, constructed, and owns the facilities and equipment to operate the 4G LTE network in the markets where King Street holds the licenses. U.S. Cellular uses the King Street spectrum to provide U.S. Cellular-branded 4G LTE service to U.S. Cellular's own customers. There are no "King Street networks" and no "King Street customers." U.S. Cellular, not King Street, sets the rates, terms, and conditions for the 4G LTE services offered using the King Street spectrum. Retail service contracts for 4G LTE services on the King Street spectrum are with U.S. Cellular, not King Street, and billing and service terminations are handled by U.S. Cellular, not King Street. U.S. Cellular employees sell 4G LTE services that use the King Street spectrum from U.S. Cellular retail stores; King Street has no retail stores or outlets.

102.    U.S. Cellular controls virtually every aspect of King Street's finances. King Street effectively has no access to funds except through U.S. Cellular. Equity financing is barred because the Loan Agreement and the Loan and Security Agreement each stipulate that all payments become due immediately upon any sale of the capital stock of King Street Inc., and the sale of any or all of King Street Inc.'s interest in King Street Wireless, L.P. Third-party debt financing is barred because the Loan and Security Agreement grants U.S. Cellular a continuing security interest in the collateral of King Street Wireless, L.P., including "to the extent permitted

31

by law, all FCC licenses and permits held by [King Street Wireless. L.P.]." U.S. Cellular also has a first priority security interest in King Street Inc.'s partnership interests in King Street Wireless, L.P., and in DiNardo's ownership interests in King Street Wireless, Inc., as well as all proceeds of any and all of the collateral of the respective King Street entities under the Pledge Agreements. The Pledge Agreements also restrict DiNardo and King Street "from selling, transferring, pledging, or otherwise encumbering or disposing of" their ownership interests or collateral.

103.    King Street has never reported or disclosed a source for the hundreds of millions of dollars required to construct the networks using its spectrum. U.S. Cellular, however, has reported capital expenditures of $782.5 million in 2011, $836.7 million in 2012, and $737.5 million in 2013, "to construct new cell sites, build out 4G LTE networks in certain markets, increase capacity in existing cell sites and switches, develop new and enhance existing office systems such as the new Billing and Operational Support System ('B/OSS') and customer relationship management platforms, and construct new and remodel existing retail stores."

104.    U.S. Cellular, which retains almost all of the revenues and profits from its use of the networks under the 2011 NSA and through the Management Agreement, has *de facto* control of King Street Wireless, L.P. and its licenses, in violation of the FCC's Controlling Interest Rule.

105.    U.S. Cellular also has a controlling interest in King Street under the MACI Rule. Ostensibly the "manager" for King Street, U.S. Cellular, in fact, controls all aspects of the wireless services provided to customers. U.S. Cellular, which offers service to its *own* customers using the King Street spectrum, determines (1) the nature or types of services offered; (2) the terms upon which services are offered; *and* (3) the prices charged for such services. *See* 47 C.F.R. § 1.2110(c)(2)(ii)(H). Regardless of how King Street characterized the Management

Agreement in its DE Annual Reports, *as it was actually implemented by the parties and in light of the terms of the 2011 NSA and other agreements*, the Management Agreement provides U.S. Cellular with a further "controlling interest" in King Street.

### 4.    U.S. Cellular and King Street Were Affiliates and Engaged in a Joint Venture

106.    U.S. Cellular and King Street were engaged in a joint venture in violation of the Joint Venture Rule.  47 C.F.R. § 1.2110(c)(5)(x). The two companies entered into numerous contracts and arrangements (only some of which they disclosed to the FCC), "to engage in and carry out a single, specific business venture for joint profit," combining their efforts, property, money, skill and knowledge" *Id.* King Street acquired and holds discounted licenses for U.S. Cellular, contributing its spectrum, while U.S. Cellular contributes the physical facilities, equipment, customers, financing, and administrative services to provide a single bundled offering of 4G LTE service to U.S. Cellular's customers. Under the terms of the 2011 NSA, both parties bear certain costs of the term-limited venture and jointly reap profits (*i.e.*, revenues minus costs) of their joint efforts based on the overall success of the bundled service in the retail wireless marketplace.

### 5.    King Street Does Not Control Its Spectrum, or Even Function as a Telecommunications Provider

107.    King Street performs only limited functions, primarily to conceal that it has ceded its spectrum to, and is controlled by, U.S. Cellular.

108.    King Street had no practical control over the construction of the 4G LTE systems in its markets, the operation of the network systems in these markets, or the policy decisions regarding the operation of the networks, including the rates and terms of the 4G LTE service offered over its network. King Street has never offered its own wireless services, has never owned or operated any retail stores, has no customers, and has no billing system or other

core network capabilities that would be necessary to offer or provide a wireless service. King Street made no efforts to market fixed or LTE wireless services in any of its 152 license areas.

109.    If King Street, rather than U.S. Cellular, actually controlled and was providing service on its licensed spectrum, it would have complied with the numerous registration and filing requirements that the FCC requires telecommunications providers to meet.

110.    The FCC requires antenna structure (tower) owners to register all antenna structures taller than 60.96 meters/200 feet above ground level or that may interfere with the flight path of a nearby airport. 47 C.F.R. § 17.7. While U.S. Cellular has registered thousands of antenna structures, King Street has no registrations on file anywhere in the United States.

111.    In the Cedar Rapids and Iowa City cellular market areas, for example, U.S. Cellular has registered 43 antenna structures, *40 of which match, exactly or very closely, the sites listed in King Street's Construction Notices for its Cedar Rapids and Iowa City licenses.* In its Cedar Rapids Construction Notice, King Street claimed that it had antennas at 4180 Munier Road and 961 Irish Lane.  Relators, who obtained the Linn County, Iowa building permits for these two sites, found that the building permit for 961 Irish Lane lists the owner as "U.S. Cellular Operating Co," while the building permit for 4180 Munier Road lists the owner as "Cedar Rapids Tele, L.P.," whose FCC Form 602 lists U.S. Cellular as its sole owner.  (*See* Exhibit 3).

112.    King Street has never applied for or received any telephone numbers from the North American Numbering Plan ("NANP"), or submitted to the North American Numbering Plan Administration ("NANPA") biannual Numbering Resource Utilization and Forecasting (NRUF) reports detailing how they are using telephone numbers and estimating their usage for the coming five years as required by FCC regulations. 47 C.F.R. § 52.15. Without telephone

numbers, King Street cannot offer customers a bundled voice and data service offered by all other U.S. mobile 4G LTE wireless service providers.

113.    King Street has never submitted an FCC Form 499A, which requires filers to identify the jurisdictions (states) in which they provide services, and to provide detailed information regarding their revenues. In fact, King Street has never even registered for an FCC Form 499 filer number. Submission of the Form 499A enables the FCC to enforce the obligations telecommunications providers must meet, including paying into the Universal Service Fund, 47 C.F.R. § 54.711, as well as the Telecommunications Relay Service ("TRS") Fund, NANPA, and the Local Number Portability Administration ("LNPA"). 47 U.S.C. §§ 151, 225, 251, 254, 616. King Street has never paid into any of these funds. Nor has King Street ever filed an annual Consumer Proprietary Network Information ("CPNI") compliance report, 47 C.F.R. § 64.2001 *et seq*., or an FCC Form 477 reporting on the deployment of a mobile 4G LTE service. 47 C.F.R. § 1.7001(b).

114.    U.S. Cellular and King Street claim in press releases and on their respective websites that they provide wireless services in partnership, or in conjunction with one another, but King Street has never been a functioning telecommunications service provider. The responsibilities and obligations of a wireless telecommunications provider in the King Street markets have been assumed by U.S. Cellular in conjunction with the operation and maintenance of its own network.

**C.    Defendants Made and Caused to Be Made Numerous False Statements and Omissions of Material Facts to Conceal that, as a Front for U.S. Cellular, King Street Was Ineligible for DE Bid Credits, and to Avoid Having to Return $100.2 Million to the Government**

115.    Under the various controlling interest standards the FCC has adopted to identify attributable interest holders, (*e.g.,* the AMR Rule, the Controlling Interest Rules, and the

Affiliation Rules), U.S. Cellular's billions of dollars in revenues should have been disclosed and attributed to King Street in its Auction 73 applications, and during the unjust enrichment period following the auction. Because it was controlled by U.S. Cellular, King Street did not meet the FCC's requirements for very small business DEs – and because U.S. Cellular incorporated its spectrum into its own networks, King Street did not retain control over its spectrum.

116.     If U.S. Cellular's control of King Street and its spectrum had been fully and truthfully disclosed in King Street's applications and post-licensing submissions to the FCC, King Street would not have qualified for DE benefits in Auction 73, would not have been eligible to retain them during the unjust enrichment period, *and* would have been obligated to return the bidding credits to the Government under the Unjust Enrichment Rule.

117.     Instead, the Defendants concealed and mischaracterized the agreements – *reportable events affecting King Street's eligibility for bid credits* – through which King Street ceded control of its licenses to U.S. Cellular, and made and caused to be made numerous false statements and documents to support the false pretense that King Street controlled and managed its spectrum in compliance with the FCC's requirements.

1.  **False Statements and Omissions of Material Facts Regarding the Network Build-Out in DE Annual Reports and Construction Notices**

118.     Defendants filed and caused to be filed King Street's DE Annual Reports in December 2010, 2011, 2012, and 2013. (*See* Exhibit 4). King Street's interim and final construction requirement deadlines were respectively December 30, 2013 and December 30, 2019, but it began filing Construction Notices in March 2011, and continued to file them throughout the license term. (*See* Exhibit 5).

119.     King Street's Construction Notices included (i) a "Coverage Map," showing the geographic market area, the geographic area covered, and the percentage of the geographic

market area covered; (ii) a chart showing the "Covered Area Data;" and (iii) a "Build Out Demonstration and Engineering Statement," that acknowledged the company's signal coverage and service obligations, but falsely and fraudulently certified *King Street's* "satisfaction" of the four-year interim or end-of-term construction requirements.

120.    Between March 2011 and November 2013, the Defendants filed or caused to be filed 152 Construction Notices with the FCC, falsely and fraudulently certifying that King Street had met its four-year performance requirements by constructing and operating wireless networks in all 152 markets. In more than 100 of these interim Construction Notices, the Defendants claimed and caused to be claimed, that *King Street* had implemented a fixed wireless[6] service system manufactured by Airspan Network, Inc., and was "serving with a signal level sufficient to provide adequate service to [35% or more] of the licensed-geographic area." In fact, the Airspan equipment (which was out-of-date and no longer supported by the manufacturer) was not meaningfully connected to any network, and King Street never actually offered or provided fixed wireless service to any of its licensed geographic areas.

121.    Fifty of Defendants' interim Construction Notices falsely certified that King Street had met the four-year construction requirements, by constructing and operating mobile Long-Term Evolution ("LTE")[7] networks "to provide coverage within the licensed area," utilizing a 5-MHz spectrum bandwidth.

---

[6] Fixed wireless refers to a wireless communication system that is used to connect two fixed locations, such as a wireless connection between an antenna attached to the subscriber's home or building and the wireless service provider's antenna attached to a nearby cell phone tower.

[7] Long Term Evolution ("4G LTE") is an industry technical standard for wireless broadband communication for mobile devices and data terminals that increases the capacity and speed of wireless data networks using a different radio technology than is used by 2G (Second Generation) and 3G (Third Generation) networks.

122.     Defendants falsely claimed that *King Street* was "serving with a signal level sufficient to provide adequate service to [35% or 70% or more] of the licensed-geographic area." In fact, U.S. Cellular, not King Street, was serving these licensed-geographic areas as part of its own network offerings.

123.     In these Construction Notices, King Street further falsely claimed that it was "currently providing an RSSI level of -83 dBm or better to an estimated population of [NUMBER] out of a total licensed area population of [NUMBER]" and that it was, therefore, "serving with a signal level sufficient to provide adequate service to [35% or 70% or more] of the population in its licensed area."[8] In fact, U.S. Cellular, not King Street, was offering and providing 4G LTE service to the population in these licensed areas as part of its own service offerings.

124.     As U.S. Cellular prepared to launch 4G LTE services in markets where King Street had previously reported installing fixed wireless equipment, Defendants decommissioned the place-holding Airspan antennas, implemented the U.S. Cellular 4G LTE technology in line with its installation on U.S. Cellular's network, and filed and caused to be filed further Construction Notices falsely claiming that *King Street,* not U.S. Cellular, had satisfied the license term construction requirement.

125.     Between May 2012 and the end of 2019, the Defendants filed and caused to be filed 152 second Construction Notices with the FCC, falsely and fraudulently certifying that King Street had met its end-of-term (ten-year) performance requirements by constructing and operating wireless networks in all 152 markets. In nine of these second Construction Reports, the

---

[8] In 2012 and 2013, King Street filed Construction Notices falsely reporting that it had deployed 4G LTE technology in 52 markets; 17 of those notices falsely stated that King Street had met the final end-of-term (70%) build-out requirements with 4G LTE.

Defendants falsely certified and caused to be falsely certified that King Street had met its final construction benchmark by deploying a fixed wireless system manufactured by Airspan and was "serving with a signal level sufficient to provide adequate service to [70% or more] of the licensed-geographic area."

126.    The Defendants also falsely certified and caused to be falsely certified that King Street had met the ten-year performance requirements in 143 markets by constructing and operating mobile LTE networks or a combination of Airspan and LTE networks "to provide coverage within the licensed area," utilizing a 5-MHz spectrum bandwidth. These 143 second Construction Notices were false because U.S. Cellular, not King Street, was offering and providing 4G LTE service to the population in these licensed areas as part of its own service offerings.

127.    In addition, over the license term, the Defendants made or caused to be made additional false statements in more than two dozen amendments to King Street's Construction Notices in which the King Street claimed to be providing fixed wireless, LTE, or a combination of fixed wireless and LTE service to the public.

128.    In its DE Annual Report filed on December 29, 2011, King Street falsely and fraudulently claimed that it, not U.S. Cellular, was "constructing LTE systems in numerous markets." (*See* Exhibit 4).

129.    In its DE Annual Report filed on December 26, 2012, King Street falsely and fraudulently claimed that it, not U.S. Cellular, had "constructed LTE systems in several markets." *Id*.

130.    In Exhibit III of its 2013 DE Annual Report, King Street falsely and fraudulently claimed that it, not U.S. Cellular, had satisfied "the interim construction requirement

for all its one-hundred and fifty two (152) markets, including constructing LTE systems in several of the markets." *Id.*

### 2. False Statements and Omissions of Material Fact Regarding U.S. Cellular's Controlling Interest in King Street and Its Spectrum in DE Annual Reports

131.   In Exhibit II, to King Street's 2010 DE Annual Report, which was headed "Summary of Applicable Agreements," Defendants falsely represented that King Street had "not entered into any agreements nor arrangements (including proposed agreements and arrangements) that relate to Filer's eligibility for bidding credits for any license covered by this annual report." Exhibit II listed six of the agreements, with the same descriptions, that had been listed in King Street's long-form application, but did not include the December 21, 2007 Bidding Protocol Agreement, or the December 21, 2007 Promissory Note. Exhibit II also included, however, a description of the Management Agreement, which had not been listed in the long-form application's "Exhibit D: Agreements Supporting Status as a Designated Entity." *Id.*

132.   In summarizing the agreement, the Defendants falsely and fraudulently represented that, under the Management Agreement, King Street retained control over its operations and spectrum:

> (a)      [U.S. Cellular] will manage any systems constructed under King Street LP's continuing oversight, review, supervision and control (Recitals), that control of the CMRS systems will remain in King Street LP, and that nothing in the Management Agreement will give [U.S. Cellular] *de facto* or *de jure* control over King Street LP or its operations (§ 11.3)."

> (b)      King Street LP retains authority and ultimate control over the determination and implementation of policy and business strategy, including King Street LP's business plans, budgets, technical service, construction schedules, service offerings, and other aspects of King Street LP's operation (§§ 3.2, 3.3, Article IV).

> (c)      King Street LP is also responsible for the payment of all financial obligations and operating expenses (except out-of-pocket expenses) (Article IV).

(d)     King Street LP enjoys the profits and bears the risk of loss from the operation of the King Street LP systems (Article IV).

(e)     King Street LP shall determine the terms upon which the King Street LP Systems' services are offered and prices charged for its services.

133.    King Street filed additional DE Annual Reports on December 29, 2011, December 26, 2012, and December 26, 2013. Exhibit II in each of these Reports was identical to Exhibit II in the 2010 DE Annual Report, and contained the same false and fraudulent statements and misrepresentations regarding the Management Agreement that were in the 2010 Report. *Id.*

134.    These statements, which were false on their face, false on the facts, and false in light of King Street's other agreements with U.S. Cellular, were designed to conceal from the FCC that U.S. Cellular was the controlling interest in King Street, and to support the false pretense that King Street operated in compliance with the FCC's requirements for DEs.

135.    King Street did not, in any of its DE Annual Reports, or by filing a Form 608 as required by the Reportable Eligibility Event rule, report or disclose that it had entered into an agreement and ceded virtually all of its spectrum rights to U.S. Cellular. Nor did King Street disclose the financing arrangements by which U.S. Cellular paid for the network build out for the King Street spectrum.

136.    DiNardo electronically signed and certified each of King Street's DE Annual Reports as the "President of General Partner." *Id.*

137.    The Defendants' false statements and omissions were material, in that the disclosure that U.S. Cellular controlled King Street and that King Street was merely a front for U.S. Cellular would have required the return of the bid credits to the Government under the Unjust Enrichment Rule.

### 3.  Further False Statements and Omissions of Material Fact in FCC Auction 901

138.    On November 18, 2011, the FCC announced the establishment of the "Connect America Fund" to expand access to broadband and mobile services in rural and under-served areas. The "Mobility Fund" provided subsidies, which were based on census tracts, to wireless carriers through a "reverse auction," in which carriers placed bids in descending amounts until one "winning bidder" agreed to accept a lower amount than any other auction participant. 47 C.F.R. § 54.1001, *et seq*.

139.    *Winning bidders were required to demonstrate that they had access to licensed spectrum sufficient to build networks and provide wireless broadband service in the specified census tract rural areas.* Specifically, applicants were required to provide "a description of the spectrum access that the applicant will use to meet its obligations in the areas for which it is the winning bidder, including whether the applicant currently holds a license for or leases the spectrum, and a certification that the description is accurate and that the applicant will retain such access for at least five (5) years after the date on which it is authorized to receive support." *Id.,* § 54.1005(b)(2)(iv).

140.    On July 12, 2012, U.S. Cellular submitted its short-form application to participate in Auction 901, stating that it had "access to the spectrum necessary to satisfy any obligations relating to the support it may receive should it be a winning bidder," and that it had access to specifically listed spectrum "through various subsidiary license companies." *(U.S. Cellular Corp., Form 175 and Exhibits attached herein as Exhibit 6).[9]*

141.    U.S. Cellular and two of its wholly owned subsidiaries were the winning bidders for Mobility Fund subsidies in 27 census tracts. U.S. Cellular and those subsidiaries

---

[9] Exhibit 6 includes only the exhibits filed with the Form 175 that are relevant to the allegations pleaded in the Second Amended Complaint.

submitted their Auction 901 long-form applications on October 26, 2012 and amended them several times in 2012 and 2013. In Exhibit 2 to each of the applications, U.S. Cellular certified that it had access to King Street's 700 MHz spectrum in 19 of the census tracts, and would build 4G LTE networks using that spectrum.

142.     Although the undisclosed 2011 NSA gave U.S. Cellular full spectrum access in 90 of King Street's license areas, including the 19 census tracts, the disclosure of that agreement would have exposed the Defendants' violation of the DE control and AMR rules. Accordingly, U.S. Cellular and King Street entered into a *second* purported Network Sharing Agreement (the "2012 NSA") on October 31, 2012, which U.S. Cellular summarized in its long-form application as proof that U.S. Cellular "currently holds a license for or leases the spectrum" necessary to construct networks in the census tracts areas. *See* 47 C.F.R. § 54.1005(b)(2)(iv).

143.     The 2012 NSA was carefully drafted to appear to give U.S. Cellular the required spectrum access *only* in the census tract areas where U.S. Cellular had won subsidies. For example, the 2011 NSA gave U.S. Cellular the right to use all of King Street's spectrum in BEA 19 in North Carolina (covering Raleigh, Durham, and Rocky Mount, and extending to the state's border with Virginia). Under the 2012 NSA, however, King Street purported to grant U.S. Cellular only the spectrum rights covering census tract T37185950400, which consists of 87.1 square miles, or just 1.03% of the 8,464 square miles of BEA 19. (*See* Exhibit 7).

144.     Because the census tracts represented only a tiny area of each of the King Street license areas in which they were located, and used only a tiny portion of the spectrum covering these areas, the 2012 NSA furthered the concealment of the attributable material and *de facto* control relationships between U.S. Cellular and King Street.

145.    U.S. Cellular's summary of the 2012 NSA did not disclose that King Street was a DE. As with the 2011 NSA, King Street never reported the 2012 NSA as a reportable event, or included it in its 2012 or 2013 DE Annual Reports. Although the 2011 NSA already included a provision to compensate King Street for U.S. Cellular's use of its spectrum, the 2012 NSA included its own, different compensation paragraph. U.S. Cellular never implemented the 2012 NSA's compensation provision, however, during any time relevant to this Complaint, demonstrating that the purpose of the 2012 NSA was solely to conceal the 2011 NSA.

146.    U.S. Cellular and its subsidiaries obtained more than $40 million in Mobility Fund subsidies, including more than $30 million toward the cost of building U.S. Cellular networks on King Street's spectrum.

**4.   U.S. Cellular's Admission of Its Controlling Interest in King Street – to the SEC**

147.    While the Defendants concealed the extent of their relationship from the FCC, U.S. Cellular openly acknowledged its controlling interest in King Street to the SEC and its investors. Thus, while King Street told the FCC that, under the Management Agreement, *King Street* "enjoy[ed] the profits and [bore] the risk of loss from the operation of the King Street LP systems," U.S. Cellular has told its investors otherwise:

> Given the significance of these contributions and/or advances in relation to the equity investment at risk, U.S. Cellular was deemed to be the primary beneficiary of these VIEs [King Street and King Street Wireless, Inc.]. Without financial support from U.S. Cellular, these VIEs are unable to finance their operations (i.e., participate in FCC auctions and construct wireless networks). Accordingly, these VIEs are consolidated pursuant to FIN 46(R) because U.S. Cellular anticipates benefiting from or absorbing a majority of these VIEs' expected gains or losses.

*(U.S. Cellular Quarterly Report to Shareholders for the Quarter Ended March 31, 2009 at 13).*[10]

---

[10] Available at http://d1lge852tjjqow.cloudfront.net/CIK-0000821130/2dd7622e-1f9d-4b6a-84b9-d69fa6041920.pdf. The phrase "these VIEs" in this quarterly report refers to King Street, Barat, and Carroll and their respective general partners.

148.    U.S. Cellular's 2013 Annual Report similarly notes, "U.S. Cellular consolidates variable interest entities [King Street and King Street Wireless, Inc.] in which it has a controlling financial interest and is the primary beneficiary." Contrary to King Street's statements in its DE Annual Reports and Management Agreement, U.S. Cellular has asserted to its shareholders that it has "the power to direct [King Street's] activities that most significantly impact economic performance" as well as "the obligation to absorb [King Street's] losses and right to receive benefits that are significant to [King Street]." *(U.S. Cellular 2013 Annual Report, at 61)*.[11]

149.    The Defendants concealed their relationship in order to obtain and retain bid credits and licenses to which they were not entitled; disclosed a small part of their relationship to obtain subsidies in a different FCC auction; and revealed their relationship to a different government agency where it benefited them to do so (*i.e.,* by presenting a favorable picture to their shareholders).

## II.    CARROLL ALLEGATIONS – FCC AUCTION 58

### A.    U.S. Cellular Used Carroll as a Front to Acquire Licenses with DE Bid Credits and Small Business Entrepreneur Benefits

150.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

151.    Before forming and using King Street to purchase and acquire DE licenses in partnership with DiNardo, U.S. Cellular first formed and used Carroll and Barat to purchase and acquire DE licenses in partnership with DiNardo. In all three instances, the Defendants effectively followed the same pattern and practices – establishing the purported DEs under

---

[11] Available at https://d1lge852tjjqow.cloudfront.net/CIK-0000821130/6a85e88b-a0c0-413c-be58-d57929b70d61.pdf .

similar conditions, entering into the same agreements, using identical language to describe the agreements to the FCC, acquiring DE licenses that were adjacent to or overlapping with U.S. Cellular licenses using millions of dollars provided by the Government, holding the DE licenses for the duration of the unjust enrichment period, making and filing false documents and records to conceal U.S. Cellular's controlling interest in the DEs – and, then, once the unjust enrichment period ended, seeking FCC consent to formally transfer the licenses to U.S. Cellular. In all, Defendants obtained and retained, and conspired to obtain and retained over $150 million in bid credits, as well as 10 licenses, to which they were not entitled, in violation of the FCA.

**1. As a Front for U.S. Cellular, Carroll Falsely and Fraudulently Applied for Very Small Business DE Bid Credits and Entrepreneur Benefits in Auction 58**

152.    On June 18, 2004, the FCC announced an auction of 242 Personal Communications Service ("PCS") licenses in the A, C, D, E, and F Frequency Blocks of the Personal Communications Service ("PCS") broadband spectrum.[12] Each license was for a term of 10 years, and licensees were required to provide service with a signal level sufficient to provide adequate service to at least 25 percent of the population in their licensed area, or make a showing of substantial service in their licensed area, within five years of being licensed. Failure to meet these requirements would result in forfeiture of the license, and the licensee would be ineligible to regain it. One hundred-nineteen C Block licenses were available only to eligible "entrepreneurs" in "closed" bidding. *See* 47 C.F.R. § 24.709. High bidders on closed licenses did not receive bid credits, and the licenses could not be assigned or transferred to an entity that was not an "entrepreneur" for five years after the license was issued. 47 C.F.R. § 24.839(a).

---

[12] Personal Communication Service refers to any of several types of wireless voice or data communications systems providing services similar to advanced cellular mobile or paging services.

153.    On November 19, 2004, Defendant DiNardo registered Carroll Wireless, L.P. as a limited partnership, and Carroll PCS, Inc. as a corporation, in Delaware.

154.    On November 29, 2004, through DiNardo, Carroll Wireless, L.P. submitted the Form 175 short-form application to participate as both a very small business and as an "entrepreneur" in Auction 58 (*Carroll Wireless, L.P., Form 175 and Exhibits* attached herein as Exhibit 8).

155.    In the application, DiNardo falsely certified that Carroll PCS, Inc. and DiNardo held the controlling interests in Carroll Wireless, L.P., and that Carroll's "only affiliate, within the meaning of Section 24.720(1) of the Commission's rules, [was] Carroll PCS, Inc." *Id.* DiNardo further certified falsely that, "as of the FCC Form 175 filing deadline, it, together with its affiliates, its controlling interests, and affiliates of its controlling interests, have combined gross revenues of less than $125 million for the preceding two years (2003 and 2002) and combined total assets of less than $500 million," and, therefore, qualified as an entrepreneur for closed bidding. *Id.* DiNardo also falsely certified that "as of the FCC Form 175 filing deadline, [Carroll], together with its affiliates, its controlling interests, and affiliates of its controlling interests, have attributable average annual gross revenues of not more than $15 million for the preceding three years (2003, 2002, and 2001)," and was qualified as a very small business. *Id.*

156.    Through DiNardo, Carroll also certified falsely that "neither the Applicant, its controlling interests, nor any holders of ownership interests amounting to 10 percent or more of the Applicant have entered into any partnerships, joint ventures, consortia or other agreements, arrangements or understandings of any kind relating to the licenses being auctioned, including any such agreements relating to the post-auction market structure," and that "neither the Applicant, its controlling interests, nor any holders of ownership interests amounting to 10

percent or more of the Applicant have entered into any explicit or implicit agreements, arrangements, or understandings of any kind with any parties regarding the amount of their bids, bidding strategies, or the particular licenses on which they will or will not bid." *Id.*

157.    These statements were false because U.S. Cellular held the controlling interest in Carroll, and had formed Carroll in partnership with DiNardo, in order to expand U.S. Cellular's network and service offerings with licenses acquired with credits and benefits reserved for small businesses.

158.    Auction 58 began on January 26, 2005 and closed on February 15, 2005. Carroll was the high bidder on 17 licenses,[13] with cumulative gross bids of $151.8 million, for which it paid a cumulative net total of $129.7 million, with funds provided by U.S. Cellular. Carroll won ten licenses as an entrepreneur in closed bidding, with total bids of $63.3 million, and six licenses as a very small business in open bidding, with total bids of $88.4 million, of which $22.1 million was provided by the Government in very small business bid credits.

## 2.    As a Front for U.S. Cellular, Carroll Falsely and Fraudulently Applied for Licenses as a Very Small Business and Entrepreneur

159.    On March 28, 2008, Carroll Wireless, L.P. submitted its long-form application for the licenses it had won in the auction, falsely certifying that it had not entered into any agreements that would impact its DE status.  (*Carroll Wireless, L.P., Form 601 and Exhibits* attached herein as Exhibit 9).  As in the short-form application, Carroll's only declared affiliates were Carroll Wireless, Inc. and DiNardo.

(a)    In "Exhibit C: Closed Bidding Eligibility," Carroll falsely stated that, "together with its affiliates, its controlling interests, and affiliates of its controlling

---

[13] Carroll won 17 licenses in Auction 58, but for reasons not related to this Complaint, the FCC did not grant one of the licenses.

interests," it had "combined gross revenues of less than $125 million for the preceding two years … and combined total assets of less than $500 million." *Id*.

(b)    In "Exhibit D:  Designated Entities," Carroll falsely stated that, "together with its affiliates, its controlling interests, and affiliates of its controlling interests," it had average annual gross revenues of not more than $15 million for the preceding three years. *Id.*

(c)    In "Exhibit E: Agreement [sic] and Other Instruments," Carroll falsely stated that, "except as set forth below, it has entered into no partnerships, joint venture, consortia or other agreements, arrangements or understandings of any kind with third parties relating to the licenses being auctioned, including any such arrangements relating to the post-auction market structure." *Id.*

(d)    Carroll identified five "agreements and other documents that support its qualifications as an Entrepreneur and eligibility for Closed Bidding": (a) *The November 30, 2004 Carroll Wireless LP Agreement,* naming Carroll PCS, Inc. as the General Partner, and USCC as the Limited Partner, and specifying that "Carroll PCS controls the Applicant;" (b) *The November 30, 2004 Investment Agreement* stating that Carroll was responsible for obtaining financing; (c) *The November 30, 2004 Bidding Protocol* declaring that Allison Cryor DiNardo had sole authority to determine the bidding for Carroll; (d) *The December 22, 2004 Loan Agreement* for the purpose of funding Carroll; and  (e) *The December 22, 2004  Loan and Security Agreement* for the purpose of making Carroll's auction deposit, and to provide Carroll with additional working capital. *Id*.

160.     Carroll has never disclosed the existence of a Management Agreement to the FCC or to the public, although King Street and Barat eventually disclosed that they had entered into Management Agreements with U.S. Cellular.

161.     The FCC issued Carroll's licenses on January 6, 2006. As would later be the case with King Street and Barat, all of the licenses that Carroll won in Auction 58 were in markets that were either adjacent to or overlapped with U.S. Cellular service areas.

**B.     Throughout the Unjust Enrichment Period, U.S. Cellular Controlled Carroll and Its Spectrum**

162.     During the unjust enrichment period, U.S. Cellular financed and complied with the licensing requirements, while Carroll performed only the clerical and reporting functions necessary to promote the pretense that it functioned as a legitimate DE-licensee and small business entrepreneur. Throughout the unjust enrichment period, U.S. Cellular had a controlling interest in Carroll and its spectrum licenses. Under the FCC's rules, therefore, U.S. Cellular was an *attributable* interest holder in Carroll, which required that its billions of dollars in revenues be aggregated with Carroll's revenues, making Carroll ineligible for DE bid credits, and requiring the repayment of up to $22 million, as well as the return of the closed licenses, under the Unjust Enrichment Rule to the Government.

**1.   U.S. Cellular Controlled Carroll and Its Spectrum**

163.     As U.S. Cellular confirmed to the SEC and investors year after year, U.S. Cellular had *de facto* control over Carroll and its spectrum:

> Carroll Wireless [is] in the process of developing long-term business and financing plans.  For financial statement purposes, U.S. Cellular consolidates … Carroll Wireless and Carroll PCS, Inc., the general partner of Carroll Wireless, pursuant to the guidelines of FIN 46(R), as U.S. Cellular anticipates benefiting from or absorbing a majority of … Carroll Wireless' expected gains or losses.

*(U.S. Cellular 2006 Annual Report to Shareholders* at 7).[14]

164.     U.S. Cellular controlled and financed Carroll. During the five-year post-licensing period, U.S. Cellular kept Carroll severely under-capitalized, effectively providing Carroll with only enough funding to *purchase* the licenses. "As of December 31, 2006, U.S. Cellular has made capital contributions and advances to Carroll Wireless and/or its general partner of $129.9 million; of this amount, $129.7 million is included in Licenses on the Consolidated Balance Sheet as of December 31, 2006." *Id.* at 7. U.S. Cellular did not provide, and Carroll did not have, sufficient funding, either to construct a network, or to provide wireless services to customers.  Nor did Carroll have any apparent means of obtaining independent third-party funding to perform these functions.

165.     As it would later with King Street and Barat, U.S. Cellular used its agreements with Carroll to block Carroll from obtaining funds from any source other than U.S. Cellular. An amendment to the Limited Partnership Agreement, which was not disclosed to the FCC until January 8, 2007, effectively gave U.S. Cellular veto authority over "the sale, transfer, exchange, lease, mortgage, pledge, or assignment of any license [with the exception of four specific licenses]."

## 2.  Carroll Did Not Control Its Spectrum, or Even Function as a Telecommunications Provider

166.     U.S. Cellular, not Carroll, made all policy and strategic decisions regarding the use and disposition of the Carroll licenses. Carroll did not engage in independent business operations during the five-year period following Auction 58. Carroll had no website or public

---

[14] Available at http://d1lge852tjjqow.cloudfront.net/CIK-0000821130/3a873744-e53a-48f8-916b-bea04ab4ee29.pdf.

presence and, at the end of 2011, U.S. Cellular reported to the SEC that the Carroll was still "in the process of developing long-term business plans." (*U.S. Cellular 2011 Annual Report* at 53).[15]

167.    If Carroll, rather than U.S. Cellular, actually controlled and provided service on its licensed spectrum, it would have complied with the numerous registration and filing requirements that the FCC requires telecommunications providers to meet.

168.    Like King Street, Carroll never applied for or received any telephone numbers from the NANP, or submitted biannual NRUF reports detailing how it was using telephone numbers and estimating its usage for the coming five years. 47 C.F.R. § 52.15. Carroll never submitted an FCC Form 499A, identifying the jurisdictions (states) in which it provided services, or registered for an FCC Form 499 filer number. As a result, Carroll never met the obligations telecommunications providers must meet, including paying into the Universal Service Fund, 47 C.F.R. § 54.711, as well as the TRS, NANPA, and LNPA payment obligations. 47 U.S.C. §§ 151, 225, 251, 254, 616. Nor did Carroll file an annual report certifying that its operations and procedures complied with the FCC's CPNI rules.  47 C.F.R. § 64.2001 *et seq.*[16] In addition, Carroll never filed an FCC Form 477 reporting on the deployment of its fixed or mobile voice or broadband services. 47 C.F.R. § 1.7001(b).

169.    Like King Street and Barat, Carroll was merely a dependent functionary of U.S. Cellular, whose purpose was to acquire and act as U.S. Cellular's caretaker for the DE licenses until they could be transferred to U.S. Cellular without requiring the unjust enrichment payment.

---

[15] Available at https://s24.q4cdn.com/321867585/files/doc_financials/archive/2011-U.S.-Cellular-Annual-Report.pdf.

[16] While Carroll did file a statement with the FCC (EB Docket 06-36) in February 2006 that it was not offering service but that it would comply with the CPNI rules in the future if it ever did offer service, Carroll never filed another CPNI report.

170.     In using Carroll to acquire and hold the entrepreneur and DE licenses for the duration of the unjust enrichment period, U.S. Cellular not only defrauded the Government of the full value of the licenses, but also deprived the Government and the public of the economic and technological benefits, including innovation and the flexibility to provide service to more people, that Congress and the FCC sought to promote through the DE and Small Business Entrepreneur programs. 47 U.S.C. §§ 309(j)(4)(C)-(D), 309(j)(3)(B).

**C.     Defendants Made and Caused to Be Made Numerous False Statements and Omissions of Material Facts to Conceal that, as a Front for U.S. Cellular, Carroll Was Ineligible for DE and Entrepreneur Benefits, and to Avoid Having to Return $22 Million and Its Closed Licenses to the Government**

171.     As a front for U.S. Cellular, Carroll did not meet the FCC's requirements for very small business DEs and did not retain control over its spectrum. If U.S. Cellular's ownership and control of Carroll had been fully and truthfully disclosed in Carroll's applications and post-licensing submissions to the FCC, Carroll would not have qualified for DE benefits in Auction 58, and would have been required to return them during the unjust enrichment period. Carroll also would not have been eligible to bid on the closed licenses, and would have been required to return the licenses to the Government during the post-licensing period.  Instead, Defendants concealed from the FCC the true nature and full extent of U.S. Cellular's controlling interests in Carroll through false statements, misrepresentations, and omissions of material facts, and failed to return the funds to the Government.

172.     Beginning with Carroll's short-form and long-form applications, the Defendants concealed and caused to be concealed, and falsely represented and caused to be falsely represented, their association in order to secure DE benefits for Carroll, and to enable Carroll to participate in closed bidding, in Auction 58. During the post-licensing unjust enrichment period, the Defendants further concealed and caused to be concealed, and falsely

represented and caused to be falsely represented, their association to avoid having to repay the DE and Entrepreneur benefits under the Unjust Enrichment Rule.

173.    Carroll filed DE Annual Reports in January 2007, 2008, 2009, and 2010. (*See* Exhibit 10). In each of these, DiNardo falsely certified that Carroll PCS, Inc. controlled Carroll Wireless, L.P., directly contradicting U.S. Cellular's own statements to the SEC and its shareholders that it was "deemed to have a controlling financial interest in Carroll Wireless," and that it "anticipate[d] absorbing a majority of Carroll Wireless' expected gains or losses." *(U.S. Cellular 2005 Annual Report to Shareholders*, at 3; 43).[17]

174.    In 2007, 2008, and 2009, Carroll falsely stated and represented in its DE Annual Reports that it was "in the preliminary stages of construction," and that its plan was to provide "Commercial Mobile Radio Service; Roaming." (Exhibit 10). In its January 2010 DE Annual Report, Carroll falsely and fraudulently stated that it had "constructed and filed its five (5) year build-out notifications for several of the markets subject to this report." *Id.* These claims of planning to provide Commercial *Mobile* Radio Service to subscribers contrasted with the claims Carroll made in its Construction Notices that it had deployed Airspan equipment to provide *fixed* wireless service to its subscribers.

175.    In 16 Construction Notices filed between September 28, 2009 and January 26, 2010, Carroll falsely and fraudulently claimed to have "met the five-year construction requirements" and that it was "currently providing a signal level of -95 dBm or higher to an estimated population of [NUMBER] out of a total licensed-area population of [NUMBER] and was serving with a signal level sufficient to provide 'adequate service' to [Percentage] of the population in its licensed service area." (*See* Exhibit 11).

---

[17] Available at https://s24.q4cdn.com/321867585/files/doc_financials/annual/2006-Annual-Report.pdf.

176.    In fact, there was no plan for Carroll ever to offer fixed or mobile wireless services, and it was never intended that Carroll would function as an independent telecommunications provider – or, indeed as anything other than a nominal license-holder for U.S. Cellular.[18] Without U.S. Cellular, Carroll/DiNardo lacked the resources and capability to construct any facilities or offer any services, and had none of the resources, expertise, or experience to perform the functions of a service provider. The conflicting statements regarding fixed vs. mobile services were made to support the false and fraudulent pretense that Carroll was complying with its obligations as a DE licensee, and to conceal U.S. Cellular's actual control of Carroll and its spectrum licenses, all to avoid triggering the obligation to repay the bid credits and return the licenses under the Unjust Enrichment Rule.

177.    On December 5, 2012, soon after the unjust enrichment period ended, U.S. Cellular formally acquired Carroll and its licenses for "an immaterial amount." (*U.S. Cellular 2012 Annual Report to Shareholders* at 53). Carroll and U.S. Cellular did not disclose the actual purchase price or the purchase agreement in their FCC license transfer application.

178.    Under the FCC's affiliation rules, U.S. Cellular also had *de facto* control over Carroll through Carroll's express affiliation with King Street.[19] Between November 27, 2007, when King Street was registered in Delaware as a limited partnership, and December 5, 2012, when Carroll was purportedly "sold" to U.S. Cellular, Carroll's acknowledged affiliation with

---

[18] The only reported use Carroll made of its licenses before officially transferring them to U.S. Cellular was to enter into several spectrum leases, including one in the Oklahoma City market with a wholly-owned subsidiary of U.S. Cellular, USCOC of Greater Oklahoma. Notably, under the lease, which had an initial five-year term, U.S. Cellular's subsidiary, not Carroll, was responsible for "build[ing] and operat[ing] a commercial mobile radio system" on those frequencies. (*Notice of Lease between Carroll Wireless, L.P. and USCOC of Greater Oklahoma, FCC File No. 0003993669 (entered October 10, 2010)).*

[19] In its Form 601 Application for licenses in FCC Auction 73, King Street falsely certified: "Applicant does not have any affiliates, except for those entities listed in the application herein, which are affiliates of Allison Cryor DiNardo. The following entities are affiliates of Allison Cryor DiNardo by virtue of her having control over these entities: (1) King Street Wireless, L.P.; (2) King Street Wireless, Inc.; (3) Barat Wireless, L.P.; (4) Barat Wireless, Inc.; (5) Carroll Wireless, LP; and (6) Carroll PCS, Inc." (Exhibit 2).

King Street made King Street an attributable interest holder in Carroll during the latter part of Carroll's unjust enrichment period. As alleged above, U.S. Cellular was an affiliate of King Street.  Thus, as an attributable interest holder in King Street under each of the FCC's controlling interest standards, U.S. Cellular also held a controlling interest in Carroll *through Carroll's affiliation with King Street*.

179.    Carroll did not disclose its own change in DE eligibility through its affiliation with King Street to the FCC, in violation of both the Reportable Eligibility Event rule and the DE Annual Report requirement.

180.    The Defendants' false statements and omissions were material, in that the disclosure that U.S. Cellular controlled Carroll and that Carroll was merely a front for U.S. Cellular would have required the return of the bid credits, as well as the closed bidding licenses, to the Government under the Unjust Enrichment Rule.

## III.    BARAT ALLEGATIONS – FCC AUCTION 66

**A.    U.S. Cellular Used Barat as a Front to Acquire Licenses with DE Bid Credits**

181.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

**1.  As a Front for U.S. Cellular, Barat Falsely and Fraudulently Applied for Very Small Business DE Bid Credits in Auction 66**

182.    On January 31, 2006, the FCC announced an auction of 1122 Advanced Wireless Services ("AWS") licenses in the A, B, C, D, E, and F Blocks in the 1710-1755 MHz and 2110-2155 MHz ("AWS-1") bands.[20] Licenses issued on or before December 31, 2009 had a term of fifteen years from the date of initial issuance; licenses issued after December 31, 2009

---

[20] Advanced Wireless Services refers to fixed and mobile terrestrial wireless applications using bandwidth that can provide a variety of applications including those using voice and data (such as internet browsing, message services, and full-motion video) content.

had a term of ten years from the date of initial issuance or renewal. See 47 C.F.R. § 27.13(g). Licensees were required to make a showing of "substantial service" in their license area within the prescribed license term, with "substantial service" defined as service which is sound, favorable, and substantially above a level of mediocre service which just might minimally warrant renewal. *See* 47 C.F.R. § 27.14(a). Failure to meet these requirements would result in forfeiture of the license, and the licensee would be ineligible to regain it. *Id.*

183.    On May 5, 2006, Defendant DiNardo registered Barat Wireless, L.P. as a limited partnership, and Barat Wireless, Inc. as a corporation, in Delaware.

184.    On or about May 10, 2006, through DiNardo, Barat Wireless, L.P. submitted its Form 175 short-form application to participate as a very small business in the auction, falsely certifying that Barat Wireless, L.P.'s controlling interests were Barat Wireless, Inc. and Allison Cryor DiNardo; that DiNardo had both *de jure* and *de facto* control in Barat Wireless, Inc.; and that as the 100% owner of Barat Wireless, Inc., she had a controlling interest in Barat Wireless, L.P.  Barat further falsely certified that, "No other individual or entity has a controlling interest in Barat Wireless;" "Barat Wireless does not have any affiliates, except for those entities listed in the application herein, which are affiliates of Allison Cryor DiNardo;" and DiNardo had "the following affiliates by virtue of controlling these entities: (1) Barat Wireless, L.P.; (2) Barat Wireless, Inc.; (3) Carroll Wireless, LP; and (4) Carroll PCS, Inc." Finally, the application falsely stated and represented, "None of these affiliates has any reportable revenues." (*Barat Wireless, L.P., Form 175 and Exhibits* attached herein as Exhibit 12).

185.    Auction 66 began on August 8, 2006 and closed on September 18, 2006. Barat was the high bidder on 17 AWS licenses, with cumulative gross bids of $169.5 million, for

which it paid a cumulative net total of $127.1 million, with funds provided by U.S. Cellular. The

Government provided the remaining $42.4 million in very small business bid credits.

### 2. As a Front for U.S. Cellular, Barat Falsely and Fraudulently Applied for Licenses as a Very Small Business

186.    On October 4, 2006, Barat Wireless, L.P. submitted its long-form application

for the AWS licenses it had won in the auction, in this instance answering "Yes," to the question

whether it had entered into any agreements that would impact its DE status.[21] (*Barat Wireless,*

*L.P., Form 601 and Exhibits* attached herein as Exhibit 13).

187.    In "Exhibit D: Agreement [sic] and Other Instruments", Barat identified seven

agreements "that supports *[sic]* its qualifications as an *[sic]* Designated Entity entitled to a

bidding credit of twenty-five (25) percent on its winning bids in Auction No. 66": (a) *The Barat*

*Wireless LP Agreement,* naming Barat Wireless, Inc. as the General Partner, and USCC as the

Limited Partner, and specifying that "Barat, Inc. controls the Applicant;" (b) *The July 11, 2006*

*Investment Agreement* stating that Barat Wireless, L.P. was responsible for obtaining financing;

(c) *The July 11, 2006 Bidding Protocol Agreement* declaring that Allison Cryor DiNardo had

sole authority to determine the bidding for Barat; (d) *The July 11, 2006 Loan Agreement* for the

purpose of providing a loan from U.S. Cellular to Barat Wireless, Inc. for its capital contribution

to Barat Wireless, L.P.; (e) *The July 11, 2006  Loan and Security Agreement* for the purpose of

making Barat's auction deposit, and to provide additional working capital; (f) *The July 11, 2006*

*Pledge Agreement from Barat Wireless, Inc.* granting U.S. Cellular a first priority security

interest in 100% of the General Partnership Interests in Barat Wireless, L.P.; and (g) *The July 11,*

---

[21] Barat apparently explained this response in Exhibit D, certifying that while it had "entered into no partnerships, joint venture, consortia or other agreements, arrangements or understandings of any kind with third parties relating to the licenses being auctioned, including any such agreements relating to the post-auction market structure," the exceptions were that Barat Wireless Inc., and USCC had entered into a Bidding Protocol Agreement on July 11, 2006, and that Barat Inc., USCC, and U.S. Cellular had entered into an Investment Agreement on July 11, 2006, which Agreements "were disclosed in Barat's Form 175 submission."

*2006 Pledge Agreement from Shareholders of Barat Wireless, Inc.* granting U.S. Cellular a first priority security interest in DiNardo's ownership interest in Barat Wireless, Inc.  *Id.*

188.     The FCC issued Barat's licenses on April 30, 2007, meaning that the AWS licenses will not expire until April 30, 2022. As in the cases of King Street and Carroll, all of the licenses that Barat won in Auction 66 were in markets that were either adjacent to or overlapped with U.S. Cellular license areas.

189.     On April 19, 2007, just before the licenses were issued, Barat entered into a "Management Services Agreement" with U.S. Cellular. The description of that Agreement, which was disclosed in Barat's April 28, 2008 DE Annual Report, is essentially identical to the description of the King Street Management Agreement, entered into in January 2009.

**B.     Throughout the Unjust Enrichment Period, U.S. Cellular Controlled Barat and Its Spectrum**

190.     During the five-year post-licensing period, Barat's only purpose was to hold the AWS licenses for U.S. Cellular.  During the five-year post-licensing period, Barat's only reported activity was to file DE Annual Reports and Administrative Updates, such as changes of address or zip code, with the FCC. (*See* Exhibit 14).

191.     In its first DE Annual Report, filed on April 28, 2008, Barat did not include the July 11, 2006 Bidding Protocol Agreement, but added the Management Services Agreement. The summary of the Barat Management Services Agreement was identical to the later summary of the King Street Management Agreement, ostensibly delegating certain responsibilities in the management of the "CMRS systems licensed to, constructed, and operated by or on behalf of Barat, LP utilizing licenses acquired in Auction No. 66," to U.S. Cellular, while repeatedly and falsely stating in varying terms that Barat held the controlling interest.  *Id.*

192.     During the five-year post-licensing period, Barat failed to take even the most preliminary steps to begin operations as an AWS licensee. Barat never applied for or received any telephone numbers from the NANP; never submitted NRUF reports to NANPA; never submitted an FCC Form 499A or paid the required regulatory fees of an operating telecommunications provider; never registered for an FCC Form 499 filer number; never filed an FCC Form 477 reporting on its deployment of fixed or mobile service in U.S. markets; and never filed an annual CPNI compliance report.

193.     While King Street and Carroll's DE licenses were subject to specific network construction requirements during the five-year post-licensing period, Barat's DE licenses required only a showing of "substantial service" in the license areas within the *fifteen-year* license term. With no construction or service activity *required* in the five years following the issuance of the licenses, Barat simply functioned as a temporary caretaker of the licenses until either they were needed by U.S. Cellular, or could be formally transferred to U.S. Cellular. In using Barat to acquire and hold DE licenses for the duration of the unjust enrichment period, U.S. Cellular not only defrauded the Government of the full value of the licenses, but also deprived the Government and the public of the economic and technological benefits, including providing service to more markets and serving more customers, that Congress and the FCC sought to promote through the DE program. *See* 47 U.S.C. §§ 309(j)(4)(C)-(D), 309(j)(3)(B).

**C.     Defendants Made and Caused to Be Made Numerous False Statements and Omissions of Material Facts to Conceal that, as a Front for U.S. Cellular, Barat Was Ineligible for DE Bid Credits, and to Avoid Having to Return $42 Million to the Government**

194.     As a front for U.S. Cellular, Barat did not meet the FCC's requirements for very small business DEs and did not retain control over its spectrum. If U.S. Cellular's ownership and control of Barat had been fully and truthfully disclosed in Barat's numerous

submissions to the FCC, Barat would not have qualified for DE benefits in Auction 58, and would have been required to return them during the unjust enrichment period. Instead, Defendants concealed the true nature and full extent of U.S. Cellular's controlling interest in Barat from the FCC through false statements, misrepresentations, and omissions of material facts, and failed to return the funds to the Government.

195.    Beginning with Barat's short-form and long-form applications, the Defendants conspired to conceal, and falsely represent, and concealed and falsely represented, their association in order to secure DE benefits for Barat in Auction 66. During the post-licensing unjust enrichment period, the Defendants conspired further to conceal and falsely represent, and concealed and falsely represented, their association to avoid its obligation to repay the DE benefits under the Unjust Enrichment Rule.

196.    Barat filed DE Annual Reports in January 2007, 2008, 2009, and 2010. (*See* Exhibit 16). In each of these, DiNardo falsely certified that Barat Wireless, Inc. controlled Barat Wireless, L.P. From 2008 until 2010, the Management Services Agreement summary included the false claim that "Barat LP enjoys the profits and bears the risk of loss from the operation of the Barat LP systems." In its annual reports to shareholders, however, U.S. Cellular claimed differently:

> U.S. Cellular was deemed to be the primary beneficiary of [Barat and Barat Wireless, Inc.] under GAAP. Accordingly, these VIEs are consolidated because U.S. Cellular anticipates benefiting from or absorbing a majority of these VIEs' expected gains or losses.

*(U.S. Cellular 2009 Annual Report to Shareholders* at 55).[22]

---

[22] Available at https://s24.q4cdn.com/321867585/files/doc_financials/archive/US-Cellular-2010-Annual-Report.pdf.

197.     In each of its DE Annual Reports between 2008 and 2011, Barat made the same false claims that it was "planning" the construction of the networks and "considering" the equipment for the network:

> The subject licenses are not subject to a specific construction requirement other than a requirement, at the time of application for renewal, that the renewal applicant has provided "substantial" service during its past license term. Filer's licenses are due to expire April 30, 2022. Barat LP is in the planning stages of construction and is considering equipment capabilities.

(*See* Exhibit 14).

198.     In fact, there was no plan for Barat to construct wireless networks, or that it would ever function as an independent telecommunications company – or, indeed as anything other than a nominal license-holder for U.S. Cellular.[23] Without U.S. Cellular, Barat/DiNardo lacked the resources and capability to construct any facilities or offer any services, and had none of the resources, expertise, or experience to perform the functions of a service provider. The claims that Barat was "planning" future construction and "considering" equipment were made to conceal that Barat was simply holding the licenses until U.S. Cellular either needed or could formally acquire them without triggering the Unjust Enrichment Rule.

199.     On September 7, 2012, soon after the unjust enrichment period ended, U.S. Cellular formally acquired Barat and its licenses for "an immaterial amount." (*U.S. Cellular 2012 Annual Report to Shareholders* at 53). Barat and U.S. Cellular did not disclose the purchase agreement or the actual purchase price in their FCC license transfer application.

---

[23] The only reported use Barat made of its licenses before officially transferring them to U.S. Cellular was to enter into a single spectrum lease in the Madison, Wisconsin market, with a subsidiary of U.S. Cellular, Madison Cellular Telephone Company. Notably, under the lease, which had an initial five-year term, U.S. Cellular's subsidiary, not Barat, was responsible for "build[ing] and operat[ing] a commercial mobile radio system" on those frequencies. (*Notice of Lease between Barat Wireless, L.P. and Madison Cellular Telephone Company, FCC File No. 0003993694 (entered October 9, 2010)).*

200.     As with Carroll, U.S. Cellular also had *de facto* control over Barat through Barat's express affiliation with King Street.[24] Between November 27, 2007, when King Street was registered in Delaware as a limited partnership, and September 7, 2012, when Barat was purportedly "sold" to U.S. Cellular, Barat's acknowledged affiliation with King Street made King Street an attributable interest holder in Barat during Barat's unjust enrichment period. Thus, as an attributable interest holder in King Street under each of the FCC's controlling interest standards, U.S. Cellular also held a controlling interest in Barat *through Barat's affiliation with King Street*.

201.     Barat did not disclose its own change in DE eligibility through its affiliation with King Street to the FCC, in violation of both the Reportable Eligibility Event rule and the DE Annual Report requirement.

202.     The Defendants' false statements and omissions were material, in that the disclosure that U.S. Cellular controlled Barat and that Barat was merely a front for U.S. Cellular would have required the return of the bid credits to the Government under the Unjust Enrichment Rule.

## COUNTS

203.     This civil action is brought by Relators on behalf of the United States against Defendants under the Federal False Claims Act, 31 U.S.C. §§ 3729-33.

## COUNT ONE – CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT
## FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(C)
## (AGAINST ALL DEFENDANTS)

204.     Relators re-allege and incorporate by reference the allegations contained in the

---

[24] In its Form 601 Application for licenses in FCC Auction 73, King Street stated: "Applicant does not have any affiliates, except for those entities listed in the application herein, which are affiliates of Allison Cryor DiNardo. The following entities are affiliates of Allison Cryor DiNardo by virtue of her having control over these entities: (1) King Street Wireless, L.P.; (2) King Street Wireless, Inc.; (3) Barat Wireless, L.P.; (4) Barat Wireless, Inc.; (5) Carroll Wireless, LP; and (6) Carroll PCS, Inc." (Exhibit 2).

preceding paragraphs of this Complaint as though set forth fully herein.

205.    U.S. Cellular, TDS, USCC, DiNardo, King Street Wireless, Inc., King Street Wireless, L.P., Carroll PCS, Inc., Carroll Wireless, L.P., Barat Wireless, Inc., Barat Wireless, L.P., and others, known and unknown, conspired to violate the FCA, and to obtain money and property from the Government, and to avoid their obligations to return money and property to the Government, by making and using false claims, records, and statements and by concealing and their obligations to return money and property to the Government.

206.    The U.S. Cellular Defendants and Defendant DiNardo entered into one or more agreements to violate the False Claims Act as enumerated in Counts Two through Five and below. These agreements included:

    a.   The arrangements establishing the corporate and financial relationship between and amongst the U.S. Cellular Defendants, Defendant DiNardo, and the King Street, Carroll and Barat Defendants ;

    b.   The Management Agreements;

    c.   The 2011 and 2012 NSAs; and

    d.   Upon information and belief other oral or implied agreements that were necessary to carry out the conspiracy.

207.    The U.S. Cellular Defendants and Defendant DiNardo conspired to form and formed Defendants King Street, Carroll, and Barat to acquire and hold wireless spectrum licenses for U.S. Cellular, using bid credits and benefits reserved for small businesses in FCC spectrum auctions.

208.    The Defendants conspired to file, caused to be filed, and filed false and fraudulent claims and applications for DE bid credits and closed bidding licenses, fraudulently

obtaining more than $150 million and at least 10 licenses to which they were not entitled, from the Government.

209.    The Defendants further conspired to file, caused to be filed, and filed false records and statements to conceal U.S. Cellular's control of the King Street, Carroll, and Barat entities and their spectrum, and to support the false pretense that King Street, Carroll, and Barat controlled and managed their spectrum in compliance with the FCC's requirements.

210.    These false records, statements, and omissions were material in that the FCC would not have provided the bid credits and closed bidding licenses to the Defendants, and would have required the return of the money and property, if the Defendants had disclosed their association truthfully and accurately.

211.    The Defendants further conspired to retain possession of the bidding credits and licenses, and to conceal and improperly avoid and decrease their obligation to return the money and property to the Government, by making and submitting false statements and records, and through the omission of material facts.

## **OVERT ACTS**

212.    The Defendants performed numerous overt acts in furtherance of the conspiracy, including, but not limited to:

(a)    Entering into agreements establishing and funding King Street, Carroll, and Barat, as described in ¶¶ 84, 159, and 187;

(b)    Registering the King Street, Carroll, and Barat limited partnerships and corporations in Delaware, as described in ¶¶ 76, 153, and 183;

(c)    Filing false and fraudulent short-form applications for King Street, Carroll and Barat to participate in the FCC auctions as DEs, and for Carroll to participate in closed bidding in FCC Auction 58, as described in ¶¶ 76-79, 152-157, and 187;

65

(d)      Entering into Bidding Protocol Agreements, and agreeing to bid on licenses that were adjacent to or overlapped with U.S. Cellular's pre-existing licenses, and that could be incorporated into U.S. Cellular's existing network, as described in ¶¶ 84, 159, and 187;

(e)      Filing false and fraudulent long-form applications for King Street, Carroll and Barat to be issued DE licenses, and for Carroll to be issued closed bidding licenses, as described in ¶¶ 84-86, 159, 186, and 187;

(f)      Entering into Management Services Agreements between U.S. Cellular and King Street, and between U.S. Cellular and Barat, as described in ¶¶ 87 and 194;

(g)      Concealing the Management Services Agreements as part of the long-form application process, as described in ¶¶ 90 and 189;

(h)      Entering into the 2011 NSA between U.S. Cellular and King Street during the unjust enrichment period, as described in ¶¶ 92-95;

(i)      Concealing the 2011 NSA between U.S. Cellular and King Street during the unjust enrichment period to hide that King Street had ceded virtually all of its spectrum rights to U.S. Cellular as described in ¶ 96;

(j)      Entering into the 2012 NSA between U.S. Cellular and King Street, in order to facilitate U.S. Cellular's receipt of Federal subsidies under Auction 901, as described in ¶¶ 142-45.

(k)      Transferring and incorporating virtually all of the King Street spectrum into the U.S. Cellular network, as described in ¶¶ 98-99;

(l)       Concealing that U.S. Cellular controlled the King Street spectrum, and owned the networks using the spectrum, during the unjust enrichment period, as described in ¶¶ 100-104;

(m)      Filing false Construction Notices and statements regarding King Street and Carroll to conceal that U.S. Cellular controlled the King Street and Carroll spectrum licenses, and avoid triggering the obligation to return the bid credits under the Unjust Enrichment Rule, as described in ¶¶ 119-127;

(n)       Filing false DE Annual Reports and statements regarding King Street, Carroll, and Barat, to conceal that U.S. Cellular controlled the King Street, Carroll and Barat spectrum licenses, and avoid triggering the obligation to return the bid credits under the Unjust Enrichment Rule as described in ¶¶ 128-136, 173-174, and 196-197;

(o)       Making false and misleading statements regarding the nature of their association in press releases, and on their websites, as described in ¶¶ 119-120;

(p)       Retaining more than $150 million in fraudulently claimed bid credits, which were required to be returned to the Government under the Unjust Enrichment Rule, as described in ¶ 151;

(q)       Retaining at least 10 licenses, that were fraudulently claimed in closed bidding, to the Government, which were required to be returned under the Unjust Enrichment Rule, as described in ¶ 151;

(r)       Formally transferring the Carroll and Barat licenses to U.S. Cellular, once the unjust enrichments had expired, as described in ¶¶ 177 and 199; and

(s)    Applying to transfer formally the King Street licenses to U.S. Cellular, once the unjust enrichment period had expired, as described in ¶ 16.

213.    The United States – unaware of the Defendants' conspiracy to violate the FCA and in reliance on the accuracy of the Defendants' claims, statements, and records – provided Defendants with millions of dollars in benefits that, in the absence of the Defendants' false claims, statements, and records, would not have been provided to them, and was deprived of the repayment and return of these benefits by Defendants' concealment, through false claims, statements, records and omissions of material facts, of the nature and extent of their association.

214.    If the United States had known that Defendants' claims – that King Street, Barat, and Carroll were legitimate DEs in control of their licenses – were false, the Government would not have approved DE bid credits or closed bidding rights for these entities. If the United States had known that U.S. Cellular, and not King Street, Barat, or Carroll, exercised control of the DE licenses and spectrum rights, the Government would have required the repayment of the bid credits and/or the forfeiture of the licenses.

215.    By reason of the Defendants' failures to pay the Government and to relinquish property owing and due under federal law, the United States has been damaged, and continues to be damaged, in a substantial amount.

216.    Defendants' unlawful conduct is continuing in nature and has caused the United States to suffer damages.

217.    Through the false statements and concealments described above, Defendants have knowingly conspired to commit violations of:

(i)    31 U.S.C. §§ 3729(a)(1)(A), by knowingly presenting and causing to be presented false and fraudulent claims for benefits as a DE and as an entrepreneur

eligible for closed bidding, for which they were ineligible, for payment and approval;

(ii)     31 U.S.C. §§ 3729(a)(1)(B), by making, using, and causing to be made and used false records and statements material to, and in furtherance of, these false and fraudulent claims;

(iii)     31 U.S.C. §§ 3729(a)(1)(D), by possessing and controlling "closed" licenses and property that belonged to the Government, and failing to deliver and return those licenses and property to the Government; and

(iv)     31 U.S.C. §§ 3729(a)(1)(G), by knowingly making, using, and causing to be made and used false records and statements material to an obligation to pay and transmit money and property to the Government, and by concealing and improperly avoiding and decreasing their obligations to repay DE funds to the Government, and to pay for, or return, the "closed" licenses to the Government,

All in violation of 31 U.S.C. § 3729(a)(1)(C).

## COUNT TWO – FALSE AND FRAUDULENT CLAIMS FOR PAYMENT
## FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(A)
## (AGAINST ALL DEFENDANTS)

218.     Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as though set forth fully herein.

219.     By virtue of the conduct described above, Defendants knowingly presented, and caused to be presented, false and fraudulent claims and applications for the payment and approval from the FCC of benefits as a DE and as an entrepreneur eligible for closed bidding, for which benefits they were not eligible – specifically, King Street's short- and long-form applications to participate as a DE in Auction 73.

220.    The United States, unaware that Defendants' claims were false and fraudulent, and in reliance on the accuracy of the claims and application, paid for DE benefits and allowed access to closed bidding benefits that otherwise would not have been provided.

221.    By reason of these payments and benefits, the United States has been damaged, and continues to be damaged, in a substantial amount.

All in violation of 31 U.S.C. § 3729(a)(1)(A).

## COUNT THREE – FALSE RECORDS AND STATEMENTS
## FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(B)
## (AGAINST ALL DEFENDANTS)

222.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as though set forth fully herein.

223.    By virtue of the conduct described above, Defendants knowingly made, used, and caused to be made and used, false records and statements material to false and fraudulent claims to the FCC – including, King Street's short- and long-form applications to participate as a DE in Auction 73.

224.    The United States, unaware that the records and statements that Defendants submitted and caused to be submitted were false, and in reliance on the accuracy of the records and statements, which were material to the Defendants' claims for benefits as a DE and as an entrepreneur eligible for closed bidding, paid for claims and provided access to closed bidding, which benefits it otherwise would not have granted.

225.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

All in violation of 31 U.S.C. § 3729(a)(1)(B).

## COUNT FOUR – POSSESSION OF PROPERTY USED BY THE GOVERNMENT
## FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(D)
### (AGAINST ALL DEFENDANTS)

226.     Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as though set forth fully herein.

227.     By virtue of the conduct described above, Defendants have possession, custody, and control of property in the form of FCC "closed" licenses issued to Carroll that, absent Defendants' unlawful possession of these licenses and failure to deliver said licenses to the Government, would have been re-auctioned by the Government in a subsequent FCC auction for tens of millions of dollars.

228.     As a result of Defendants' unlawful retention of the improperly obtained property, the United States has been damaged, and continues to be damaged, in a substantial amount.

All in violation of 31 U.S.C. § 3729(a)(1)(D).

## COUNT FIVE – FAILURE TO RETURN PAYMENTS TO THE GOVERNMENT
## FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(G)
### (AGAINST ALL DEFENDANTS)

229.     Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

230.     Defendants knowingly made, used, and caused to be made and used false records and statements, including false and fraudulent DE Annual Reports and Construction Notices, material to their obligation to pay and transmit money and property to the Government, and knowingly concealed, and improperly avoided and decreased their obligation to pay and transmit money, or unjust enrichment payments, and property, or "closed" licenses, to the Government.

231.     As a result of Defendants' unlawful retention of millions of dollars in improperly obtained bid credits and "closed licenses," the United States has been damaged, and continues to be damaged, in a substantial amount.

All in violation of 31 U.S.C. § 3729(a)(1)(G).

## PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of the United States and on their behalf, request that judgment be entered against Defendants, ordering that:

(i)     Defendants violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*;

(ii)     Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions;

(iii)     Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 that occurred before November 2, 2015, and not more than the current maximum penalty linked to inflation for each violation that occurred after November 2, 2015,  *See* 28 C.F.R. § 85.5;

(iv)     The Relators be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

(v)     The Relators be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

(vi)     Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

(vii)     The United States and the Relators recover all such other relief as the Court deems just and proper.

## <u>REQUEST FOR TRIAL BY JURY</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relators hereby demand a trial by jury.

Dated:   April 17, 2020

Respectfully submitted,

  /s/Vicki Zemp Behenna
Vicki Zemp Behenna, OBA #10734
MULINIX, GOERKE & MEYER
First Oklahoma Tower
210 W. Park Avenue, Suite 3030
Oklahoma City, OK 73102
Tel:   (405) 232-3800
Fax:  (405) 232-8999
vzb@lawokc.com

Sara M. Lord
Admitted *pro hac vice*
John P. Rowley III
Admitted *pro hac vice*
Adriaen M. Morse
Admitted *pro hac vice*
ARNALL GOLDEN GREGORY, LLP
1775 Pennsylvania Avenue, N.W.
Suite 1000
Washington, D.C. 20006
Tel: (202) 677-4054
Fax: (202) 677-4055
sara.lord@agg.com
john.rowley@agg.com
adriaen.morse@agg.com

Benjamin J. Vernia
Admitted *pro hac vice*
THE VERNIA LAW FIRM
1455 Pennsylvania Avenue, N.W.
Suite 400
Washington, D.C. 20004
Tel: (202) 349-4053
Fax: (866) 572-6728
bvernia@vernialaw.com

*Attorneys for Relators Mark J. O'Connor and Sara F. Leibman*